IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC, a Nevada limited liability company, and DAVID WOODRUM, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. _____ **08 C 1721** |
| LAKESHORE SURGICARE, LLC, an Indiana limited liability company; REASC, LLC, an Indiana limited liability company; ANTON THOMPKINS, M.D., BRUCE THOMA, M.D., DAVID MUSGRAVE, M.D., JAMES MALAYTER, M.D., GEORGE ALAVANJA, M.D., MARC BRUELL, M.D., MICHAEL LELAND, M.D., THOMAS KAY, M.D., and PAUL GRUSZKA, M.D. | ) ) ) ) ) ) ) ) ) ) ) | **JUDGE MORAN MAGISTRATE JUDGE SCHENKIER** |
| Defendants. | ) ) | |

## COMPLAINT AT LAW AND FOR AN ACCOUNTING

NOW COME the Plaintiffs, Woodrum/Ambulatory Systems Development, a Nevada limited liability company ("WASD") and David Woodrum ("Woodrum") (collectively, the "Plaintiffs") and for their Complaint at Law and for an Accounting against the Defendants Lakeshore Surgicare, LLC, an Indiana limited liability company ("Lakeshore"), REASC, LLC, an Indiana limited liability company ("REASC"), Anton Thompkins, M.D. ("Thompkins"), Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay") and Paul Gruszka, M.D. ("Gruszka") (Thompkins, Thoma, Musgrave, Malayter, Alavanja, Buell, Leland, Kay, and Gruszka will be collectively referred to as the "Doctors") (collectively, the "Defendants"), allege as follows:

## SUMMARY OF ACTION

Plaintiffs were to be partners and/or limited liability company ("LLC") members with the Doctors as to a venture relating to the operation of an ambulatory surgery center ("ASC") in Northwest Indiana (the "Venture"). The Doctors unilaterally and improperly decided to cut the Plaintiffs out of the ASC Venture and to instead keep the fruits of the Venture for themselves. The Plaintiffs, however, had invested cash relating to Venture; provided valuable consulting and "brainpower;" and dedicated hours of manpower to the Venture. Through this lawsuit, Plaintiffs seek compensatory and punitive damages arising out of the loss of their right to participate in the Venture and also seek an equitable accounting to enable Plaintiffs to determine the full extent of the Defendants' fraud, breaches of fiduciary duty, unjust enrichment and other misconduct.

## THE PARTIES AND JURISDICTION

1.      WASD is a Nevada limited liability.  The members and managers of WASD reside in, and are citizens of, the states of Illinois, California and Texas. WASD is in the business of developing, operating, managing and owning ambulatory care centers, including ASCs. ASCs are health care facilities that specialize in providing surgical and related medical services in an outpatient setting.

2.      Woodrum is a citizen and resident of the State of Illinois and resides in Chicago, Cook County, Illinois.

3.      Lakeshore is an Indiana limited liability company that at all relevant times was the operating entity for the ASC at issue in this lawsuit (the "Lakeshore ASC").  The current members of Lakeshore reside in, or are citizens of, the State of Indiana in light of the improper expulsion or exclusion of WASD from Lakeshore.

4.     REASC is an Indiana limited liability company that at times relevant to this lawsuit held title to the real estate underlying the Lakeshore ASC.  The current members of REASC reside in, or are citizens of, the State of Indiana.

5.     Upon information and belief, the Doctors are all Indiana residents. At all times relevant to this lawsuit, the Doctors were all partners to the Venture and/or members of Lakeshore's LLC and/or REASC's LLC.

6.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).  The parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and because Defendants are subject to personal jurisdiction in this district.  This Court has personal jurisdiction over the Defendants pursuant to 735 ILCS 5/2-209. As to Lakeshore and the Doctors, this Court has general personal jurisdiction over those parties pursuant to 735 ILCS 5/2-209(a)(l) as, upon information and belief, the Partner Defendants have transacted business; within this State by *inter alia*, regularly seeing and treating patients who are Illinois residents. Further, this Court has specific personal jurisdiction over Defendants pursuant to 735 ILCS 5/2-209(a)(2) since, as alleged herein, Defendants committed tortious acts within the State of Illinois; pursuant to 735 ILCS 5/2-209(a)(7) by virtue of making a contract or promise substantially connected with the State of Illinois, as alleged herein; and, pursuant to 735 ILCS 5/2-209(a)(l 1) by virtue of committing at least one breach of fiduciary duty to the Plaintiffs within the State of Illinois, as alleged herein.

## THE VENTURE

8.     By April, 2004, after some initial discussions, the Doctors and the Plaintiffs decided to develop the Lakeshore ASC as partners in Chesterton, Indiana. For example, Plaintiffs' April 2, 2004 letter to the Doctors referred to their partnership as to the Lakeshore ASC. A true and correct copy of this April 2, 2004 letter is attached hereto and incorporated herein as Exhibit "A."

9.     Later in the year 2004, counsel to the Venture prepared a Letter of Intent (the "LOI") that identified WASD as a member owning a twenty percent membership interest in "a limited liability company under the laws of the state of Indiana to own and operate the ASC (the "Company")." A true and correct copy of the LOI is attached hereto and incorporated herein as Exhibit "B." The "Company" referenced in the LOI came to be known as Lakeshore Surgicare, LLC ("Lakeshore").

10.     At the end of September, 2005, counsel to the Venture prepared a draft LLC Operating Agreement for Lakeshore ("the Lakeshore OA") which further confirmed that WASD was to be a member owning an interest in Lakeshore. A true and correct copy of the Lakeshore OA is attached hereto and incorporated herein as Exhibit "C."

11.     The Doctors further confirmed WASD's ownership interest in Lakeshore orally in October, 2005 at meetings among Plaintiffs and Defendants. Therefore, by no later than October, 2005, the Doctors and WASD agreed that WASD was a member holding a twenty percent (20%) membership interest in Lakeshore.

12.     The Doctors further referred to Plaintiffs as "partners" in the Venture. The Plaintiffs invested time and money in the Venture by, *inter alia*, performing the following:

      a.     By dedicating employees from WASD's Chicago office to perform hundreds of hours of services relating to the Venture, including, but not

limited to, attending meetings on site, preparing feasibility studies and projections;

b.   By expending monies for legal fees, travel costs and other expenses and investing a minimum of approximately $10,000 to $20,000.00 in cash in regards to the Venture;

c.   By providing other consulting from WASD's Chicago office; and

d.   By diverting WASD resources from other actual or potential WASD opportunities to the Venture.

13.   In December, 2005, Thompkins called a lunch meeting with Woodrum in Chicago, Illinois, at which he advised Woodrum that Lake Park Surgicare, LLC ("Lake Park") had offered to purchase Lakeshore's stock (the "December 2005 Meeting").

14.   Thompkins made this representation as an agent and representative of the Doctors and Lakeshore as Thompkins practiced with the other Doctors and had management responsibilities for the ASC vis-à-vis the other Doctors.

15.   At the December, 2005 Meeting Thompkins once again orally confirmed that WASD held a twenty percent interest in the Venture.

16.   Thompkins further advised that the Doctors and Lakeshore would compensate WASD based on its twenty-percent interest in Lakeshore and expenses paid in the event of any sale of Lakeshore's stock or assets.

**THE DOCTORS CUT PLAINTIFFS OUT OF THE VENTURE**

17.   Upon information and belief, the Doctors and Lakeshore thereafter proceeded to sell part or all of the stock and/or assets of the Venture to Lake Park (the "Sale").

18.   The Doctors and Lakeshore concealed the Sale until after it occurred, which, upon information and belief was in approximately May, 2006.

19.     The Doctors have never accounted to Plaintiffs as to any aspect of the Venture or Sale, and have never paid or offered to pay any proceeds from the Venture or Sale to Plaintiffs, despite Plaintiffs' demands.

**COUNT I — BREACH OF THE LAKESHORE OA**
**(WASD VS. DOCTORS)**

20.     WASD adopts and realleges paragraphs 1-19 by and for paragraph 20 of Count I as if more fully alleged herein.

21.     WASD and the Doctors formed a valid operating agreement, the Lakeshore OA, on or before October, 2005.

22.     WASD has complied with all material terms of the Lakeshore OA.

23.     The Doctors breached the Lakeshore OA, by, *inter alia*,

a.     Failing to distribute the Venture's net cash flow on at least a quarterly basis to WASD for its *pro rata* or other equitable share;

b.     Failing to distribute to WASD its *pro rata* or other equitable share of the proceeds from the Sale;

c.     Failing to allocate tax losses on a *pro rata* or other equitable basis to WASD and attributable to the Venture;

d.     Failing to allow WASD to participate in certain aspects of the management of the Venture, including the negotiation of, and entering into, the Sale;

e.     Failing to provide accountings of Lakeshore's finances to WASD;

f.     Failing to reimburse WASD for expenses incurred in relation to the Venture;

g.     Failing to allow WASD to earn management fees in managing the operations of Lakeshore's ASC once up and running; and

h.     By otherwise failing to comply with the terms of the Lakeshore OA.

24.     As a result of the Doctors breach of the Lakeshore OA, WASD suffered damages in an amount to be determined at trial, but in excess of $75,000.00.

WHEREFORE, Plaintiff, Woodrum/Ambulatory Systems Development, LLC, respectfully requests that this Court enter judgment in its favor in an amount to be proven at trial, but in excess of $75,000.00, plus costs and other relief deemed just, against the Defendants, Anton Thompkins, M.D., Bruce Thoma, M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell, M.D., Michael Leland, M.D., Thomas Kay, M.D. and Paul Gruszka, M.D.

### COUNT II-BREACH OF ORAL PARTNERSHIP AGREEMENT
### (PLAINTIFFS VS. DOCTORS)
### (ALTERNATIVE TO COUNT I)

25.     Plaintiffs adopt and reallege paragraphs 1-24 of Count I by and for paragraph 25 of Count II as if more fully alleged herein.

26.     In the event that the Lakeshore OA is found to be unenforceable as to WASD, and regardless as to Woodrum, the Doctors agreed to form a general partnership agreement (the "PA") with Plaintiffs as to the Venture where Woodrum and/or WASD would hold a 20% ownership interest in the Venture.

27.     The Doctors breached the PA by, *inter alia*:

    a.     Failing to distribute the Venture's net cash flow on at least a periodic basis to WASD for its *pro rata* or other equitable share;

    b.     Failing to distribute to WASD its *pro rata* or other equitable share of the proceeds from the Sale;

    c.     Failing to allocate tax losses on a *pro rata* or other equitable basis to WASD and attributable to the Venture;

    d.     Failing to allow WASD to participate in certain aspects of the management of the Venture, including the negotiation of, and entering into, the Sale;

e.     Failing to provide accountings of Lakeshore's finances to WASD;

f.     Failing to reimburse WASD for expenses incurred in relation to the Venture; and

g.     Failing to allow WASD to earn management fees in managing the operations of Lakeshore's ASC once up and running.

28.     As a result of the Doctors breach of the Lakeshore OA, WASD suffered damages in an amount to be determined at trial, but in excess of $75,000.00.

WHEREFORE, Plaintiffs, Woodrum/Ambulatory Systems Development, LLC, and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be proven at trial, but in excess of $75,000.00, plus costs and other relief deemed just, against the Defendants, Anton Thompkins, M.D., Bruce Thoma, M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell, M.D., Michael Leland, M.D., Thomas Kay, M.D., and Paul Gruszka, M.D.

## COUNT III — BREACH OF FIDUCIARY DUTY
### (PLAINTIFFS VS. DOCTORS)

29.     Plaintiffs adopt and reallege paragraphs 1-28 of Count II by and for Paragraph 29 of Count III as if more fully alleged herein.

30.     The Doctors owed WASD a fiduciary duty either as fellow members or managers of Lakeshore's LLC.  Alternatively, the Doctors owed WASD a fiduciary duty as partners in the Venture.

31.     Further, the Doctors owed Woodrum a fiduciary duty as partners in the Venture.

32.     The Doctors breached their fiduciary duties to the Plaintiffs as alleged herein.

33.    As a direct and proximate cause of the Doctors' breaches of fiduciary duty, the Plaintiffs suffered compensatory damages in an amount to be determined at trial but in excess of $75,000.00.

34.    The Doctors' breaches of fiduciary duty were willful and wanton, and the Doctors intentionally and willfully concealed the Sale from Plaintiffs and therefore the Plaintiffs should be awarded punitive damages against the Doctors in an amount to be determined at trial, but no less than ten times the compensatory damages awarded to Plaintiffs.

WHEREFORE, Plaintiffs Woodrum/Ambulatory Systems Development, LLC and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be proven at trial, but in excess of $75,000.00, plus punitive damages, costs and other relief deemed just, against the Defendants, Anton Thompkins, M.D., Bruce Thoma, M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell, M.D., Michael Leland, M.D., Thomas Kay, M.D., and Paul Gruszka, M.D.

### COUNT IV — FRAUDULENT MISREPRESENTATION
### (PLAINTIFFS VS. DOCTORS AND LAKESHORE)

35.    Plaintiffs adopt and reallege paragraphs 1-34 of Count III by and for Paragraph 35 of Count IV as if more fully alleged herein.

36.    As alleged herein, the Doctors falsely misrepresented to the Plaintiffs that the Doctors considered the Plaintiffs to be partners and/or members in Lakeshore and the Venture and that the Plaintiffs would be fully compensated as such (the "Misrepresentations"). Such Misrepresentations occurred at various times, including in October, 2005 minutes of the Lakeshore Board as well as Thompkins' misrepresentations to that effect at the December, 2005 Meeting.

37.    The Doctors knew that the Misrepresentations were false when made.

38.     The Doctors made the Representations in the scope of their duties to Lakeshore.

39.     Lakeshore ratified the Doctors' Misrepresentations as Lakeshore's Management knew of the Misrepresentations and authorized the same.

40.     Plaintiffs relied on the Misrepresentations, as alleged herein.

41.     Plaintiffs' reliance was reasonable and justifiable as the Doctors, through their words and conduct, indicated to the Plaintiffs that they were partners and/or members in Lakeshore and the Venture.

42.     As a direct and proximate result of the Misrepresentations, Plaintiffs suffered actual damages in an amount to be determined at trial, but in excess of $75,000.00 measured, *inter alia*, by the following:

> a.     Compensation paid to WASD employees who provided services for the Venture;
>
> b.     Monies spent for expenses incurred by Plaintiffs relating to the Venture, including, but not limited to, legal fees and costs and travel expenses;
>
> c.     The Plaintiffs' *pro rata* or other equitable distributions relating to the Venture, which were never paid, allocated and/or distributed;
>
> d.     Management fees that WASD was to earn while managing the Lakeshore ASC's operations once it was up and running; and
>
> e.     By foregoing other business opportunities, *i.e.*, "opportunity cost."

43.     The Doctors' fraud was committed willfully and wantonly, and therefore the Plaintiffs should be awarded punitive damages against the Doctors and Lakeshore in an amount to be determined at trial, but no less than ten times the compensatory damages awarded to Plaintiffs.

WHEREFORE, Plaintiffs Woodrum/Ambulatory Systems Development, LLC and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be

proven at trial, but in excess of $75,000.00, plus punitive damages, costs and other relief deemed

just, against the Defendants, Lakeshore Surgicare, LLC; Anton Thompkins, M.D., Bruce Thoma,

M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell,

M.D., Michael Leland, M.D., Thomas Kay, M.D., and Paul Gruszka, M.D.

**COUNT V — FRAUDULENT CONCEALMENT**
**(PLAINTIFFS VS. LAKESHORE AND THE DOCTORS)**

44.     Plaintiffs adopt and reallege paragraphs 1-34 of Count III by and for Paragraph 44

of Count V as if more fully alleged herein.

45.     The Doctors, by virtue of their relationship as co-members, fiduciaries and

partners vis-à-vis the Plaintiffs, had a duty to disclose the Sale to the Plaintiffs.

46.     To conceal the Sale from the Plaintiffs, the Doctors concealed the Venture's

finances, concealed the negotiations and other communications leading to the Sale, and failed to

disclose the Sale.

47.     The Doctors did so in the scope of their duties to Lakeshore, and Lakeshore knew

of and ratified this concealment.

48.     As a direct and proximate result of the Doctors' and Lakeshore's concealment,

Plaintiffs suffered actual damages in an amount to be determined at trial, but in excess of

$75,000.00 measured, *inter ali*a, by the following:

  a.  Compensation paid to WASD employees who provided services for the Venture;

  b.  Monies spent for expenses incurred by Plaintiffs relating to the Venture, including, but not limited to, legal fees and costs and travel expenses; and

  c.  By foregoing other business opportunities, *i.e.*, "opportunity cost."

49.     The Doctors' fraudulent concealment was committed willfully and wantonly, and

therefore the Plaintiffs should be awarded punitive damages against the Doctors and Lakeshore

in an amount to be determined at trial, but no less than ten times the compensatory damages awarded to Plaintiffs.

WHEREFORE, Plaintiffs Woodrum/Ambulatory Systems Development, LLC and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be proven at trial, but in excess of $75,000.00, plus punitive damages, costs and other relief deemed just, against the Defendants, Lakeshore Surgicare, LLC; Anton Thompkins, M.D., Bruce Thoma, M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell, M.D., Michael Leland, M.D., Thomas Kay, M.D., and Paul Gruszka, M.D.

## COUNT VI — UNJUST ENRICHMENT
### (PLAINTIFFS VS. ALL DEFENDANTS')

50.     Plaintiffs adopt and reallege paragraphs 1-49 of Count V by and for paragraph 50 of Count VI as if more fully alleged herein.

51.     It would violate fundamental principles of fair play and good conscience if the Doctors and Lakeshore were able to retain the benefits of the Plaintiffs' infusion of cash, brainpower and manpower into the Venture without just compensation.

52.     Additionally, the Plaintiffs conferred a benefit on REASC which increased the value of the property held by REASC.

53.     It would violate fundamental principles of fair play and good conscience if REASC was able to retain the benefit of the increased value of the property without compensating Plaintiff.

54.     As a result of the Plaintiffs' unjust enrichment of the Defendants, the Plaintiffs have suffered compensatory damages in an amount to be determined at trial, but in excess of $75,000.00.

WHEREFORE, Plaintiffs Woodrum/Ambulatory Systems Development, LLC and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be proven at trial, but in excess of $75,000.00, plus the imposition of a constructive trust as to any benefits wrongfully retained by the Defendants, plus costs and other relief deemed just, against the Defendants, Lakeshore Surgicare, LLC; REASC, LLC; Anton Thompkins, M.D., Bruce Thoma, M.D., David Musgrave, M.D., James Malayter, M.D., George Alavanja, M.D., Marc Bruell, M.D., Michael Leland, M.D., Thomas Kay, M.D., and Paul Gruszka, M.D.

## COUNT VII — ACTION FOR EQUITABLE ACCOUNTING
### (PLAINTIFFS v. ALL DEFENDANTS)

55.     Plaintiffs adopt and reallege paragraphs 1-54 of Count VI by and for Paragraph 55 of Count VII as if more fully alleged herein.

56.     By virtue of the breaches of fiduciary duty, fraud unjust enrichment and the need for discovery due to the obfuscatory conduct alleged herein, the Plaintiffs are entitled to an equitable accounting.

57.     Pleading in the alternative, money damages will not fully and adequately compensate the Plaintiffs for the reasons alleged herein, as Plaintiffs cannot determine the full nature and extent of the Doctors' and Lakeshore's breaches of fiduciary duty, fraud and unjust enrichment without a full accounting of the Venture and the Sale from all Defendants as all Defendants, upon information and belief, possess some knowledge and facts in regards to receipts and disbursements relating to the Venture and the Sale.

WHEREFORE, Plaintiff, Woodrum/Ambulatory Systems Development, LLC, respectfully requests that this Court enter the following relief against the Defendants, Lakeshore Surgicare, LLC; REASC, LLC; Anton Thompkins, M.D.; Bruce Thoma, M.D.; David Musgrave,

M.D.; James Malayter, M.D.; George Alavanja, M.D.; Marc Bruell, M.D.; Michael Leland,

M.D.; Thomas Kay, M.D.; and Paul Gruszka, M.D.:

    a.    Requiring the Defendants to provide a detailed equitable accounting for both the Sale and the Venture, including, but not limited to, the listing of every receipt and every disbursement for both the Sale and the Venture and providing proper back-up documentation for such receipts and disbursements;

    b.    Entering judgment in favor of the Plaintiffs in the event that the Defendants' equitable accounting reveals amounts due to the Plaintiffs or in the event that the Defendants cannot fully account; and/or

    c.    For such other relief deemed just and equitable.

## COUNT VIII — CIVIL CONSPIRACY
### (PLAINTIFFS v. ALL DEFENDANTS)

58.    Plaintiffs adopt and reallege paragraphs 1-57 of Count VII by and for Paragraph 58 of Count VIII as if more fully alleged herein.

59.    As alleged herein, the Defendants, and each of them, actively participated in the improper and illegal act of misappropriating the Plaintiffs' partnership and/or membership interests in the Venture and Lakeshore by cooperating in, and facilitating the Doctors' fraud and breaches of fiduciary duty and the Defendants' unjust enrichment.

60.    The Defendants' scheme basically involved a "bait-and-switch" where Defendants' misled Plaintiffs to believe that they would be members and/or partners in the Venture and where Defendants indicated that WASD was a member of Lakeshore and then sold the Venture without regard to Plaintiffs' interest in the Venture.

61.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered compensatory damages in an amount to be determined at trial, but in excess of $75,000.00.

62.    Defendants' conduct was committed willfully and wantonly, and therefore Plaintiffs should be awarded punitive damages against the Defendants' in an amount not less than ten times actual damages.

WHEREFORE, Plaintiffs, Woodrum/Ambulatory Systems Development, LLC and David Woodrum, respectfully request that this Court enter judgment in their favor in an amount to be proven at trial, but in excess of $75,000.00, plus punitive damages in an amount to be proven at trial, plus costs and other relief deemed just, against the Defendants, Lakeshore Surgicare, LLC; REASC, LLC; Anton Thompkins, M.D.; Bruce Thoma, M.D.; David Musgrave, M.D.; James Malayter, M.D.; George Alavanja, M.D.; Marc Bruell, M.D.; Michael Leland, M.D.; Thomas Kay, M.D.; and Paul Gruszka, M.D.

**JURY TRIAL DEMANDED**

DAVID WOODRUM and WOODRUM/
AMBULATORY SYSTEMS DEVELOPMENT,
LLC,


By:_____/s/ Robert H. Lang._____
              One of Their Attorneys


Robert H. Lang, Esq.
Karen E. Gossman, Esq.
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603
312.263.3600
312.578.6666
# 5047021_v4

08 C 1721

JUDGE MORAN
MAGISTRATE JUDGE SCHENKIER

# EXHIBIT A

April 2, 2004

Anton Thompkins, MD and David Musgrave, MD
Valparaiso Orthopedic Clinic, Inc.
2501 Cumberland Drive
Valparaiso, IN 46383

### Re: Ambulatory Surgery Center Services

Thank you for the opportunity to respond to your request regarding development and management services for a contemplated, ambulatory surgery center. Woodrum/Ambulatory Systems Development, LLC wishes to propose/qualify for this project and to be allowed to present in person to the review committee. In support of this request, I wish to provide the following information:

### Project Approach

Woodrum/ASD will serve as a single-source, external ASC developer/manager.

**Woodrum/Ambulatory Systems Development, LLC** is a national company with partners located in Chicago, Dallas and Los Angeles. Woodrum/ASD provides expertise in planning, developing and managing successful ambulatory care businesses for physicians and health care organizations. The purpose of the firm is to create more cost-effective, more easily accessible, plus affordable quality health care services. It is Woodrum/ASD's unique knowledge and skills that produce improved results. In so doing, Woodrum/ASD creates economic value and increased productivity for health care providers. The partners and principals of Woodrum/ASD have engineered multiple freestanding ambulatory care facilities for both private and publicly-held health organizations. Clients also rely on the firm's leadership in structuring and consummating successful joint venture ownership arrangements. In addition, Woodrum/ASD services are not purely consultative. Sharing risk with the client via equity investment in the project is an additional opportunity, although it is not an absolute requirement for us to participate. Woodrum/Ambulatory Systems Development, LLC delivers results which helps differentiate physicians and health care organizations from their competitors and assists them in capturing and retaining greater market share.

1

## Development- Initial Phase

1. **Market and Demand Analysis** Woodrum/ASD already has performed the financial pro forma statements incident to the formation of the ASC for free as one way to assist the Valparaiso Orthopedic Clinic to make decisions regarding the contemplated ASC. As decisions are made and the "facts and circumstances" upon which the financial pro forma statements were constructed are changed, Woodrum/ASD accordingly will revise and "re-revise" the pro forma statements to reflect reality. This will be performed as part of the development process. In this manner, Woodrum/ASD will be able to assure that corresponding pro-forma cash flow projections, income statements, and sources and uses of funds are adequate for the various needs of the project. David L. Woodrum will interview each physician individually. During the interview process, Woodrum/ASD will ascertain whether or not the physician being interviewed is interested in participating on an equity basis. Under the securities laws of the United States and The State of Indiana, this is known as the "pre-sell period." Woodrum/ASD's personnel are familiar with the intricacies of these laws having participated in numerous joint venture offerings in the past. Since ambulatory surgery centers are not merely "stand-alone" facilities, one output would be the determination of whether or not additional ambulatory services would be located adjacent to, or become part of, the building housing the ambulatory surgery center. Woodrum/ASD just performed this service for White Memorial Hospital, an Adventist academic medical center (part of the Loma Linda academic system) in East Los Angeles. The other output of this phase of the project is the refinement of the project timeline already provided by Woodrum/ASD that would serve as a communications device for all parties involved and as the structure within which all of the various parties would work.

**It is important to start the process of developing the operational, governance and legal structure of the ambulatory surgery center** as part of the initial aspects of the development phase. Working with legal counsels (for the hospitals) and for the physicians, David L. Woodrum of Woodrum/ASD would facilitate the creation of a structure that would meet the various divergent interests of the parties. This aspect of the project needs to be finalized before the ownership offering is proffered to the owners. If the physicians do not have qualified legal representation, Woodrum/ASD would assist them to obtain proper legal counsel. Woodrum/ASD also would assist legal counsel to prepare the required legal documentation for each aspect of the project, although Woodrum/ASD does not provide legal services.

2

Woodrum/ASD will serve as the **construction manager** for the project including the obtainment of the architect/contractor or design-build firm for the physical development of the ASC.

**Identification of sources for financing of construction, equipment purchases, working capital, and line of credit** are the major financial needs for projects. Woodrum/ASD has established relationships with a number of companies that provide financing for these types of projects. Woodrum/ASD would assign Robert Goodman, Principal to obtain the financing required.

**Anticipated Strategy To Achieve the Work-** On a project this large with the number of divergent participants, it is important to use a project coordination committee approach. Woodrum/ASD would be responsible to convene and operate such a committee of representatives from each of the constituent groups. With the number of potential participants it would be Woodrum/ASD's responsibility to develop a **public relations plan** that would identify and communicate with each of the "publics" that would have an interest in the project. Woodrum/ASD developed and implemented a similar plan for the University of Maryland, Baltimore, Maryland in their orthopedic, neurology and rehabilitation departments when they merged two rehabilitation hospitals and created a new, integrated service with the acute University hospital and the shock trauma unit. Also, Woodrum/ASD prepared a similar plan for the University of Missouri, Columbia when they converted a hospital-based, ASC into a for profit, joint venture, multi-specialty ambulatory surgery center with private, community physicians and employed university physicians. The work plan (includes time line and tasks) already developed by Woodrum/ASD would be the structure for making the project move forward expeditiously.

**Relevant Experience-** Woodrum/ASD has extensive experience with the development, operation, and ownership of ambulatory surgery centers. Woodrum/ASD's principals have been involved in over 200 ASC projects nationally and internationally. Currently, Woodrum/ASD operates 15 ASC centers nationally, and five more centers will be operational this year. We currently have approximately 60 projects underway in different aspects of consulting, development and management. Woodrum/ASD has minority ownership in ten centers. Woodrum/ASD recently developed and operated a

3

surgery center that is owned by two health systems (three hospitals) and three medical staffs.

**Anticipated Available Resources**- Woodrum/ASD has the internal personnel to provide all of the services required to develop, coordinate and operate this project. Together, Woodrum/ASD and its partners can provide a seamless, integrated project.

2. **Development- Second Phase**

Woodrum/ASD has extensive experience in performing the operational development of the surgery center at the same time that the contractor is doing the physical development. Woodrum/ASD has the internal personnel to perform the following work:

    a.  Develop and implement the **operating policies, procedures, and manuals for a stand-alone facility**. Woodrum/ASD already has manuals and systems that are compliant with all applicable federal, state and voluntary accrediting bodies. Randy Todorovich, RN will be responsible for this activity;

    b.  Apply for all **licenses and certifications** required to convert and operate the facility. Cathy Havens will be assigned to this task;

    c.  Evaluate, acquire, install and operate the freestanding **systems for the business office**, surgical scheduling, payroll, and management reports (assuming that this is the selected course of action). This includes the **data processing system and hardware**. Kelly Grier will be responsible for this task;

    d.  **Planning and acquisition of equipment and furnishings, if any**. This includes existing equipment (if any) valuation, office furniture and art work. Part of the service is to establish a fixed asset system for managerial control and to develop a depreciation schedule. Coordination of the receipt of the equipment, the warehousing of the equipment before installation, and installation of the equipment is part of this task. In-service of the new equipment also is included. Our established partner for this aspect is HELP International, Dallas, Texas. They have extensive experience in ambulatory surgery centers, hospitals, physician offices and other ambulatory centers, and their fee is not part of Woodrum/ASD's fee;

4

e. **Hiring and Training of Personnel-** The manager of the center will be recruited with an anticipated employment date of three months prior to conversion. Other employees then will be employed. Paul Nylander and David L. Woodrum will perform this task. In addition, David L. Woodrum will develop the personnel policies, wage and salary system and employee compensation packages;

f. **Woodrum/ASD has a favored arrangement with Amerinet, group purchasing organization,** although the possible hospital partner may be able to offer affiliated membership through its group purchasing organization. Woodrum is able, through its group membership, to obtain product discounts for its projects, and there are no initiation fees or continuing monthly membership fees. Amerinet is the one group purchasing organization that is best structured to handle group purchasing contracts for ambulatory surgery centers. David L. Woodrum will handle this task;

g. As part of the **marketing and public relations campaign,** Woodrum/ASD will develop, produce and distribute advance opening and other promotional materials and patient information. Randy Todorovich, RN will be responsible for this task;

h. Woodrum/ASD will develop **insurance, risk management and quality assurance programs** for implementation within the surgery center. These programs and accreditation will be performed by Sandra Jones;

i. David L. Woodrum will develop the first year operating **budget** along with a cash flow budget and a capital budget, if necessary. As part of this task, **management information and monitoring systems** and reports will be implemented. Woodrum/ASD has an extensive data base of experience at other centers to draw upon for management and system comparative monitoring and correction; and

j. Randy Todorovich is Woodrum/ASD's specialist for negotiating and obtaining the new **managed care contracts**.

Woodrum/ASD provides turn-key services. All of the development work tasks listed above have been performed successfully by all of the Woodrum/ASD personnel and established partners listed above.

5

**Fee Structure and Amount for Pre-Development and Development**

Woodrum/ASD is flexible in its approach to setting and negotiating fees. Usually, there is a flat fee for the two aspects of the development work performed by Woodrum/ASD.

The fee for syndication services is zero.

The two development tasks by Woodrum/ASD are listed above. Development Fee is $75,000. If the construction management services are not required, the development fee is $65,000.

Out-of-pocket expenses are reimbursed at cost separately and billed after the fact. If Woodrum/ASD is selected to perform the entire project process, we would be willing to re-structure and spread the payments for all or parts of the above fees upon negotiation.

3. **Equity Owner and/or Facilitator to Capital Sources**

The size of the equity portion for each of the partners has to be negotiated, plus a determination will be made as to the "per unit" of ownership price during the re-calculation of the financial pro forma statements. Woodrum/ASD has extensive experience, particularly Bob Goodman, in obtaining financing for ASCs. Woodrum/ASD is not a "broker-dealer" in the sense of the Federal and State securities laws. It is anticipated that the legal structure will be structured so as to be an exempt organization from registration and reporting requirements under the securities' laws. If that proves true, the owners will not be able to pay an outsider for performing solicitation or other securities' work. Woodrum/ASD will work with the owners and their attorneys to complete this task without compensation. David L. Woodrum and Joe Zasa, partner, have been licensed securities dealers in the past and have had extensive experience in selling the units of ownership as securities.

4. **Facility Management**- It is anticipated that there would be a board of managers composed of representatives of the owners based upon their proportionate ownership interests. This board would deal with corporate issues such as how many units of ownership will be issued and sold, what should the price of the unit of ownership be, when would financial distributions be issued, etc. Under this structure would be an operating committee. Woodrum/ASD's experience has shown that it is important for physicians to have control of the operations of an

ambulatory surgery center. Therefore, it is proposed that the physicians exercise control of the operations through their operating committee oversight of the credentialing, scheduling, quality improvement, budgeting, purchasing and planning aspects. This involves the input of the physician, of course, with final oversight by the board of managers. Physicians would have representation on the board. In almost all of Woodrum/ASD's centers, the administrative director of the ASC is an employee of the Center. As such, Woodrum/ASD directly manages the administrative director, and Woodrum/ASD, in turn, reports to the board of managers. All of the employees of the center are employees of the center. Woodrum/ASD would assign Kenna Holzen, RN, to supervise the clinical aspects of the Center;

### 5. Management Services Envisioned to be Provided-

a) Prepare ongoing operational and quality improvement audits;
b) Manage the Center;
c) Develop and manage annual budget, goals and objectives based upon a strategic plan developed in advance;
d) Assure profit margins are met or exceeded;
e) Oversight of business and clinical systems to maximize efficiencies;
f) Monitor on-site performance of personnel;
g) Monthly review of all costs and recommendations for adjustments;
h) Review of contractual relationships to ensure they are necessary, lucrative and appropriate levels of services;
i) Set standards and monitor performance of management and recommend intervention as needed;
j) Work with on-site manager to review personnel and staffing issues;
k) Expand service mix by introducing market-driven new services to diversify the revenue base;
l) Update manuals procedures and protocols;
m) Regulatory updates on relevant state and national issues; and
n) Provide comprehensive monthly reports to the governing body and to the investors.

As mentioned earlier, Woodrum/ASD currently is managing fifteen centers and will actuate an additional five centers this year. In all, Woodrum/ASD partners and principals have had experience managing over 100 centers

7

nationally. This includes joint ventures for teaching hospitals, health systems, Indiana facilities, and urban facilities.

**Management Fee** for operating the ambulatory surgery center can be structured flexibly. This can be a flat fee, although it is best to align the interests of all of the players in such a joint venture. It is recommended that Woodrum/ASD be paid a percent of net revenue plus incentive bonuses. The incentives can be structured annually to address the needs of the ASC. Woodrum/ASD's total fee is 3 percent of net revenue (defined as "collectible revenue"). The initial term of the management contract would be for five years.

Woodrum/ASD, LLC wishes to plan, develop and manage the contemplated, joint venture, ambulatory surgery center on the Coffee Creek Health campus. We hope that you will allow us to meet with the Committee so that we can explain in greater detail our capabilities. May we serve you?


Sincerely,


David L. Woodrum, CHC, FACHE
Partner
Woodrum/Ambulatory Systems Development, LLC
175 North Harbor Drive, Suite 2206
Chicago, IL 60601-7361
(312) 540-0662 (Office)
(312) 540-0663 (Facsimile)
dwoodrum@msn.com

08 C 1721

JUDGE MORAN
MAGISTRATE JUDGE SCHENKIER

# EXHIBIT B



_____, 2004
Page 1

_____, 2004

**[Each of the Signatories hereto]**

  Re: ~~Letter of Intent~~ - - Valparaiso, Indiana
    Joint Venture for Ownership of Ambulatory Surgical Center

Ladies and Gentlemen:

   This Letter of Intent (the "Letter") sets forth certain agreements among each of the physicians listed on the signature page hereto (the "Physicians") and Woodrum/Ambulatory Systems Development, LLC ("Woodrum" and collectively with the Physicians, the "Parties") to take the initial steps to evaluate the feasibility of a joint venture for the development of a new ambulatory surgical center ("ASC") in the Valparaiso, Indiana area (the "Transaction"). In the event that the Parties determine that the Transaction is feasible, the Parties intend to form a limited liability company under the laws of the state of Indiana to own and operate the ASC (the "Company").

   1. <u>Transaction</u>. The Parties intend to utilize the funds raised hereby to investigate the feasibility of the Transaction. If the Parties determine that the Transaction is feasible, it is anticipated that the Parties will utilize funds to form the Company to be the developer of the ASC. As a preliminary matter, the ASC is projected to be approximately **[7,000 to 10,000]** square feet and have **[2-4]** operating rooms.

   All ownership is subject to applicable Indiana laws, regulations, and ordinances, including without limitation Indiana securities laws. No Party shall be entitled to own interest unless such approval is obtained.

   2. <u>Allocation of Interests in Company</u>. Except as indicated herein or as prohibited by law, each Party shall have the right (if a determination is made to move forward with the Transaction and the Company) to purchase interests to become a member of the Company. It is anticipated that Woodrum will own **[Twenty Percent (20%)]** in the Company, and that the Physicians will collectively own **[Eighty Percent (80%)]** of the Company. The amount contributed by each Party hereby will be credited against shares in the Company ultimately purchased by such Party, if any.

\\HEA\98934.1

_____, 2004
Page 2

3.   Costs. For initial seed money and to fund initial expenses, each Party shall contribute [Two Thousand Dollars ($2,000.00)] ("Initial Amount"). Thereafter, additional contributions will be requested for additional expenses upon the vote of Parties who have contributed a majority of funds hereto. No Party shall be required to make any such additional contribution beyond the Initial Amount, but a failure to make such additional contribution shall cause a forfeiture of all money previously contributed and forfeiture of all of the rights of the contributing Parties set forth herein, including all rights set forth in Section 2 hereof. The initial budget includes payments for initial feasibility determinations and legal and consulting services solely with respect to the ASC, which are hereby authorized to be undertaken by or contracted for by the Parties. No Party shall be liable for any amount in excess of the amounts contributed hereunder. In addition, no Party shall be entitled to any return of contributed funds (including the Initial Amount or any amounts contributed in addition to the Initial Amount). The Initial Amount is not expected to cover all initial budget costs. In the event that the Parties determine that the Transaction is feasible, the Parties acknowledge and agree that each shall be responsible for his or her own legal expenses in connection with his or her individual assessment as to whether to participate in the Company and ASC ownership. In the event that the Parties determine that the Transaction is not feasible, each Party will be responsible for his or her own expenses except as otherwise provided herein.

[Please make your check out to _____ and send your check and a signed copy of this Letter to: _____.]

4.   Expiration and Exclusivity. This Letter shall be effective as of the Deadline (defined below) and continue for a period of [sixty (60) days] (the "Letter Period") when it will expire unless extended for an additional period by written agreement of the Parties. During the Letter Period, none of the Parties hereto shall, directly or indirectly, through any representative or otherwise, solicit or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person or entity, including any hospital physicians or management company, relating to the development and establishment of an ASC in the Valparaiso, Indiana area.

5.   Confidentiality. Except as and to the extent required by law, no Party to this Letter shall disclose or use, or cause its representatives to disclose or use, any Confidential Information (as defined below) with respect to the Transaction or any of the plans disclosed herewith.

Confidential Information is intended to include any and all plans, strategies, trade secret information, managed care contracting information, information systems information, budgets, strategic plans, projections, and any and all other data relative to the Transaction. Such information shall be only used in connection with the Transaction and for no other reason.

6.   Binding Provisions. The provisions hereof are to be considered legally binding agreements which shall survive expiration or termination of this Letter. This Letter does not

_____, 2004
Page 3

constitute and shall not be construed as a legally binding agreement to actually consummate the Transaction. Rather, this Letter is a binding obligation to explore the feasibility of the Transaction together and to spend monies towards such initial effort. Each Party who is a signatory shall be considered a beneficiary of the agreements made hereby for enforcement and all other purposes.

No person shall be permitted to assign any of its rights hereunder.

7.    Escrow.    All funds contributed herewith shall be placed in escrow by [_____] (the "Representative") at a bank in Valparaiso, Indiana. Funds can only be withdrawn upon the signature of the Representative. No persons other than the Representative can commit to expenditures hereunder. If the Parties determine to cease moving forward with this effort, funds shall be released to the Parties in proportion to amounts funded but only after all expenses have been paid. No individual shall have a right to any return of funds unless authorized by the signatories hereto based on the vote of the Parties who have contributed the majority of funds.

8.    [Management and Development.    The Company intends to enter into a Management and Development Agreement with Woodrum.]

9.    Real Estate.    The Company will likely lease the real estate and building needed for the ASC from a company that will be owned by various different physicians and which will be formed to own and operate the real estate and building.

10.    Equity Capital.    The Company shall require equity capital of approximately [Four to Six Hundred Thousand Dollars ($400,000 - $600,000)]. Each Party will likely be required to sign pro rata limited guarantees relating to working capital and tenant improvements, and perhaps relating to equipment for the Company.

11.    Certain Physicians Under Covenant Not to Compete Obligations.    Certain of the Physicians (the "Restricted Physicians") are currently obligated by restrictive covenants with other entities that prohibit them from owning an interest in the Company as of the date of this Letter. It is anticipated that if a determination is made to move forward with the Transaction and the Company, such Restricted Physicians shall contribute the Initial Amount, and any additional amounts required hereunder to proceed with the Transaction and/or the Company, but that such amounts shall be held in trust until such time as the Restricted Physicians are no longer prohibited from ownership in the Company. It is further anticipated that if a determination is made to move forward with the Transaction and the Company, the Restricted Physicians shall execute the Operating Agreement but that the Restricted Physicians shall not become owners in the Company until such time as the Restricted Physicians are no longer prohibited from ownership in the Company.

_____, 2004
Page 4

    12.    <u>Draft of Operating Agreement</u>.  Upon the parties execution of this Letter, a short memo will be prepared for review and discussion regarding organizational documents, including a draft Operating Agreement, which would govern the ownership and operation of the ASC.

    13.    <u>Counterparts</u>.  This Letter may be executed in two or more counterparts and each such counterpart executed shall for all purposes be deemed an original, and all counterparts together shall constitute but one and the same instrument.  This shall be binding upon all signatories hereof who sign below.

    14.    <u>Risk; Accredited Investor</u>.  McGuireWoods, LLP will develop the core transaction documents.  Each Party acknowledges and agrees that McGuireWoods, LLP will act as counsel to the Company and not to any individual Party.  The Parties are encouraged to obtain independent counsel in connection herewith and in connection with the transaction documents.  Each Party further acknowledges and agrees that monies contributed are likely to be expended in full, that there is a significant risk that the project will not move forward and that no monies contributed hereunder will be returned.  Each Party also acknowledges that they are an accredited investor (*i.e.*, they individually earn more than $200,000 per year or have a net worth, exclusive of home and home furnishings, in excess of $1,000,000).

    15.    <u>Binding Law</u>.  This Letter of Intent shall be governed by the laws of the State of Indiana.

Please sign and date this Letter in the space provided below to confirm the mutual understandings set forth herein and return a signed copy to the undersigned on or before [_____, 2004] (the "Deadline").

Very truly yours,

_____

ACKNOWLEDGED AND AGREED:

PHYSICIAN INVESTORS

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

_____     DATE:_____

WOODRUM

Woodrum/Ambulatory Systems Development, LLC

BY:_____

ITS:_____

DATE:_____

\\HEA\98934.1

**08 C 1721**

**JUDGE MORAN**
**MAGISTRATE JUDGE SCHENKIER**

# EXHIBIT C –
# PART 1

## LAKESHORE SURGICARE LLC

**An Indiana Limited Liability Company**


**OPERATING AGREEMENT**


**Dated as of October 1, 2005**

# LAKESHORE SURGICARE LLC

## OPERATING AGREEMENT

## TABLE OF CONTENTS

Page

ARTICLE I          DEFINITIONS ................................................................ 2

ARTICLE II         ORGANIZATIONAL POWERS AND MEMBERSHIP .............................. 8

2.1     Organization ........................................................................ 8

2.2     Purposes and Powers of the LLC ............................................... 8

2.3     Permissible Relationships ....................................................... 8

2.4     Membership ......................................................................... 9

ARTICLE III        CAPITAL CONTRIBUTIONS AND LIABILITY OF MEMBERS ............ 10

3.1     Capital Accounts .................................................................. 10

3.2     Capital Contributions ............................................................ 10

3.3     Withdrawal of or Interest on Capital ........................................ 11

3.4     Liability of Members ............................................................. 11

3.5     Member Guarantees .............................................................. 11

3.6     Managers as Members ........................................................... 11

3.7     Additional Members .............................................................. 11

ARTICLE IV         MEMBERS AND MEMBERSHIP UNITS ................................... 11

4.1     Classification of Members ...................................................... 11

4.2     Withdrawal of a Member ........................................................ 11

4.3     Redemption of a Member ....................................................... 12

ARTICLE V          ADDITIONAL CAPITAL .................................................... 15

5.1     Funding Capital Requirements ................................................ 15

5.2     Third-Party Liabilities ........................................................... 15

ARTICLE VI         DISTRIBUTIONS; PROFITS AND LOSSES ............................... 15

6.1     Distribution of LLC Funds - In General ...................................... 15

6.2     Distribution Upon Dissolution ................................................. 16

6.3     Distribution of Assets in Kind ................................................. 16

6.4     Allocation of Profits and Losses .............................................. 16

6.5     Required Regulatory Allocations .............................................. 16

6.6     Curative Allocations ............................................................. 18

-i-

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 6.7 | Tax Allocations and Book Allocations | 18 |
| 6.8 | General Allocation and Distribution Rules | 19 |
| 6.9 | Tax Withholding | 19 |
| ARTICLE VII | MANAGEMENT | 20 |
| 7.1 | Management of the LLC | 20 |
| 7.2 | Board of Managers | 20 |
| 7.3 | Manner of Exercise of Board's Authority | 21 |
| 7.4 | Restrictions | 22 |
| 7.5 | Binding the LLC | 23 |
| 7.6 | Compensation of Managers and Members | 23 |
| 7.7 | Contracts with Affiliated Persons | 23 |
| 7.8 | Indemnification | 23 |
| 7.9 | Other Activities | 24 |
| ARTICLE VIII | OFFICERS | 24 |
| 8.1 | Number; Election; Resignation | 24 |
| 8.2 | Same Person Holding Two or More Offices | 24 |
| 8.3 | Officers Need Not Be Members or Managers | 24 |
| 8.4 | Removal of Officers | 24 |
| 8.5 | President | 24 |
| 8.6 | Treasurer | 24 |
| 8.7 | Secretary | 25 |
| ARTICLE IX | FISCAL MATTERS | 25 |
| 9.1 | Books and Records | 25 |
| 9.2 | Bank Accounts | 25 |
| 9.3 | Fiscal Year | 26 |
| ARTICLE X | TRANSFER AND REDEMPTION OF INTERESTS AND ADMISSION OF NEW MEMBERS | 26 |
| 10.1 | Restriction on Transfers | 26 |
| 10.2 | Irreparable Harm | 26 |
| 10.3 | Assignee of a Member's Membership Units | 26 |

-ii-

**TABLE OF CONTENTS**
(continued)

Page

| 10.4 | Admission of Transferees | 27 |
| 10.5 | Obligations of Permitted Transferees | 27 |
| 10.6 | Noncompetition | 27 |
| 10.7 | Confidential Information | 27 |
| 10.8 | Additional Covenants | 29 |
| ARTICLE XI | DISSOLUTION AND TERMINATION | 30 |
| 11.1 | Events Causing Dissolution | 30 |
| 11.2 | Procedures on Dissolution | 31 |
| ARTICLE XII | GENERAL PROVISIONS | 31 |
| 12.1 | Notices | 31 |
| 12.2 | Word Meanings | 31 |
| 12.3 | Binding Provisions | 31 |
| 12.4 | Applicable Law | 31 |
| 12.5 | Counterparts | 31 |
| 12.6 | Sevarability of Provisions | 32 |
| 12.7 | Section Titles | 32 |
| 12.8 | Amendments | 32 |
| 12.9 | Entire Agreement | 32 |
| 12.10 | Waiver of Partition | 32 |
| 12.11 | Survival of Certain Provisions | 32 |
| 12.12 | Specific Performance or Injunctive Relief | 32 |
| 12.13 | Dispute Resolution; Limited Renegotiation | 33 |
| 12.14 | Power of Attorney | 35 |
| 12.15 | Waiver of Trial by Jury | 35 |

# LAKESHORE SURGICARE LLC

## OPERATING AGREEMENT

This Operating Agreement is made and entered into as of the 1st day of October, 2005, by and among the persons and entities identified as Members (collectively the "Members") in <u>Exhibit A</u> annexed hereto, made a part hereof, and incorporated herein by reference. Except as otherwise provided, the capitalized terms used in this Agreement shall have the meanings set forth in Article I hereof.

**WHEREAS**, LAKESHORE SURGICARE LLC (the "LLC" or "Company") has been formed as a limited liability company under the laws of the State of Indiana by the filing on or about May 6, 2004 (the "Effective Date"), of the Articles of Organization in the office of the Secretary of State;

**WHEREAS**, the LLC is formed to build, establish, own and operate an ambulatory surgical center that will provide orthopedic surgical services (the "Center" or the "ASC");

**WHEREAS**, the LLC is formed by two (2) classes of Members, including (1) an institutional class (the "Institutional Members"), which is initially made up of Woodrum/ASD ("Woodrum/ASD") and (2) a physician class (the "Physician Members"), which is initially made up of the physicians set forth on the signature page hereto;

**WHEREAS**, the Members own all of the membership interests in the LLC (the "Units");

**WHEREAS**, the Members desire to enact this Operating Agreement and to provide for their respective rights, obligations, the management, and the governance of the LLC, and their duties with respect to the LLC;

**WHEREAS**, the Members have determined that the creation of a limited liability company to operate an ambulatory surgery center formed and organized under the laws of the State of Indiana will provide cost-efficient and quality patient care for patients residing in and around Valparaiso, Indiana; and

**WHEREAS**, the Members have determined that the Company will promote community health and fulfill a community need because, among other things, this venture will result in: (i) expanding the availability and accessibility of ambulatory surgery services and related health care services which can be efficiently delivered at lower costs to residents of Valparaiso, Indiana and the surrounding areas, including the poor and indigent; and (ii) the more effective use of scarce health care resources and encourage further improvement in the quality of ambulatory surgical services rendered for the benefit of the Valparaiso, Indiana community and surrounding areas.

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I
## Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"<u>Act</u>" shall mean the Indiana Business Flexibility Act, I.C. 23-18-1-1-et seq., as now existing or hereafter amended from time to time.

"<u>Adjusted Capital Account Deficit</u>" shall mean, with respect to any Member, the deficit balance, if any, in such Member's aggregate Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)　　Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)　　Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"<u>Adjusted Capital Contribution</u>" shall mean a Member's aggregate Capital Contribution to the LLC reduced by all distributions made to such Member under Article VI.

"<u>Affiliated Person</u>" or "<u>Affiliate</u>" as it applies to a Member shall mean, with reference to a specified Person, (a) any member of such Person's Immediate Family, (b) any Person who owns directly or indirectly ten percent (10%) or more of the beneficial ownership in such Person, and (c) any one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clauses (a) or (b);

"<u>Agreement</u>" shall mean this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"<u>Applicable Federal Rate</u>" shall mean the Applicable Federal Rate as that term is defined in Code Section 1274(d)(1), compounded annually, whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury.

"<u>Approval</u>" or "<u>Consent of the Managers</u>," and any grammatical variation thereof, shall mean consent, approval or vote in favor of at least sixty-six and 66/100 percent (66.66%) of the Managers.

"<u>Articles</u>" shall mean the Articles of Organization of the Company as filed with the Indiana Secretary of State on or about May 6, 2004, as they may, from time to time, be amended in accordance with the Act.

"<u>Bankruptcy</u>" shall mean any of the following:

(a)    If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her interest in the LLC (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree);

(b)    If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her interest in the LLC shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

(c)    If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Book Value" shall mean, with respect to any asset of the LLC, such asset's adjusted basis for federal income tax purposes, except that:

(a)    The initial Book Value of any asset contributed by a Member of the LLC shall be the gross fair market value of such asset as agreed to by the Board of Managers and such Member (reduced for any liabilities to which it is subject or which the LLC assumes), as such value is determined and for which credit is given to the contributing Member under this Agreement;

(b)    The Book Values of all assets of the LLC shall be adjusted to equal their respective gross fair market values, as determined by Approval of the Managers, at and as of the following times:

(i)    The acquisition of an additional or new interest in the LLC by a new or existing Member in exchange for other than a de minimis capital contribution by such Member, if the Managers, acting by Approval, reasonably determine that such adjustment is necessary

or appropriate to reflect the relative economic interests of the Members;

(ii)    The distribution by the LLC to a Member of more than a de minimis amount of any asset of the LLC (including cash or cash equivalents) as consideration for all or any portion of an interest in the LLC, if the Managers, acting by Approval, reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and

(iii)   The liquidation of the LLC within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and

(c)     The Book Value of the assets of the LLC shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (c) to the extent that the Managers, acting by Approval, determine that an adjustment pursuant to the immediately preceding clause (b) is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (c).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (a), (b) or (c), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Section 704(b) and (c) of the Code. The Capital Account of each Member shall be:

(d)     Credited with all payments made to the LLC by such Member on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Member, the agreed (as agreed to by the Approval of the Board of Managers and such Member) fair market value of such property, net of liabilities secured by such property and assumed by the LLC or subject to which such contributed property is taken) and by such Member's allocable share of Profits and items in the nature of income and gain of the LLC;

(e)     Charged with the amount of any distributions to such Member (and as to any distributions of property other than cash or a promissory note of a Member or the LLC, by the agreed (as agreed to by the Approval of the Board of Managers and such Member) fair market value of such property, net of liabilities secured by such property and assumed by such Member or subject to which such distributed property is taken), and by such Member's allocable share of Losses and items in the nature of losses and deductions of the LLC;

(f)     Adjusted simultaneously with the making of any adjustment to the Book Value of the LLC's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the LLC recognized Profit or Loss equal to the respective

amount of such aggregate net adjustments immediately before the event causing such adjustments as required by the Code or the Regulations; and

(g)    Otherwise appropriately adjusted to reflect transactions of the LLC and the Members in accordance with the other capital account maintenance rules of Regulations Section 1.704 -1(b)(2)(iv).

"Capital Contribution" shall mean the amount of cash and the value of any other property contributed to the LLC by a Member.  The value of any other property contributed to the LLC by a Member shall be agreed to by the Approval of the Board of Managers and such Member.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent or Approval of the Members" shall mean the written consent or approval of the Members holding at least sixty-six and 66/100 percent (66.66%) of the total number of the Units then issued and outstanding.

"Depreciation" shall mean, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by Approval of the Managers, but not less than depreciation allowable for tax purposes for such year.

"Disability" shall mean the inability of a Member by reason of mental or physical illness, disease or injury, to perform the usual surgical procedures within such Member's medical specialty for a minimum period of six (6) consecutive months as determined by the Consent of the Managers.

"Immediate Family" with respect to any individual, means his or her parents, spouse, issue, spouses of issue, any trust principally for the benefit of any one or more of such individuals and his estate.

"Institutional Member" shall mean (i) Woodrum/ASD, a professional surgery center management company; and/or (ii) such other institutional investor that is admitted as a Member and indicated as an Institutional Member on Exhibit A hereof.

"Legal Representative" shall mean, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, personal representative or other legal representative appointed as a result of the death, minority or incompetency of such individual.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Manager" shall refer to each Person named as a Manager in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the LLC. "Managers" "Board" or "Board of Managers" shall refer collectively to the Persons named as Managers in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the LLC.

"Member" shall mean any Person named as an Institutional Member or Physician Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the LLC.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as that term is defined in Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" or "partner nonrecourse liability" as those terms are defined in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as that term is defined in Regulations Section 1.704-2(i)(1).

"Minimum Gain" shall have the meaning given in Regulations Sections 1.704-2(d) and 1.704-2(b)(2).

"Net Cash Flow of the LLC" shall mean the LLC's taxable income or loss arising in the ordinary course of its business activities, increased by tax-exempt interest and by depreciation and any other deductions that do not involve cash expenditures, and decreased by principal payments, capital expenditures (other than those made from borrowings), and any other nondeductible cash expenditures.

"Nonrecourse Deductions" shall have the meaning given in Regulations Sections 1.704-2(b)(1) and 1.704-2(c).

"Person" or "Party" shall mean any natural person, partnership (whether general or limited), limited liability company, trust, estate, association or corporation.

"Physician Members" shall mean (i) those Members indicated as Physician Members on Exhibit A hereof; and/or (ii) such other institutional investor that is admitted as a Member and indicated as a Physician Member on Exhibit A hereof.

"Profits and Losses" shall mean, for each year or other period, an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(h)     Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

(i)     Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or added to such loss;

(j)     Gain or loss from a disposition of property of the LLC with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

(k)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

(l)     Any items which are separately allocated pursuant to Sections 6.5 and/or 6.6 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the LLC's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the LLC's Profits for such year; and if negative, such amount shall be the LLC's Losses for such year.

"Reasonable Reserves" shall mean such amount as the Managers, acting by Approval, shall deem reasonably necessary to meet the foreseeable liabilities or obligations of the LLC taking into consideration historic costs as well as reasonably projected cash flow, and including, but not limited to, (i) the normal expenses of the operation and management of its activities, as such liabilities and obligations become due and payable, and (ii) any obligations or expenses resulting from any redemptions pursuant to the provisions of this Agreement; provided however, in no event shall such amount equal less than the amount needed to operate the Company for at least sixty (60) days.

"Regulations" shall mean the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Relocation" shall mean when a Physician Member ceases to practice medicine within thirty five (35) miles of Porter County, Indiana but continues to practice medicine in an area outside of the thirty five (35) mile radius surrounding Porter County, Indiana.

"Retirement" shall mean when a Physician Member ceases to practice medicine and publicly announces such retirement or, if he or she does not publicly announce such retirement, the Company's Board of Managers determines and Approves in its reasonable discretion that

such person no longer practices medicine on at least a substantially (i.e., approximately 35 hours per week, approximately 35 weeks per year) full-time basis.

"Terminating Capital Transaction" shall mean a sale or other disposition of all or substantially all of the assets of the LLC.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any interest of a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Unit" shall mean a unit or share of ownership interest in the LLC. The interest of each Unit in the LLC shall be equal to one (1) divided by the total number of Units then authorized and outstanding.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

## ARTICLE II
## Organizational Powers and Membership

2.1    Organization.  The LLC was formed on or about May 6, 2004, by filing the Articles of Organization of the LLC with the Indiana Secretary of State. The Board of Managers shall file such other documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the LLC shall conduct business and shall continue to do so as long as the LLC conducts business therein. By Approval of the Managers, the LLC may establish places of business within the State of Indiana, as and when required by its business and in furtherance of its purposes set forth in Section 2.2 hereof, and may appoint agents for service of process in all jurisdictions in which the LLC shall conduct business.

2.2    Purposes and Powers of the LLC.  The LLC is organized for the general purposes of (i) establishing, owning and operating an ambulatory surgical center that provides orthopedic services in Valparaiso, Indiana (the "Center"); (ii) engaging in other activities in connection therewith which are necessary or beneficial to the Center, and (iii) engaging in any other lawful business activity permitted under the Act consistent with the foregoing. To that end, the LLC, subject to the terms of this Agreement, may enter into any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the LLC, so long as said activities and contracts may be lawfully carried on or performed by a limited liability company under the laws of the State of Indiana.

2.3    Permissible Relationships.  The Members understand that the Company's and the Center's operations are subject to various state and federal laws regulating permissible relationships between the Members and entities such as the Company, including 42 U.S.C. § 1320a-7b(b) (the "Fraud and Abuse Statute"), and 42 U.S.C. § 1395nn and regulations

promulgated thereunder, (the "Stark Law"). It is the intent of the parties that the Company operate in a manner consistent with the foregoing statutes.

Each Physician Member therefore represents and warrants that he or she: (i) has not received loans for the purpose of investing in the Center from the Company or from any investor in the Company; and (ii) has not been barred or suspended from participation in the Medicare and/or Medicaid programs. Each Physician Member covenants and agrees that (i) except for Drs. Anton A. Thompkins and (who are instrumental in forming the Company, are in the same group practice as the other Physician Members, and are not allowed to invest with the intent that they will generate direct or indirect referrals to the Center) he or she shall derive approximately one-third (1/3) of his or her medical practice income from all sources for the previous fiscal year or previous 12-month period from his or her own performance of procedures that are ambulatory surgery procedures as defined in accordance with the Medicare list of procedures that can be performed in an ambulatory surgery center; (ii) he or she shall perform not less than approximately one-third (1/3) of his or her procedures that require or can be performed in an ambulatory surgery center or outpatient hospital setting (in accordance with applicable Medicare reimbursement rules) at the Center; (iii) he or she shall fully inform each patient, prior to referring patients to the Center, of such physician's investment interest in the Center; and (iv) he or she shall treat patients receiving medical benefits or assistance under any federal health care program in a nondiscriminatory manner.

The Members also acknowledge that Stark Law, the regulations promulgated thereunder and similar Indiana laws and regulations may restrict the Center (as presently formed) from providing "designated health services" (as defined by the Stark Law) or other services to patients referred by Members. The Center and the Physician Members shall not provide "designated health services" at the Center. If, in the future, any of the services that the Center provides are deemed to be "designated health services," such services shall be provided by the Center only if such services may be provided in compliance with one or more exceptions to the ban on self-referrals set forth in Stark Law, the regulations promulgated thereunder, or any successor statutes and/or regulations thereto. Furthermore, if the owner of a Member is a pension plan, trust or other entity, all of the owners and beneficiaries of such pension plan, trust or other entity who are practicing physicians shall also comply with Stark Law, the Fraud and Abuse Statute, associated regulations and similar Indiana laws and regulations. In addition, all ancillary services performed at the Center shall be directly and integrally related to primary procedures performed at the Center, and none shall be separately billed to Medicare or other Federal health care programs.

2.4    Membership.

(a)    Reference is hereby made to the fact that there shall initially be two (2) authorized classes of Members of the LLC. All Members shall have (based on Units held) the same economic rights. The Members, acting as Members, shall have no right to act for or bind the Company. The initial Members are identified in Exhibit A hereto. Special meetings of the Members may be called at the request of any Member upon ten (10) days advance written notice to other Members. The time, place and purpose or purposes for such special meetings shall be stated in the notice of such meeting.

(b)    No Person shall be eligible to become a Member (or remain a Member, as applicable) (an "Eligible Physician") unless the following eligibility requirements are satisfied: (1) such Physician Member shall be a physician, licensed and registered, in good standing, to practice medicine in the State of Indiana; (2) such Physician Member shall abide by the requirements of Section 2.3; (3) such Physician Member shall maintain an active practice of medicine in the greater Valparaiso, Indiana metropolitan area, and if able to refer patients to the Center for services, shall be able to perform surgical services at the Center; (4) such Physician Member shall maintain active privileges at the Center and at least one hospital within thirty (30) miles of the Center; and (5) under applicable law, such Physician Member's ownership shall not disqualify (and, without further action, would not disqualify) the LLC or the Center from engaging in operations as a Medicare certified ambulatory surgery center for any reason or from having such physician perform cases at the Center.

### ARTICLE III
### Capital Contributions and Liability of Members

3.1    <u>Capital Accounts.</u>  A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the LLC.

3.2    <u>Capital Contributions.</u>

(a)    <u>Capital Contributions.</u>  Each of the Members shall be required to make a Capital Contribution to the LLC in accordance with the following provisions of this paragraph 3.2(a).  The Members shall acquire collectively One Hundred (100) Units.  Based on a total Capital Contribution to the Company of One Million Dollars ($1,000,000) in exchange for One Hundred (100) Units, it is intended that the initial installment of the total Capital Contribution shall be made upon execution of this Agreement and that one or more additional installments shall be made thereafter (in a manner to be agreed upon by the Members).  A total of Ten Thousand Dollars ($10,000) per Unit shall be contributed by the Members in exchange for One Hundred (100) Units, divided among them as set forth on <u>Exhibit A</u>.

(b)    <u>Additional Capital Contributions.</u>  Except as authorized by Approval of the Members, no Member shall be required to make an additional Capital Contribution in excess of such Member's initial Capital Contribution (an "Additional Capital Contribution") to the Company.  Except with respect to Additional Capital Contributions authorized by Approval of the Board pursuant to this Section 3.2(b), the Members may, if upon Approval of the Board of Managers and the Members in accord with Section 7.4 hereof, make Additional Capital Contributions to the Company.    The failure to provide an Additional Capital Contribution authorized by Approval of the Board pursuant to this Section 3.2(b) shall not be deemed an Adverse Terminating Event (as defined in Article IV); provided that if a Member does not make a properly approved Additional Capital Contribution, such Member's ownership in the Company may be diluted.

(c)    <u>Loans.</u>  Except as specifically set forth herein, no Member or Manager shall be obligated or required to make any loan to or guarantee for the LLC or any Capital Contribution to the LLC in addition to his, her or its Capital Contribution made pursuant to Section 3.2(a).  No loan made to the LLC by any Member or Manager shall constitute a Capital Contribution to the LLC for any purpose.

3.3    <u>Withdrawal of or Interest on Capital</u>.  Except as otherwise provided in this Agreement, (i) no Member shall have any right to demand and receive property of the LLC in exchange for all or any portion of his or her Capital Contribution or Capital Account, and (ii) no interest or preferred return shall accrue or be paid on any Capital Contribution, Additional Capital Contribution or Capital Account.

3.4    <u>Liability of Members</u>.  No Member, in his or her capacity as a Member, shall have any liability to restore any negative balance in his or her Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the LLC, or to restore any amounts distributed from the LLC, except as may be required specifically under this Agreement, the Act or other applicable law.  Except as otherwise provided by law or provided in Section 3.5 hereof, in no event shall any Member, in his or her capacity as a Member, be personally liable for any liabilities or obligations of the LLC.

3.5    <u>Member Guarantees</u>.  Each Member shall, if requested by the Board, guarantee on a several (not joint) basis his or her pro rata share (based on his or her ownership) of a credit line or loan which the Company may obtain from a third-party lending institution; provided, the Members collectively shall not be required to guarantee an aggregate amount of debt which exceeds One Million Seven Hundred Thousand Dollars ($1,700,000) unless the Board receives consent of the holders of at least sixty-six and 66/100 percent (66.66%) of all Units issued and outstanding.  The failure to provide debt guarantees as to aggregate debt of the Company up to One Million Seven Hundred Thousand Dollars ($1,700,000) shall be deemed an Adverse Terminating Event.  All Members shall be provided the right to provide such guarantees on a pro rata basis.  The failure of a Member to provide a guarantee that relates to aggregate debt of the Company in excess of One Million Seven Hundred Thousand Dollars ($1,700,000) shall not be deemed a Terminating Event (as defined in Article IV); provided however, if one or more Members does not provide such properly approved guarantees, the Board may, in its reasonable discretion, compensate the Members who provided the guarantees, including compensation in the form of Units.  If a Member does not provide any such guarantee in excess of the One Million Seven Hundred Thousand Dollar ($1,700,000) threshold), such Member's ownership in the Company may be diluted.

3.6    <u>Managers as Members</u>.  No Manager is required to hold any membership interest in the LLC in order to serve as a Manager.

3.7    <u>Additional Members</u>.  Additional Members may be admitted to the Company only upon the Approval, including the terms of admission, of the Board of Managers and otherwise in accordance with the terms of Article VII and Section 7.4 and Section 10.4 herein.

**ARTICLE IV**
**<u>Members and Membership Units</u>**

4.1    <u>Classification of Members</u>.  There shall be one (1) class of Members of the Company.  All Members shall have (based on Units held) the same economic rights.  The initial Members are identified in <u>Exhibit A</u> hereto.

4.2    <u>Withdrawal of a Member</u>.  Except in connection with events described in Section 4.3(b), no Member may withdraw or resign from the Company at any time prior to the later of (i)

six (6) years from the date such Member becomes a Member of the Company or (ii) six (6) years after the Center obtained its Medicare certification. If a Member withdraws or resigns as a Member in violation of this Section, such Member hereby agrees that such withdrawal or resignation will constitute a breach of this Agreement and be deemed an Adverse Terminating Event (as defined in Section 4.3(a) below). The Company may offset any damages due to such a breach against any amounts otherwise distributable to such Member in addition to any remedies otherwise available to the Company. No assessment of damages shall account for or be based on the volume or value of business generated by such Member.

4.3    <u>Redemption of a Member</u>. Events upon which the redemption of a Member occurs as described in this Section 4.3 ("Terminating Events") are divided for purposes of differentiating the Company's redemption obligations to the Member according to which type of Terminating Event occurs.

(a)    For purposes of this Section 4.3, an "Adverse Terminating Event" means:

(i)    In the case of any Member:

(a)    the improper Transfer (or attempt to Transfer) of Units;

(b)    failure to make an initial Capital Contribution or a personal guarantee related to up to an aggregate amount of Company debt of One Million Seven Hundred Thousand Dollars ($1,700,000);

(c)    the exclusion, suspension or debarment from participation in the Medicare or Medicaid programs;

(d)    resignation or withdrawal as a Member prior to the later of (i) six (6) years from the date such Member becomes a Member of the Company or (ii) six (6) years after the Center obtained its Medicare certification, unless such resignation or withdrawal is deemed a Non-Adverse Terminating Event (as defined below) pursuant to 4.3(b);

(e)    any breach of this Agreement;

(f)    the conviction of any felony; or

(g)    any event of Bankruptcy.

(ii)    In the case of a Physician Member:

(a)    revocation or suspension of a license to practice in Indiana, or any other license required by any health care licensing authority in the State of Indiana;

(b)    failure to maintain privileges at the Center or to meet the eligibility requirements of Sections 2.3 and/or 2.4; or

(c)    the Relocation of the Physician Member's medical practice at any time prior to (i) six (6) years from the date such Member becomes a Member of the Company or (ii) six (6) years after the Center obtained its Medicare certification.

(b)    For purposes of this Section 4.3, a "Non-Adverse Terminating Event" means:

(i)    In the case of any Member: resignation or withdrawal subsequent to the later of (i) six (6) years from the date such Member becomes a Member of the Company or (ii) six (6) years after the Center obtained its Medicare certification.

(ii)    In the case of a Physician Member:

(a)    Retirement at any time;

(b)    Death of a Member at any time;

(c)    Disability or adjudication of incompetence at any time; or

(d)    Relocation at any time subsequent to the later of (i) six (6) years from the date such Member becomes a Member of the Company or (ii) six (6) years after the Center obtained its Medicare certification, provided that such Relocation does not occur within one (1) year before or after the occurrence of an Adverse Terminating Event relating to such Physician Member.    Any withdrawal or resignation by a Physician Member that occurs within a one (1) year period before or after the occurrence of an Adverse Terminating Event relating to such Physician Member shall be deemed an Adverse Terminating Event.

Each Terminating Event, if subject to cure, shall trigger termination only after written notice is provided of the Terminating Event and if a cure has not been made of the Terminating Event within the specified period for cure.

(c)    If an Adverse Terminating Event shall occur with respect to any Member, the Company may elect, at the Company's sole option, and upon forty-five (45) days written notice to such Member, to purchase the Member's Units.  Written notice shall be provided at any time after the Company has received actual knowledge (meaning knowledge of a majority of the Board of Managers) of the occurrence of such Adverse Terminating Event.  A Manager with such knowledge shall promptly disclose such knowledge to the Board of Managers.  If any Member's Units are purchased because of the occurrence of an Adverse Terminating Event, the amount to be paid for the Units owned by such Member shall be equal to the Formula Amount (defined below) multiplied by the departing Member's Unit Proportion (defined below) discounted by forty percent (40%) (the "Adverse Purchase Price").

(d)    If a Non-Adverse Terminating Event shall occur with respect to any Member, the Company shall purchase from such Member, and the Member shall sell to the Company, such Member's Units pursuant to the terms hereof.  The amount to be paid for such

Units shall be equal to the Formula Amount (defined below) multiplied by the departing Member's Unit Proportion (defined below) (the "Non-Adverse Purchase Price"). "Unit Proportion" equals the number of Units held by the Member divided by all Units then issued and outstanding.

(e)    The Formula Amount (the "Formula Amount") for purposes of this Section 4.3 shall be determined as follows: (i) if the Center has been in operation as a Medicare-certified ambulatory surgery center for less than one (1) full calendar year, the Formula Amount shall be equal to the actual amount of cash equity invested in the Company by all Members, or (ii) if the Center has been in operation as a Medicare-certified ambulatory surgery center for more than one (1) full calendar year, the Formula Amount shall be calculated by multiplying the LLC's EBITDA (annual net operating income, excluding extraordinary gains and losses, calculated before deduction of interest, taxes, depreciation and amortization) by a number (the "Multiple"), which shall initially be three and one-half (3.5), then subtracting the LLC's outstanding long-term debt and long-term liabilities as of the date of the Terminating Event, determined in accordance with generally accepted accounting principles. For this purpose, the EBITDA of the LLC shall be based on the average of the EBIDTA for the LLC for the two most recent fully completed calendar years. For example, if the Terminating Event occurs in May 2006, the Formula Amount shall be calculated using the average of EBITDA for 2005 and 2004, multiplying that number by 3.5, and then subtracting the LLC's outstanding long-term debt and long-term liabilities as of the date of the Terminating Event.

(f)    (i)    All calculations shall be handled by the Company's regularly retained accountants and such calculations shall be final and binding upon all parties to this Agreement. All Members acknowledge and agree that the Formula Amount is an inexact proxy for fair market value, is an agreed upon value and does not necessarily equal fair market value at any particular point in time, and all Members waive any and all rights to contest the use of the Formula Amount for any and all purposes in lieu of an appraisal method.

(i)    The Board of Managers, in its sole discretion, by Approval and with Consent of the Members of the Company, shall have the ability to adjust the Multiple used for the Formula Amount (*i.e.*, the 3.5 number indicated in this Section 4.3) based on its assessment of the market conditions for surgery centers on an annual basis or whenever determined; provided, once adjusted, the Multiple may not be adjusted for the next twelve (12) months; provided further, the Multiple may not be adjusted after a Terminating Event has occurred with regard to the Member for whom the Terminating Event has occurred. Rather, the Multiple shall remain the Multiple in effect up to such date.

(g)    Payments for Units hereunder shall be made as follows: twenty-five percent (25%) on the initial payment date (the "First Installment"), which shall be within ninety (90) days after the determination of the Purchase Price (the "Purchase Date"), and twenty-five percent (25%) of the Purchase Price on each of the anniversaries of the Purchase Date with interest on the outstanding principal balance accruing at the prime rate as indicated by the *Wall Street Journal* on the Purchase Date. Payments may be delayed at the direction of the Board of Managers to the extent that the Company has insufficient assets as provided by law to make any

such payments. Notwithstanding any such delay in the payment of amounts due, the Member's rights as a Member shall cease on the Purchase Date. The total amount of payments to be made in connection with all redemption events, including both principal and interest, shall not exceed the lesser of either seven and one half percent (7.5%) of the Company's collected revenues or twenty percent (20%) of the Company's net income in any given year. If payments are so restricted, payments shall be made in proportion to amounts owed to all Members being redeemed. In sum, notwithstanding the provisions of this Article, the LLC shall not be required to make payments to former Members pursuant to this Section which, in the aggregate, would exceed the lesser of seven and one half percent (7.5%) of the aggregate collections of the LLC or twenty percent (20%) of the Company's net income for any such period. If the aggregate amount of payments otherwise due to former Members pursuant to this Section would reasonably be expected to exceed this limitation in any calendar year or portion thereof, with the Approval of the Managers, the LLC shall pay such former Members, on a pro rata basis, based on the amount still owed such Members, payments totaling twenty percent (20%) of the LLC's anticipated net income for such period, and the balance of that period's payment obligations to such former Members shall be deferred to the following calendar year or years, until such amounts can be paid without violating such limitation with respect to any such year or years. The LLC also shall not, under any circumstances, make any payments pursuant to this Article IV that would be prohibited by the Act. Within thirty (30) days following the end of each calendar year, the LLC shall make a pro rata adjusted payment to the former Members if and to the extent that actual aggregate collections or net income (whichever is the core total amount) during the prior year (or relevant portion thereof) have exceeded the anticipated amount. The payments due shall be deferred pursuant to such limits and not forfeited.

### ARTICLE V
### Additional Capital

5.1     Funding Capital Requirements.

(a)     In the event that the LLC requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the LLC may borrow funds from such lender(s), including Members and Managers, and on such terms and conditions as are Approved by the Managers, all on such terms as reflect fair market value. It is specifically provided that (except as set forth in Section 3.2 or 3.5) no such terms or conditions shall impose any personal liability on any Member without the prior written consent of such Member.

(b)     No Member or Manager shall be obligated to make any Capital Contributions or loans to the LLC (except as provided in Section 3.2 or 3.5), or otherwise supply or make available any funds to the LLC, even if the failure to do so would result in a default of any of the LLC's obligations or the loss or termination of all or any part of the LLC's assets or business; provided, failure to fund a properly Approved additional Capital Contribution under Section 3.2(b) hereof shall be deemed an Adverse Terminating Event.

5.2     Third-Party Liabilities.  The provisions of this Article V and of Article III are not intended to be for the benefit of any creditor or other Person (other than a Member in his or her capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the LLC or any of the Members.  Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article,

no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the LLC or any Member.

## ARTICLE VI
### Distributions; Profits and Losses

6.1     <u>Distribution of LLC Funds - In General</u>.

(a)     Except as necessary to comply with Sections in this Article, all Net Cash Flow of the LLC over and above Reasonable Reserves shall be distributed at least quarterly to the Members on a pro rata basis, based on each Member's Unit Proportion. While the intent is to distribute substantially all available cash flow (minus reserves), in accordance with this Section, at a minimum the Company shall attempt to distribute at least the estimated amount (i.e., 40-42% of Company net income) as is necessary for Members to meet expected individual tax obligations related to Company income. The LLC shall not make any distributions to a Member under this Article VI which would be prohibited by the Act.

(b)     Except as necessary to comply with certain of the following Sections in this Article, all other cash flow of the LLC shall be distributed among the Members of the LLC on a pro rata basis based on each Member's Unit Proportion as determined by Approval of the Managers.

6.2     <u>Distribution Upon Dissolution</u>.  Proceeds from, a Terminating Capital Transaction and/or other amounts or assets available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the LLC, shall be distributed and applied in the following priority:

(a)     First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by Approval of the Managers, provided that, upon the expiration of such period of time as the Managers, acting by Approval, shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section; and

(b)     Second, to the Members, an amount sufficient to reduce the Members' Capital Accounts to zero, in proportion to the positive balances in such Capital Accounts (after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other LLC transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss) and (ii) such Terminating Capital Transaction.)

6.3     <u>Distribution of Assets in Kind</u>.  No Member shall have the right to require any distribution of any assets of the LLC in kind.  If any assets of the LLC are distributed in kind, such assets shall be distributed on the basis of their respective fair market values as determined by the Approval of the Managers.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Approval the Managers, receive separate assets of the LLC and not an interest as tenant-in-common, with other Members so entitled, in each asset being distributed.

6.4     Allocation of Profits and Losses.  After giving effect to the allocations set forth in Sections 6.5 and 6.6 which affect the Members' distributive shares, Profits and Losses shall be allocated among the Members on a pro rata basis, based each Member's Unit Proportion.

6.5     Required Regulatory Allocations.

(a)     Limitation on and Reallocation of Losses.  At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any fiscal year.  To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 6.5(a).

(b)     Minimum Gain Chargeback.  If there is a net decrease in the Minimum Gain of the LLC during any fiscal year, then items of income or gain of the LLC for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Member in an amount equal to such Member's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d)(1).  A Member's share of the net decrease in the Minimum Gain of the LLC shall be determined in accordance with Regulations Section 1.704-2(g).  The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(2)(i).

(c)     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 6.5(d)) shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the LLC, within the meaning of Regulations Section 1.752-3(a)(3), the LLC Profits shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4), to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).  The items of losses, deductions and Code Section 705(a)(2)(b) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e)     Member Minimum Gain Chargeback.  Notwithstanding any contrary provisions of this Article VI, other than Section 6.5(b) above, if there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during any fiscal year, then each Member who has a share of such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the LLC, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if

necessary, subsequent fiscal years) in an amount equal to each such Member's share of the net decrease in such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(3) and 2(i)(5).

(f)    Qualified Income Offset.  If any Member unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Member in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 6.5(f) shall only be made if and to the extent that such Member would have an Adjusted Capital Account Deficit after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(f).

(g)    Basis Adjustment.  To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to either of Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to said Section of the Regulations.

(h)    Gross Income Allocation.  If at the end of any LLC fiscal year any Member has a Capital Account deficit which is in excess of the sum of the items to be credited to a Member's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Member shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 6.5(h) shall only be made if and to the extent that such Member would have a Capital Account deficit in excess of such sum after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(h).  As among Members having such excess, if there are not sufficient items of income and gain to eliminate all such excess, such allocations shall be made in proportion to the amount of each Member's respective excess.

6.6    Curative Allocations.  The allocations set forth in Section 6.5 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith.  Such allocations may not be consistent with the manner in which the Members intend to divide LLC distributions and to make Profit and Loss allocations as set forth in this Agreement. Accordingly, by the Approval of the Managers, after effecting the allocations required pursuant to Section 6.5, other allocations of Profits, Losses and items thereof shall be divided among the Members so as to prevent the allocations in Section 6.5 from distorting the manner in which LLC distributions will be divided among the Members pursuant to Sections 6.1 and 6.2 hereof.  In general, the Members anticipate that this will be accomplished by specifically allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that the net amount of allocations under Section 6.5 and allocations under this Section 6.6 to each such Member is zero.  However, the Managers shall have discretion to accomplish this result in any reasonable manner.

6.7    Tax Allocations and Book Allocations.

**08 C 1721**

**JUDGE MORAN**
**MAGISTRATE JUDGE SCHENKIER**

# EXHIBIT C – PART 2

(a)     Except as otherwise provided in this Section 6.7, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article VI.

(b)     In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its Book Value, such allocation to be made by the Approval of all of the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

(c)     In the event the Book Value of any property of the LLC is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its respective Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

(d)     Allocations pursuant to this Section 6.7 are solely for federal, state, and local income tax purposes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

6.8     General Allocation and Distribution Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Approval of all of the Managers using any permissible method under Code Section 706 and the Regulations thereunder.  Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocated among the Members in the same proportions as the allocations of Profits or Losses for the fiscal year in which such items are to be allocated.

(b)     Upon the admission of a new Member or the Transfer of Units by a Member, the new and old Members or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations, and shall receive distributions, if any, based on the portion of the fiscal year that the new or transferred Unit(s) were held by the new and old Members, or the transferor and transferee, respectively. For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the LLC shall close its books on an interim basis on the last day of the previous calendar month.

6.9    Tax Withholding.  If the LLC incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the LLC, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member.  Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the LLC within thirty (30) days after the Managers, acting by Approval of the Managers, give notice to such Member making demand therefor.  Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the Applicable Federal Rate as of such expiration date.  The LLC shall collect any unpaid amounts so advanced from any LLC distributions that would otherwise be made to such Member.

# ARTICLE VII
## Management

7.1    Management of the LLC.  The overall management and control of the business and affairs of the LLC shall be vested in the Managers, acting by Approval of the Managers.  All management and other responsibilities not specifically reserved to the Members in this Agreement, or requiring consent of the Members pursuant to Section 7.4, shall be vested in the Managers, and the Members shall have no voting rights except as specifically provided in this Agreement.  Each Manager shall devote such time to the affairs of the LLC as is reasonably necessary for performance by such Manager of his or her duties, provided such Manager shall not be required to devote full time to such affairs.

7.2    Board of Managers.  The business and affairs of the Company shall be managed by the Board of Managers.

(a)    Effective for all purposes on the date of this Agreement, the Board of Managers shall be comprised of five (5) Managers (including one Manager appointed by the Class B Member and four (4) Managers elected by all Members collectively), and each Manager shall have one vote. Except for the Manager appointed by the Class B Member, Managers shall be elected on an annual basis by the vote of the holders of more than fifty percent (50%) of the Units issued and outstanding. Such votes shall be noncumulative.

(b)    The powers of the Board shall be exercised subject to the Member protections indicated in Section 7.4.

(c)    There shall be at least four (4) meetings of the Managers per annum and at least two (2) meetings of the Members per annum. The Managers or Members, as applicable, may provide, by resolution, the time and place for the holding of these or additional meetings. Written notice shall be provided to all Managers and Members of such resolution.

Special meetings of the Board of Managers also may be called at the request of any Manager upon ten (10) days advance written notice to all other Managers. The time, place and purpose or purposes for such special meetings shall be stated in the notice of such meeting.

Special meetings of the Members also may be called at the request of any Member upon ten (10) days advance written notice to other Members. The time, place and purpose or purposes for such special meetings shall be stated in the notice of such meeting.

(d)     A majority of the Managers, present in person or by telephone, shall constitute a quorum at any meeting of the Board of Managers.  Members representing a majority of Member Units shall constitute a quorum at any meeting of the Members.

(e)     Managers may not act by proxy.

(f)     The election of Managers shall be conducted at any duly convened meeting of the Members. In the event that any Manager ceases to serve as Manager (whether by reason of termination, resignation, removal or any other cause), thereby creating a vacancy in the position of Manager, the Members shall elect a successor Manager to fill such vacancy; provided, that if the Class B-appointed Manager ceases to serve as a Manager, his or her replacement shall be appointed by the Class B Manager.  If a Member's (who is a Manager) interest in the LLC is terminated for any reason whatsoever, then such terminated Member/Manager shall be removed, and the Members shall select a replacement Manager.

(g)     Termination of a Manager shall be conducted as follows.  Any Member may call a special meeting of the Members for purpose of calling for the termination of a Manager. At such special meeting, the Members shall vote on the termination of the Manager in question; such Manager shall be immediately terminated if the holders of at least sixty six and 66/100 percent (66.66%) of the Units issued and outstanding vote affirmatively for the Manager's termination. Consistent with and subject to Section 7.2(f) hereof, the Members shall elect a successor Manager to fill such vacancy.

7.3     <u>Manner of Exercise of Board's Authority</u>.  All responsibilities granted to the Board under this Agreement shall be exercised by the Board as a body, and no Member, or Manager, acting alone and without prior Approval of the Board, shall have the authority to act on behalf of the Board or the LLC.  Subject to the requirements of Section 7.4 hereof, actions which the Board may take include (but are not limited to) the following:

(a)     Borrow money and otherwise obtain credit and other financial accommodations in the ordinary course of the business of the LLC;

(b)     Perform or cause to be performed all of the LLC's obligations under any agreement to which the LLC is a Party, including without limitation, any obligations of the LLC or otherwise in respect of any indebtedness secured in whole or in part by, or by lien on, or security interest in, any asset(s) of the LLC;

(c)     Employ, engage, retain or deal with any Persons to act as employees, agents, brokers, accountants, lawyers or in such other capacity as may be necessary or desirable;

(d)     Appoint individuals to act as officers of the LLC and delegate to such individuals such authority to act on behalf of the LLC and such duties and functions as would normally be delegated to officers of a corporation holding similar offices and approve compensation paid to Members, Managers and officers for their services as Members, Managers and officers;

(e)     Adjust, compromise, settle or refer to arbitration any claim in favor of or against the LLC or any of its assets, to make elections in connection with the preparation of any federal, state and local tax returns of the LLC, and institute, prosecute, and defend any legal action or any arbitration proceeding;

(f)     Acquire and enter into any contract of insurance necessary or proper for the protection of the LLC and/or any Member and/or any Manager, including without limitation, to provide the indemnity described in Section 7.8 or any portion thereof;

(g)     Establish a record date for any distribution to be made under Article VI;

(h)     Make technical amendments to this Agreement, e.g., as needed to make changes to Exhibit A to the Agreement; and

(i)     Perform any other act which the Managers may deem necessary or desirable for the LLC as well as the ongoing operations of the LLC in the ordinary course of business.

7.4     Restrictions.  Notwithstanding any other provision in this Agreement to the contrary, the Board shall not take any of the following actions on behalf of the LLC without the Consent of the Members:

(a)     Issue Units or authorize, create, designate, determine or issue any new class of Units of the LLC, or issue new Units of the LLC, or securities convertible into Units of the LLC, or issue options or warrants to purchase Units of the LLC or approve of the Transfer of any Units;

(b)     Enter into any transaction or agreement with a Member or departing Member or an Affiliate; provided however, no such action shall be taken without disclosure to all Members and all such transactions or agreements must be on commercially reasonably terms and conditions;

(c)     Authorize the merger, consolidation or similar combination with any other entity, or authorize the sale of all or substantially all of the assets of the LLC;

(d)     Approve a recapitalization, reclassification, reorganization, split or other similar event affecting the Units of the LLC;

(e)     Effect any Bankruptcy, dissolution or liquidation event with regard to the LLC;

(f)     Except with respect to liens imposed to secure the lease or purchase of equipment for the Center or working capital for the Center, mortgage, pledge or otherwise

dispose of all or any part of the business of the LLC and/or all or any part of the assets of the LLC;

(g)    Enter into, renew, amend or terminate any arrangement or agreement with any Company administrator, management company, business manager, consulting company or other senior employee or executive of the LLC;

(h)    With regard to staff privileges of the Center, close or limit the staff privileges of the Center;

(i)    Other than with respect to technical amendments set forth in Section 7.3 amend this Agreement or the Articles of Organization of the LLC;

(j)    Waive any Member obligations, approve Additional Capital Contributions, approve a request that Members provide debt guarantees of on behalf of the Company, change the Multiple used for the Formula Amount in Section 4.3; and

(k)    With regard to any action or issue involving a Member or an Affiliate, adjust, arbitrate, compromise, sue, defend, abandon, or otherwise deal with and settle any and all claims in favor of or against the Company.

7.5    <u>Binding the LLC</u>.  Any action taken by a Manager as a Manager of the LLC with prior Approval of the Managers, or, where so required, of the Members as a whole, shall bind the LLC and any other Managers and shall be deemed to be the action of the LLC.

7.6    <u>Compensation of Managers and Members</u>.  No direct or indirect payment shall be made by the LLC to any Manager, Member, or officer of the LLC or to any Affiliate of any Manager, Member, or officer of the LLC or for such Manager's, Member's, or officer's services as a Manager, Member, or officer except as Approved by the Board in accordance with Section 7.3 hereof.  Solely as specifically approved by the Board, each Manager and officer shall be entitled to reimbursement from the LLC for all expenses incurred by such Manager or officer in managing and conducting the business and affairs of the LLC.

7.7    <u>Contracts with Affiliated Persons</u>.  Subject to Section 7.4, the LLC may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the LLC of goods, services or space with any Member, Manager, or Affiliated Person, and may pay compensation thereunder for such goods, services or space; provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.

7.8    <u>Indemnification</u>.  The LLC shall indemnify, hold harmless and defend the officers and Managers of the LLC for any liability incurred and/or for any act performed by them within the scope of the authority conferred on them by this Agreement, and/or for any act omitted to be performed, except for their actions made in bad faith or which are grossly negligent, which indemnification shall include all reasonable expenses incurred, including reasonable legal and other professional fees and expenses.  The doing of any act or failure to do any act by an officer or a Manager, the effect of which may cause or result in loss or damage to the LLC, if done in

good faith to promote the best interests of the LLC, shall not subject the officer or Manager to any liability to the Members except for grossly negligent or bad faith acts.

7.9    Other Activities.  Subject to any other restrictions set forth in this Agreement, the Members, Managers and any Affiliates of any of them may engage in and possess interests in other business ventures and investment opportunities of every kind and description, independently or with others as long as they do not violate Article X hereof.

## ARTICLE VIII
## Officers

8.1    Number; Election; Resignation.  The LLC shall have a President, a Treasurer, a Secretary, and such other officers as the Managers may in their discretion create.  All officers shall be elected annually by the Managers, acting by Approval, at any duly convened meeting of the Board.

Each officer shall hold office for one (1) year and until their successors are chosen and qualified, unless terminated earlier and except as otherwise provided at the meetings respectively at which they are elected or appointed.  Any officer may resign by delivering his written resignation to the LLC at its office, or to the Managers, and such resignation shall be effective upon receipt, unless it is specified to be effective at some other time or upon the happening of some other event.

8.2    Same Person Holding Two or More Offices.  To the extent permitted by the Act, any two or more of the offices referred to in this Section may be held by the same person.

8.3    Officers Need Not Be Members or Managers.  Except as otherwise provided by the Act, any person shall be eligible for election to be an officer of the LLC without the necessity of being a Member or Manager.

8.4    Removal of Officers.  Any officer may be removed by the Managers, acting by Approval, with or without cause.

8.5    President.  The President shall be the chief executive officer of the LLC and shall, subject to the provisions set forth hereinafter, have the authority to oversee such administrative activities and to take such administrative actions as shall be customary for a chief executive officer.  The President shall perform such additional duties as may be delegated to him by the Managers or as may be imposed by law.  It shall be the duty of the President, and he shall have the power to see to it, that all orders and resolutions of the Managers are carried into effect.  The President, as soon as reasonably possible after the close of each fiscal year, shall submit to the Managers a report of the operation of the LLC for such year and a statement of its affairs, and he shall, from time to time, report to the Managers all matters within his knowledge which the interests of the LLC may require to be brought to its notice.

8.6    Treasurer.  The Treasurer shall, subject to the supervision and control of the Managers, have custody of the funds and of all the valuable papers of the LLC.  He shall keep the accounts of the LLC in a manner consistent with good business practices, and he shall, at all times, when requested by the Managers, exhibit a true statement of the affairs of the LLC.  He

shall, if required by the Managers, give a bond for the faithful discharge of his duties, at the expense of the LLC, with satisfactory sureties in such sum as the Managers may determine, if so required by the Managers. Except as the Managers may otherwise order, he shall sign and/or endorse all promissory notes, bills, checks, drafts, trade acceptances, and bankers' acceptances, and he may execute all deeds, mortgages, reports, contracts, agreements, and other legal documents of the LLC, but the Managers may authorize any other officer or officers, or agent or agents, to sign any obligations, instruments, or papers on behalf of the LLC, and/or may limit the authority of the Treasurer in any of said matters. The Treasurer shall perform such other duties as may be delegated to him by the Managers or as may be imposed by law.

When the Treasurer shall be absent or for any other reason unable to perform his duties, he may appoint any other officer of the LLC to perform the duties of the Treasurer, and said Person shall have all the duties herein delegated to the Treasurer during the term of his appointment.

8.7    Secretary.  The Secretary shall keep the records of the LLC, of its Members, and of the Managers, and he shall perform such duties and have such powers additional to the foregoing as the Managers shall designate.

## ARTICLE IX
## Fiscal Matters

9.1    Books and Records.  The LLC intends to engage the services of a certified public accounting firm ("Accounting Firm"). The Company shall keep complete and accurate books and records of the LLC, using the methods of accounting as determined by the Board. Such books and records shall all be maintained and updated monthly, and shall be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the LLC or the Accounting Firm for examination and copying by any Member, or his or her duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such books, records, documents and information shall be sent by the LLC to any Member, or his or her duly authorized representative, upon reasonable request therefor and at the expense of such Member. The LLC shall keep at its registered office all items required pursuant to the Act. Within ninety (90) days after the end of each fiscal year of the LLC, each Member shall be furnished, on a basis consistent with generally accepted accounting principles, with audited or unaudited financial statements which shall contain a balance sheet as of the end of the fiscal year and statements of income and cash flows for such fiscal year. Any Member may, at any time, at his or her own expense, cause an audit or review of the LLC books to be made by a certified public accountant of his or her own selection.

9.2    Bank Accounts.  Bank accounts and/or other accounts of the LLC shall be maintained in such banking and/or other financial institution(s) as shall be selected by Approval of the Managers, and withdrawals shall be made and other activity conducted on such signature or signatures as determined by Approval of the Managers. Any and all records with respect to such bank accounts and/or other accounts, including, but not limited to, copies of any checks written on such account or records or other withdrawal activity, shall be available at an office of the LLC or the Accounting Firm for examination and copying by any Member, or his or her duly authorized representative, upon reasonable request therefor and at the expense of such Member.

Alternately, copies of such records shall be sent by the LLC to any Member, or his or her duly authorized representative, upon reasonable request therefor and at the expense of such Member.

9.3    Fiscal Year. The fiscal year of the LLC shall end on December 31 of each year.

## ARTICLE X
## Transfer and Redemption of Interests
## and Admission of New Members

10.1    Restriction on Transfers. No Member may sell, transfer, pledge, hypothecate, gift or otherwise dispose of or encumber all or any portion of its Membership Units without the prior written consent or Approval of the Board of Managers and the Members in accordance with Section 7.4 hereof, which consent may be given or withheld for any reason or no reason; provided, however, that any decision shall not take into account the volume or value of referrals of a transferee. The transferee of a Member's Units shall assume the Capital Account of the transferor.

Any transferee must sign a counterpart to this Agreement agreeing to be bound by all terms hereof prior to such Transfer being deemed effective. Any Transfer (or attempted Transfer) in violation hereof shall be treated as an Adverse Terminating Event. The Units of a Physician Member and any interest of a Physician Member's spouse in such Units, shall remain subject to this Agreement regardless of the termination, for any reason, of the marital relationship of any Physician Member and the Physician Member's spouse. During the marriage of the Physician Member and such Physician Member's spouse, such Physician Member's obligations to sell or offer to sell Units pursuant to this Agreement shall include any interest of such Physician Member's spouse in the Units. Any Units Transferred in contravention of this Agreement shall be void of all voting, inspection and other rights with respect to the pledgee/transferee, and any such Transfer shall be considered an Adverse Terminating Event, and shall be subject to purchase by Company pursuant to Section 4.3(c) and (d) of this Agreement. Each spouse of a Physician Member shall sign a Consent of Spouse form, substantially in the form of Exhibit B, agreeing to be bound by the terms hereof.

10.2    Irreparable Harm. Each Member specifically acknowledges that a breach of Section 10.1 would cause the Company and the Members to suffer immediate and irreparable harm which could not be remedied by the payment of money. Notwithstanding the arbitration provisions otherwise contained herein, in the event of a breach or threatened breach by a Member of the provisions of Section 10.1, the Company or other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond. Nothing herein shall be construed to prevent the Company or other Members from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages, reasonable attorneys' fees and expenses.

10.3    Assignee of a Member's Membership Units. If, notwithstanding the prohibitions in Section 10.1, a Member Transfers all or any portion of its Membership Units (whether voluntarily, involuntarily or by operation of law, including, but not limited to, the death, divorce, Disability, merger, or bankruptcy of a Member) and a Person acquires such Membership Units, (but is not admitted as a substituted Member pursuant to the terms of this Agreement) such Person shall:

(a)      be treated as an assignee of such Member's Units, as provided in the Act and shall not be treated as a Member of the Company;

(b)      have no right to participate in the business and affairs of the Company or to exercise any rights of a Member under this Agreement or the Act;

(c)      share in distributions from the Company with respect to the transferred Units on the same basis as the transferring Member previously had; and

(d)      be required to transfer the Units to the Company in accord with the redemption provisions hereof relating to Adverse Terminating Events.

10.4    <u>Admission of Transferees</u>.  Subject to the Transfers permitted by Section 10.1, and subject to Indiana state law, a transferee (not already a Member) may be admitted to the Company as a substituted Member only upon Consent of the Members.  Units may be Transferred only in accordance with the provisions of this Section 10.4 and the provisions of 10.1 hereof.

10.5    <u>Obligations of Permitted Transferees</u>.  In the case of any approved Transfer or disposition of Units, the transferee shall execute and deliver an appropriate instrument agreeing to be bound by this Agreement as a Member and such additional agreements or instruments as the Board may require. Any permitted transferee of Units shall receive and hold such Units subject to this Agreement and all of the restrictions, obligations and rights created hereunder, and the Members and each transferee shall be bound by their obligations under this Agreement with respect to each subsequent transferee.

10.6    <u>Noncompetition</u>.  During the term of a Member's membership in the LLC and for a period of two (2) years thereafter, other than through the LLC, no Member nor any of its Affiliates shall, without the prior written Approval of the Managers and Consent of the Members, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a facility (including a hospital, an office or practice-based facility or operating site or room that provides any of the services offered by the Company) that provides outpatient surgical services of the type offered by the Center within fifteen (15) miles of the Center (the "Restricted Area"), it being understood that the Company's services include the technical or facility fee component of outpatient surgical services. This Section 10.6 shall not be interpreted to restrict any of the Members from providing professional services, practicing medicine and performing procedures at any location, including any inpatient or outpatient hospital setting or in his or her office as long as such Member's office does not become a Medicare-certified, accredited or state-licensed ambulatory surgery center (or charge or receive an in-office facility, site-of-service or enhanced professional fee or a technical fee for services of the type the Center provides).

10.7    <u>Confidential Information</u>.  Each Member acknowledges that the Confidential Information (as defined below) is valuable property of the Company and undertakes that for so long as he, she or it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section, shall:

(a)     treat the Confidential Information as secret and confidential;

(b)     not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third Party except with the prior written consent of Company;

(c)     not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement;

(d)     recognize and acknowledge that the Company's Confidential Information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for its own personal benefit or for the benefit of anyone else any Confidential Information, except: (i) with the prior written consent of all the other Members; (ii) in the course of the proper performance of the Member's duties hereunder; or (iii) as required by applicable law or legal process. Each Member confirms that all such Confidential Information constitutes the exclusive property of the Company.

Given the secretive and competitive environment in which the Company does business, each Member agrees to promptly deliver to the Company, at any time when the Company so requests, all Confidential Information, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) embodying the Confidential Information constitute the exclusive property of the Company. Notwithstanding the foregoing paragraph or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member; and

(e)     limit the dissemination of and access to the Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents, attorneys, consultants, professional advisors or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section.

(f)     "Confidential Information" means any and all policies, procedures, contracts, quality assurance techniques, plans, market studies, projections, pro formas, managed care initiatives, strategies, utilization management, physician lists, patient records, credentialing, financial, statistical and other information relating solely to the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information. Confidential Information does not include information which:

(i)     was lawfully made available to or known by third person on a non-confidential basis prior to disclosure by a Member;

(ii)     is or becomes publicly known or in the public domain through no wrongful act of a Member;

(iii)    is received by a Member from a third Party other than in breach of confidence; or

(iv)    developed independently by a Member.

10.8    <u>Additional Covenants</u>.  If a court of competent jurisdiction should declare this Article X, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

(a)    Each Member specifically acknowledges that a breach of this Article would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of any of the provisions of this Article, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorneys' fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

(b)    Each Member warrants and represents that he, she or it:

(i)    is familiar with the confidentiality and non-competition agreements contained herein.

(ii)    is acquiring the Units for his or its own account, and not for resale, has not learned of the investment via publication or any advertising, has business and financial expertise sufficient to understand the terms of the investment and to protect their own interests, is a preorganization owner of the Company.

(iii)    has concluded that its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable.

(iv)    is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by this Article.

(v)    acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty.

(vi)    acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no obligation or current intention to register such Units under the Federal Securities Act 1933 ("33 Act").

(vii)    acknowledges that the Units have not been registered under the 33 Act because the Company is issuing such Units in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Indiana Securities Act.

(viii)    acknowledges that the Company has relied upon the fact that the Units in the Company are to be held by the Members solely for investment.

(ix)    acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

(x)    acknowledges that this Agreement does not conflict with or violate any other agreement to which the Member is party.

(xi)    acknowledges that except with respect to Transfers specifically permitted under this Agreement, no Member may resell his, her or its Units within twelve (12) months of the purchase of such Units.

(xii)    is an accredited investor.

## ARTICLE XI
## Dissolution and Termination

11.1    <u>Events Causing Dissolution</u>. The LLC shall be dissolved and its affairs wound up upon the first to occur of the following events, unless the Board approves the continuation of the Company (other than under subsection (b) of this Section 11.1):

(a)    The sale or other disposition of all or substantially all of the assets of the LLC, unless the disposition is a transfer of assets of the LLC in return for consideration other than cash and, by Approval of the Managers a determination is made not to distribute all of such non-cash items to the Members;

(b)    The election for any reason to dissolve the LLC made pursuant to the Approval of the Board and the Approval of the Members pursuant to Section 7.4 hereof;

(c)    Any consolidation or merger of the LLC with or into any entity unless the LLC is the resulting or surviving entity; or

(d)    Entry of a decree of judicial dissolution.

To the greatest extent permitted by law, no event (including without limitation the death, resignation, expulsion, bankruptcy, or dissolution of a Member) shall cause automatic dissolution of the Company. Further, any event giving rise to automatic dissolution shall not cause dissolution if the Board votes that it shall not cause dissolution.

11.2    <u>Procedures on Dissolution</u>. Dissolution of the LLC shall be effective on the day on which the event occurs giving rise to the dissolution, but the LLC shall not terminate until the Articles shall be canceled in the manner set forth in the Act. Notwithstanding the dissolution of the LLC, prior to the termination of the LLC as aforesaid, the business and the affairs of the LLC shall be conducted so as to maintain the continuous operation of the LLC pursuant to the terms of this Agreement. Upon dissolution of the LLC, the Managers, acting by Approval, or, if none, a liquidator elected by the Consent of the Members, shall liquidate the assets of the LLC, apply and distribute the proceeds thereof under Article VI, and cause the termination of the Agreement.

## ARTICLE XII
### General Provisions

12.1    <u>Notices</u>. Any and all notices under this Agreement shall be effective (a) on the fifth (5th) business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the LLC at its principal office, or if to a Member at the last address of record on the LLC books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified. A Member may change its address for purposes of this Agreement by giving the other Members notice of such change in the manner herebefore provided for the giving of notices.

12.2    <u>Word Meanings</u>. The words "herein," "hereinafter," "hereinbefore," "hereof" and "hereunder" as used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. All section references, except as otherwise provided herein, are to sections of this Agreement.

12.3    <u>Binding Provisions</u>. Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, legal representatives, successors and assigns.

12.4    <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Indiana including the Act, as interpreted by the courts of the State of Indiana, notwithstanding any rules regarding choice of law to the contrary.

12.5    <u>Counterparts</u>. This Agreement may be executed in several counterparts and as so executed shall constitute one Agreement binding on all Parties hereto, notwithstanding that all of the Parties have not signed the original or the same counterpart.

12.6    <u>Severability of Provisions</u>. Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and if for any reason any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the LLC, such provision or provisions shall be deemed void and of no effect.

12.7    Section Titles. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8    Amendments. This Agreement may be amended or modified only with the Approval of the Managers and the Members (pursuant to Sections 7.3 and 7.4).

12.9    Entire Agreement. This Agreement embodies the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12.10    Waiver of Partition. Each Member agrees that irreparable damage would be done to the LLC if any Member brought an action in court to dissolve the LLC. Accordingly, each Member agrees that he or she shall not, either directly or indirectly, take any action to require partition or appraisement of the LLC or of any of the assets or properties of the LLC, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his or her successors and assigns) accepts the provisions of this Agreement as his or her sole entitlement on termination, dissolution and/or liquidation of the LLC and hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale or other liquidation with respect to his or her interest, in or with respect to, any assets or properties of the LLC. Each Member further agrees that he or she or it will not petition a court for the dissolution, termination or liquidation of the LLC.

12.11    Survival of Certain Provisions. The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the LLC, including, but without limitation, the provisions of Sections 10.6 and 10.7. The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the LLC so as to effectuate the intended purposes and agreements of the Members hereunder, shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the LLC or the execution of any document terminating this Agreement, unless such document specifically provides for nonsurvival and to the specific provisions hereof which are intended not to survive.

12.12    Specific Performance or Injunctive Relief. The Members and the Company ·hereby declare that it is impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform any of its obligations hereunder. Therefore, if any Party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has or may have an adequate remedy at law and agrees not to urge in any such action or proceeding that such a remedy exists. Furthermore, any Party seeking to enforce the provisions of this Agreement shall have the right to specific performance, injunctive or other equitable relief without the requirement to post bond.

12.13    Dispute Resolution; Limited Renegotiation. Except for disputes relating to breaches of Sections 10.6 and 10.7, all disputes shall be resolved under the following provisions of this Agreement.

This Agreement shall be construed to be in accordance with any and all federal and state statutes, including, the Code, Medicare, Medicaid and all federal and state rules, regulations, principles and interpretations applicable to the Company and the Members, and the relationships among them. It is the intent of this Section to set forth a procedure so that if a dispute among the Members occurs, a procedure will be in place to resolve such dispute while preserving, to the extent possible, the economic and governance relationships set forth here.

In the event there is any dispute among the Members arising from a provision of this Agreement (the "Dispute"), any Member affected by such Dispute shall have the immediate right upon notice to the other Members (the "Notice") to initiate the renegotiation of the affected term or terms of this Agreement, so as to remedy the impacts of the Dispute, each in a manner that substantially maintains the then existing economic and governance relationships of the Members, if it is legal to accomplish the change while maintaining substantially such economic and governance relationship.

A.    Mediation; Binding Arbitration.

1.    Any Dispute between the Parties relating to this Agreement must first be submitted to non-binding mediation in accordance with procedures agreed upon by the Parties. If the Dispute is not resolved through mediation within forty-five (45) days of the initial request for mediation or within a time frame mutually agreed upon by the Parties, the Dispute must then be submitted for binding arbitration in accordance with procedures set forth by the American Health Lawyers Association.

B.    Pre-Arbitration Procedure.

1.    Any Dispute shall be submitted to arbitration by notifying the other Party or Parties, as the case may be, hereto in writing of the submission of such dispute to arbitration (the "Arbitration Notice"). The Party delivering the Arbitration Notice shall specify therein, to the fullest extent then possible, its version of the facts surrounding the dispute and the amount of any damages and/or the nature of any injunctive or other relief such Party claims.

2.    The Party (or Parties, as the case may be) receiving such Arbitration Notice shall respond within thirty (30) days after receipt thereof in writing (the "Arbitration Response"), stating its version of the facts to the fullest extent then possible and, if applicable, its position as to damages or other relief sought by the Party initiating arbitration.

3.    The Parties shall then endeavor, in good faith, to resolve the dispute outlined in the Arbitration Notice and Arbitration Response. In the event the Parties are unable to resolve such dispute within thirty (30) days after receipt of the Arbitration Response, the Parties shall initiate the arbitration procedure outlined below.

C.    Arbitration Procedure.

1.    If the Parties hereto are unable to resolve the Dispute within thirty (30) days after receipt of the Arbitration Response as set forth above, then the Parties must submit the Dispute to binding arbitration in accordance with the American Health Lawyers arbitration program. If the Parties are unable to agree on an arbitrator within thirty (30) days after receipt of

the Arbitration Response, each of the Parties shall, within thirty (30) days after receipt of the Arbitration Response, choose an arbitrator selector ("Selector"). The two Selectors shall then have fifteen (15) days to select an arbitrator who shall serve as the final arbitrator for the dispute. (The arbitrator chosen by the Parties hereto or by the Selectors, as the case may be, shall hereinafter be referred to as the "Arbitrator"). The Arbitrator shall not be an Affiliate of any of the Parties hereto.

2.      The arbitration shall be held in Valparaiso, Indiana.  The Parties shall submit to the Arbitrator the Arbitration Notice and the Arbitration Response and any other facts regarding the dispute of which any Party desires.

3.      The Arbitrator shall apply the arbitration rules set forth below in making his or her decision. The decision of the Arbitrator shall be rendered within thirty (30) days of the close of the hearing record, shall be in writing and shall contain findings of fact and conclusions of law.

D.      <u>Arbitration Rules</u>.

1.      The Arbitrator shall allow reasonable discovery, which he determines is necessary for determination of the issues presented.

2.      The Arbitrator shall agree to resolve all factual disputes prior to resolving legal disputes.

3.      The Arbitrator shall be guided by, and shall substantially comply with, the then-applicable Federal Rules of Evidence.

4.      The Arbitrator is empowered to include in any award made hereunder such relief as the Arbitrator deems appropriate (other than punitive damages), including, without limitation, (i) injunctive relief in addition to or in lieu of monetary damages and (ii) reasonable attorneys' fees and expenses.

5.      Should any Party refuse or neglect to appear or participate in the arbitration proceedings, including the procedures relating to the selection of an Arbitrator, the participating Party may select the Arbitrator and the Arbitrator is empowered to decide the controversy in accordance with whatever evidence is presented.

6.      The Arbitrator's award shall be in a form sufficient to clearly inform the Parties of the Arbitrator's decision.

E.      <u>Arbitrator's Award</u>. The award of the Arbitrator shall be binding on the Parties and may be entered as a final judgment in a court of competent jurisdiction.

F.      <u>Other Disputes</u>.  All disputes relating to breaches of Sections 10.6 and 10.7 shall be resolved by a court of law with the site of venue in Valparaiso, Indiana.  All Members and Managers (1) submit to the exclusive jurisdiction of this court; and (2) waive the defense of inconvenient forum.

12.14  <u>Power of Attorney</u>. Each Member hereby irrevocably constitutes and appoints the Board of Managers, acting through a Manager or authorized signatory to act as its true and lawful attorney-in-fact and agent (with full power of substitution) with full power and authority in its name, place and stead to execute, swear to, acknowledge, deliver, file and record in the appropriate public office or offices, all as appropriate under the circumstances:

(a)  this Operating Agreement, and all certificates, agreements and other instruments and any amendment thereto, which the Board of Managers deems necessary or appropriate to qualify or continue the Company as a limited liability company under the Act or to reflect actions taken pursuant to this Agreement to issue amended and restated operating agreements; and

(b)  all instruments relating to the admission of Members, including substituted or additional Members, after the approval required in accordance with this Agreement.

The appointment by all Members of the attorney-in-fact shall be deemed to be a power coupled with an interest and is irrevocable and the foregoing grant of authority: (i) shall survive the death, bankruptcy, incompetence, dissolution or termination of existence of any or all of the Members; (ii) may be executed by a Manager; (iii) shall bind any person who becomes a substituted or additional Member pursuant to this Agreement; and (iv) shall continue to bind any Member who assigns the whole or any portion of its interest, except that where the assignee thereof has been approved by the Board of Managers, for admission to the Company as a substituted Member, then, as to such assigning Member, this power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Board of Managers to execute, acknowledge and file any instrument necessary to effect such substitution.  Upon the request of the Board of Managers, the Members shall execute any certificate or other instrument with respect to which the attorney-in-fact could have invoked this power of attorney.

12.15  <u>Waiver of Trial by Jury</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY ACTION OR PROCEEDING INSTITUTED UNDER OR RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO, OR IN CONNECTION WITH ANY COUNTERCLAIM RESULTING FROM ANY SUCH ACTION OR PROCEEDING.

12.16  <u>Waiver of McGuireWoods Conflict</u>. McGuireWoods, LLP ("MW") has acted to develop the documentation to form the Company and to act as counsel to the Company.  In this regard, the Parties acknowledge that MW has informed each Member that a conflict of interest exists in MW's representation in such formation and that each Member has been advised to seek outside counsel and business advice to review all documents relating to the Company and to advise each Member as to the effects, consequences and legalities of the documents.  It is also acknowledged that MW provides counsel to both the Class B Member and the Class A Members' orthopedic practice, Valparaiso Orthopedic Clinic, Inc. d/b/a Lakeshore Bone and Joint Institute, in other matters, and the Parties acknowledge that MW has informed each Member of such potential conflict of interest as well.

*Remainder of page intentionally blank*

**IN WITNESS WHEREOF**, the Managers and the Members hereto have executed this Agreement under seal as of the day and year first above written.

**PHYSICIAN MEMBERS**

_____
James A. Malayter, M.D.

_____
Michael C. Leland, M.D.

_____
Bruce J. Thoma, M.D.

_____
Paul J. Gruszka, M.D.

_____
Thomas H. Kay, M.D.

_____
Ron Clark, M.D.

_____
Anton A. Thompkins, M.D.

_____
David J. Musgrave, M.D.

_____
Kirnjot Singh, M.D.

_____
George Alavanja M.D.

_____
Marc S. Bruell, D.P.M.

**WOODRUM/ASD**

By: _____

Its: _____

### EXHIBIT A

### MEMBERSHIP UNITS

| NAMES OF MEMBERS | CAPITAL CONTRIBUTION | UNITS |
|---|---|---|
| **PHYSICIAN MEMBERS** | | |
| James A. Malayter, M.D. | $72,727.27 | 7.2727 |
| Michael C. Leland, M.D. | $72,727.27 | 7.2727 |
| Bruce J. Thoma, M.D. | $72,727.27 | 7.2727 |
| Paul J. Gruszka, M.D. | $72,727.27 | 7.2727 |
| Thomas H. Kay, M.D. | $72,727.27 | 7.2727 |
| Ron Clark, M.D. | $72,727.27 | 7.2727 |
| Anton A. Thompkins, M.D. | $72,727.27 | 7.2727 |
| David J. Musgrave, M.D. | $72,727.27 | 7.2727 |
| Kirnjot Singh, M.D. | $72,727.27 | 7.2727 |
| George Alavanja M.D. | $72,727.27 | 7.2727 |
| Marc S. Bruell, D.P.M. | $72,727.27 | 7.2727 |
| **Physician Member Total:** | $800,000 | 80 |
| **INSTITUTIONAL MEMBER** | | |
| Woodrum/ASD | $200,000 | 20 |
| **Total:** | $1,000,000 | 100 |

## EXHIBIT B

## CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Operating Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in LAKESHORE SURGICARE LLC (the "LLC"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the LLC pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the LLC so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENTS THAT I WILL WAIVE SUCH RIGHT.

The foregoing is accepted by LAKESHORE SURGICARE LLC, as of the following date:

Date: _____, _____.

Name of Member: _____.

Name of Spouse: _____

Signature of Spouse: _____

Name of Witness: _____

Signature of Witness: _____

\\HEA\99261.5