**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC, a Nevada limited liability company, and DAVID WOODRUM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No.08-C-1721 |
| | ) | Judge Moran |
| LAKESHORE SURGICARE, LLC, an Indiana limited liability company; REASC, LLC, an Indiana limited liability company; ANTON THOMPKINS, M.D., BRUCE THOMA, M.D., DAVID MUSGRAVE, M.D., JAMES MALAYTER, M.D., GEORGE ALAVANJA, M.D., MARC BRUELL, M.D., MICHAEL LELAND, M.D., THOMAS KAY, M.D., and PAUL GRUSZKA, M.D., | ) ) ) ) ) ) ) ) ) ) | Magistrate Judge Schenkier |
| Defendants. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF
CERTAIN DEFENDANTS' MOTION TO DISMISS**

**I.    INTRODUCTION**

This Court should dismiss this case as to defendants Anton Thompkins, M.D. ("Thompkins"), Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay"), and Paul Gruszka, M.D. ("Gruszka") (collectively the "Doctors") because these defendants are not subject to personal jurisdiction in Illinois. Additionally, venue is not proper in the Northern District of Illinois. These threshold jurisdictional issues preclude the Court

1

from reaching the merits of the case.

As a preliminary matter, every federal court must determine that the matter before the Court satisfies three elements: (1) personal jurisdiction over the parties; (2) subject matter jurisdiction over the claim; and (3) proper venue. *ISC-Bunker Ramo Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1328-29 (N.D.Ill. 1990); *see also Paper Systems, Inc. v. Mitsubishi Corp.,* 967 F. Supp. 364, 366 (E.D.Wis. 1997), citing *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.,* 906 F.2d 276, 279, 283 (7th Cir. 1990). If any of these elements are lacking, the Court cannot hear the case. *Id.* The Court lacks personal jurisdiction over the Doctors because they are citizens of Indiana. The Doctors practice exclusively in Indiana. None of the Doctors have established minimum contacts with Illinois sufficient for the Court to exercise jurisdiction without offending federal and state due process.

Venue is improper in this Court for three reasons. First, all of the underlying facts in paintiffs' complaint, except for a single meeting between David Woodrum ("Woodrum") and Thompkins, occurred in Indiana. Second, the Complaint – even if taken as true – fails to allege proper venue for seven out of eight causes of action. Finally, the mandatory choice of forum clause in the Settlement Agreement and Mutual Release ("Settlement Agreement") between Woodrum Ambulatory Systems Development LLC ("WASD") and Lakeshore Surgicare LLC ("Lakeshore") applies to this action. The Settlement Agreement designates Indiana state courts as the exclusive forum to hear disputes between these parties.

## II.    FACTUAL BACKGROUND

The Doctors were members of Lakeshore, an Indiana limited liability company,

organized in May 2004 to build an ambulatory surgery center in Chesterton, Indiana (the "ASC"). (Trish Houlihan Affidavit ("Houlihan Aff."), attached as Exhibit "A," ¶¶ 5-6; Anton Thompkins, M.D. Affidavit ("Thompkins Aff."), attached as Exhibit "B" ¶¶ 2, 3, 5.) The Doctors were also members of REASC LLC ("REASC"), an Indiana limited liability company, organized in January 2005 to own the real estate underlying the ASC. (*Id.*) The Doctors are Indiana citizens who practice medicine exclusively in Indiana (Houlihan Aff. ¶ 7; Thompkins Aff. ¶ 4.) None of the Doctors have referral relationships with Illinois entities. (Houlihan Aff. ¶ 8; Thompkins Aff. ¶ 4.) The Doctors do not advertise in Illinois. (Houlihan Aff. ¶ 9.) The Doctors treated 1,996 patients between 2004 and 2007. (Houlihan Aff. ¶10.) Of this number, fewer than 2% were Illinois patients. (*Id.*)

WASD is a Nevada limited liability company. (Complaint at Law and for an Accounting ("Complaint"), ¶ 1.) David Woodrum ("Woodrum") is an Illinois citizen. (Complaint, ¶ 2.) Woodrum sent a proposal/solicitation letter, dated April 2, 2004, to Thompkins offering WASD consultant services for the development of the ASC. (Thompkins Aff. ¶ 6.) Lakeshore entered into a Development Agreement with WASD on August 6, 2004 (the "Development Agreement"). (Development Agreement, attached as Exhibit "C," Thompkins Aff. ¶ 6; Houlihan Aff. ¶ 11.) The Development Agreement was executed by both parties in Indiana. (Thompkins Aff. ¶ 7; Houlihan Aff. ¶ 12.) The Development Agreement is governed by Indiana law. (Development Agreement, p. 6, ¶ 6.6.) Woodrum and other members of WASD met with the Doctors and representatives of Lakeshore numerous times during WASD's commission of its duties under the Development Agreement, all of which meetings were held in Indiana. (Thompkins Aff. ¶

3

8; Houlihan Aff. ¶ 13.)

During various times in 2004 and 2005, the members of Lakeshore discussed the possibility of WASD joining the membership of Lakeshore, with an offer for WASD to purchase units extended in October 2005.  (Thompkins Aff. ¶ 9; Houlihan Aff. ¶ 14.) WASD failed to accept this offer by contributing capital.  (Thompkins Aff. ¶ 9; Houlihan Aff. ¶ 14.)  All of these discussions were at Lakeshore board meetings or other meetings held in Indiana.  (*Id.*)  Lakeshore counsel drafted a letter of intent ("LOI") and operating agreement ("Lakeshore OA") which provided for 80% ownership by the Doctors and 20% ownership by WASD.  (Thompkins Aff. ¶ 10; Houlihan Aff. ¶ 15.)  These draft versions of the LOI and Lakeshore OA were never finalized or executed.  (Thompkins Aff. ¶ 10; Houlihan Aff. ¶ 15.)

On December 15, 2005, at a board meeting of Lakeshore in Indiana, the members of Lakeshore voted to pursue Lake-Porter Ambulatory LLC's ("Lake-Porter") proposal to purchase the ASC.  (Thompkins Aff. ¶ 11.)  In a conversation with Thompkins, Woodrum suggested meeting for lunch at Lawry's restaurant in Chicago on December 27, 2007.  (Thompkins Aff. ¶ 12.)  At this meeting, Thompkins informed Woodrum that the members of Lakeshore had voted to sell Lakeshore to Lake-Porter.  (*Id.*)

After Lakeshore was sold to Lake-Porter, Lake-Porter assumed by assignment the Development Agreement.  After completion of the ASC, WASD initiated an arbitration proceeding against Lakeshore pursuant to the Development Agreement on March 8, 2007.  (Thompkins Aff. ¶ 13.)  This action was resolved by a Settlement Agreement and Mutual Release between Lakeshore and WASD dated October 17, 2007 ("Settlement Agreement").  (Settlement Agreement, attached as Exhibit "D"; Thompkins Aff. ¶ 14;

Houlihan Aff. ¶ 17.)  The Settlement Agreement contained a choice of law and forum clause designating Indiana state courts as the exclusive venue.  (Settlement Agreement, ¶ 7.)

## III.  ARGUMENT

### A.    The Doctors Are Not Subject to Personal Jurisdiction in Illinois.

The Court does not have personal jurisdiction over the Doctors.  Plaintiffs bear the burden of establishing a prima facie basis for personal jurisdiction against each defendant. *Illinois Commerce Comm'n v. Entergy-Koch Trading,* 841 N.E.2d 27, 32 (Ill. App. Ct. 2005).  The Court has personal jurisdiction over a non-resident defendant <u>only</u> if Illinois state courts would have jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.* 107 F.3d 1272, 1275 (7th Cir. 2003) (emphasis added).  Illinois state courts may assert personal jurisdiction over a defendant if it does not offend the guarantees of due process provided by the Illinois and United States Constitutions.  *Sabados v. Planned Parenthood of Greater Indiana,* 882 N.E.2d 121, 125 (Ill. App. Ct. 2007).  Federal due process requires that all defendants have sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id.* quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)

*Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 111 (1987) clarified that both minimum contacts and reasonableness requirements must be met in order to establish personal jurisdiction.  The reasonableness test relates to the magnitude and the purposefulness of each defendant's contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).  Similarly, "Illinois due process requires that it be fair, just, and reasonable to require a non-resident defendant to defend an action in Illinois, considering

the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Sabados,* 882 N.E.2d at 126

1.     Illinois does not have General Jurisdiction over the Doctors

Personal jurisdiction may be general or specific. General jurisdiction requires that each defendant's non-controversy related contacts be substantial, continuous, and systematic. *Helicopteros Nacionales v. Hall*, 466 U.S. 408, 414 (1984). Under a general jurisdiction analysis, there is no way that any of the Doctors' contacts with Illinois meet these criteria. Plaintiffs allege that the Doctors are subject to general jurisdiction by "regularly seeing and treating patients who are Illinois residents." (Complaint, ¶ 7.) Plaintiffs are wrong for two reasons. First, the Doctors do not regularly treat Illinois residents. (*See* Houlihan Aff. ¶ 10.) During the relevant time period of 2004-2007, fewer than 2% of the Doctors' 1,996 patients were Illinois residents. (Houlihan Aff. ¶ 10.) Second, even if the Doctors regularly treated a substantial number of Illinois residents, such contact does not subject them to general jurisdiction. *See Sabados,* 882 N.E.2d at 128-29; *see also Rogers v. Furlow,* 699 F. Supp. 672, 676-77 (N.D.Ill. 1988) (defendant doctor and clinic were not subject to Illinois jurisdiction even though 10-12% of their patients were Illinois residents referred by Illinois doctors and defendants regularly presented seminars in Illinois).

In *Sabados*, an Illinois patient traveled to Indiana to receive medical services from an Indiana clinic. The patient developed an injury related to her treatment and sued the clinic in Illinois state court. The Court found that the clinic had the following contacts: 1) it treated up to 1,500 Illinois patients a year; 2) the clinic listed a number of Illinois residents in its fund-raising database; 3) clinic advertisements appeared in the telephone

books of four Illinois cities, including plaintiff's hometown and 4) the clinic had employed eight Illinois residents over the course of five years.  These contacts, even aggregated, were insufficient for general jurisdiction under a due process analysis. *Sabados,* 882 N.E.2d at 127, *see also Ballard v. Rawlins,* 428 N.E.2d 532 (Ill. App. Ct. 1981) (finding no personal jurisdiction even though nonresident doctor called prescription into an Illinois pharmacy and plaintiff claimed doctor solicited her as a patient).  Personal services rendered by physicians in their local office are not directed at any particular place. *Id.*; *see also Rogers v. Furlow,* 699 F. Supp. at 677 (doctors "treat people, not states, and therefore they are not invoking the protection of the laws of Illinois by treating residents of Illinois exclusively [in another state]").  "[A] plaintiff who travels out of state to seek personal assistance and then travels back to the forum state should expect to travel back to the state of service in order to lodge any related complaint."  *Sabados,* 882 N.E.2d at 127.

The Doctors' contacts with Illinois are even more tenuous than the defendants' in *Sabados* and *Rogers*.  Each of the Doctors is a resident and citizen of Indiana. (Thompkins Aff. ¶ 4; Houlihan Aff. ¶ 7.) Each practices exclusively in Indiana.  (*Id.)* None of them have referral relationships with any entity in Illinois.  (Thompkins Aff. ¶ 4; Houlihan Aff. ¶ 8.)  Fewer than 2% of the 1,996 patients seen by the Doctors between 2004-2007 were Illinois residents. (Houlihan Aff. ¶ 10.)   These Illinois patients traveled to Indiana to receive services from the Doctors in their Indiana office.  (Houlihan Aff. ¶ 7; Thompkins Aff. ¶ 4.)  The Doctors do not advertise in Illinois.  (Houlihan Aff. ¶ 9.) None of the Doctors have engaged in widespread, continuous, or systemic contact with Illinois.  It would violate due process for the Court to exercise general jurisdiction.

2.    Illinois Cannot Assert Specific Jurisdiction Over the Doctors

For specific jurisdiction, the Court must decide if a defendant "has purposefully established minimum contacts" with Illinois "and consider whether, by traditional standards, those minimum contacts would make personal jurisdiction reasonable and fair under the circumstances." *RAR, Inc, v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). The Court has to determine if each defendant "should reasonably anticipate being haled into court" in the forum state. *Burger King*, *supra*, at 474. A defendant may have "fair warning" that it would be called to defend a suit in the forum state only if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state thereby invoking the benefits and protection of the forum's laws." *Id.* at 477-78. "An out-of-state party's contract with an in-state party is alone not enough to establish the requisite minimum contacts." *RAR, Inc,* 107 F.3d at 1277. "[S]pecific jurisdiction is not appropriate merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather the action must *directly arise* out of the specific contacts between the defendant and the forum state." *Id.* at 1278 quoting *Sawtelle v. Farrell,* 70 F.3d 1381, 1389 (1st Cir. 1995) (internal citations omitted) (emphasis original).

There is no evidence that any of the Doctors purposefully established contacts with Illinois sufficient for specific jurisdiction. Plaintiffs' single explicit allegation concerning Illinois is one lunch meeting between Woodrum and Thompkins at a Chicago restaurant. (Complaint, ¶ 13.) This meeting was held in Illinois at the request of Woodrum. (Thompkins Aff. ¶ 12.) Plaintiffs make no allegation that Thompkins had any other specific contact with Illinois. There is no allegation of contact with Illinois for

the other Doctors.  Other than vague allegations of "making a contract substantially connected" with Illinois, "breach of fiduciary duty" and "tortious conduct," in Illinois, plaintiffs fail to allege that any of the Doctors had any specific contacts with Illinois at all, let alone contacts that would subject them to the specific jurisdiction of this Court. (Complaint, ¶ 7.)  There is no specific personal jurisdiction over the Doctors in Illinois for the matters raised in plaintiffs' Complaint.

### B.    This Court Should Dismiss this Matter for Improper Venue

#### 1.    No Substantial Events or Omissions Occurred in This Jurisdiction

Improper venue is an independent reason for the Court to dismiss this case. Under 28 U.S.C. §1391(b), venue should lie either where the defendant resides or where substantial events or omissions occurred.  Plaintiff asserts that venue is proper in this court because a "substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district."  (Complaint, ¶ 7.)  Plaintiff has the burden of establishing proper venue.  *Grantham v. Challenge-Cook Bros., Inc.,* 420 F.2d 1182, 1184 (7th Cir. 1969).  Other than one meeting between Thompkins and Woodrum at a Chicago restaurant, plaintiffs do not allege that <u>any</u> specific events forming the basis of their action happened in Illinois.  The executed contract between Lakeshore and WASD giving rise to this action – the Development Agreement– was signed in Indiana. (Houlihan Aff. ¶ 12; Thompkins Aff. ¶ 7.)  The subject ASC is in Indiana. (Houlihan Aff. ¶ 5; Thompkins Aff. ¶ 3.) All other meetings between the members of Lakeshore and WASD took place in Indiana.  (Houlihan Aff. ¶¶13-14; Thompkins Aff. ¶¶ 8-9.) The only Illinois aspect to this case is that one plaintiff, Woodrum, resides in Illinois.  (Complaint, ¶ 2.)  With the exception of Count IV (Fraudulent Misrepresentation), all of the counts in

the Complaint rest on alleged omissions by the Doctors.  For example, in Count I (Breach of the Lakeshore OA), plaintiffs alleged that the Doctors breached the Lakeshore OA by:

> a) failing to distribute the Venture's net cash flow on at least a quarterly basis to WASD for its pro rata or other equitable share;
>
> b) failing to distribute to WASD its pro rata or other equitable share of the proceeds of the Sale; …
>
> h) By otherwise failing to comply with the terms of the Lakeshore OA."

(Complaint, ¶ 23.)

To the extent that plaintiffs' allegations rely on failures to act by the Doctors, such omissions "could only take place where the [d]efendants are located." *Giordano v. City of Palm Bay,* 2007 WL 4365341 *2 (N.D. Ill. December 12, 2007).   All of the Doctors are Indiana citizens and practice exclusively in Indiana.  (Houlihan Aff. ¶ 7; Thompkins Aff. ¶ 4.)   Each of the alleged omissions could have only been an Indiana event.

2.   Plaintiffs Fail to Plead Sufficient Allegations to Support Venue for Each Cause of Action

Plaintiffs have failed to establish proper venue in this Court for each count of their complaint.   "At least when the plaintiff asserts venue on a basis other than the defendants' residence, the plaintiff generally must establish proper venue as to each separate cause of action." *Giordano,* 2007 WL 4365341 at *2. Of plaintiffs' eight causes of action, only one – the Count IV (Fraudulent Misrepresentation) - purports an Illinois connection and rests on the lunch meeting between Woodrum and Thompkins in Chicago.  The remaining seven counts are predicated on (1) failures of the Doctors to act, which can only happen in Indiana, or (2) actions taken by the Doctors in Indiana.  See

*Giordano, supra.*    There is not even a prima facie basis for venue for seven out of eight counts in the Complaint.

      3.    <u>Plaintiffs Have Waived Venue in this District</u>

Finally, the forum selection clause in the Settlement Agreement provides an additional basis to dismiss this case for improper venue.  A lack of venue challenge, based upon a forum selection clause, is appropriately brought as a Rule 12 (b) (3) motion to dismiss.  *Continental Ins. Co. v. M/V Orsula,* 354 F.3d 603, 606-07 (7th Cir. 2003). A forum selection clause in "an enforceable contract is presumed valid and will be generally enforced."  *AGA Shareholders, LLC v. CSK Auto, Inc.,* 467 F.Supp.2d 834, 843 (N.D. Ill. 2006).  This is particularly true where the contractual language makes clear that a certain venue is mandatory and exclusive.  *Id.*  Plaintiffs' reliance on alternative equitable and tort claims does not circumvent the basis of their case.  *Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir. 1993) quoting *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190, 203 (3rd Cir. 1983), *cert. denied (*internal citations omitted) ("where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain as to the appropriate forum for litigation")

Hugel, as an individual, entered into a contract to join the Corporation of Lloyd's, with a forum selection clause designating the courts of England.  He was the President, Chairman, and owner of GCM and OMI.  Hugel and GCM filed suit against Lloyd's in Illinois District Court, alleging breach of contract, breach of fiduciary duty, invasion of privacy and tortious interference with business relationships, all arising out of disclosures

Lloyd's allegedly made during a misconduct investigation.  The Court dismissed the suit for improper venue based on the forum selection clause.  *Hugel,* 999 F.2d at 211.

Plaintiffs tried to circumvent the clause by arguing that 1) the suit does not arise out of the subject of the original contract, 2) Lloyd's assurances of confidentiality constituted a separate contract, 3) tortious interference with a business relationship is a tort claim not covered by the forum selection clause, and 4) because only Hugel was a party to the original contract, GCM and OMI are not bound by the forum selection clause.  *Hugel,* 999 F.2d at 209-10. The Court rejected each of these arguments, holding that the executed contract was the basis of all plaintiffs' claims.  "[If] Hugel were not a member of Lloyd's, there would not have been an investigation."  *Id.* at 209.  The investigation itself was intertwined with membership requirements under the contract such that oral promises made in the course of the investigation were not a separate contract.  *Id.; see also AGA Shareholders, LLC,* 467 F.Supp.2d at 848 citing *Omron Healthcare, Inc. v. Maclaren Exp. Ltd.,* 28 F.3d 600, 603 (7th Cir. 1994) (forum selection clause in master contract governs all later related contracts).  Even though plaintiffs were alleging tort claims, the duty element of the tort stemmed from the contract and is governed by the forum selection clause. *Hugel,* 999 F.2d at 209.  Finally, because GCM and OMI are closely related to Hugel - Hugel is an officer and owner of both companies - they are bound by the forum selection clause.  *Id.*

Here, all of plaintiffs' allegations center on the ASC.  Plaintiffs' connection with the ASC stemmed from the Development Agreement.  Any alleged promises or omissions by the Doctors to plaintiffs directly arose out of the relationship between the

parties created by the Development Agreement.  The Settlement Agreement resolved all

claims related to the Development Agreement:

> WASD and Lakeshore, for themselves, their partners, members, managers, representatives…generally release, covenant not to sue, and forever discharge WASD and Lakeshore and their partners, representatives, assigns, predecessors, successors…from any and all claims, demands, or causes of action related in any way to, or arising out of the Development Agreement, known or unknown, and any and all other past present and future.

(Settlement Agreement, ¶ 2.)

The Settlement Agreement designated Indiana state courts as an exclusive forum

for all disputes:

> This Settlement Agreement shall be governed by, and construed in accordance with the laws of the State of Indiana.  Any and all actions arising from this Settlement Agreement shall be brought in the appropriate Indiana state court and all parties agree to submit to the jurisdiction of the Indiana courts and waive any and all claims of forum non conveniens.

(Settlement Agreement, ¶ 7.)

The Doctors were members of Lakeshore.  (Houlihan Aff. ¶ 6; Thompkins Aff. ¶

5.)  Woodrum is a partner of WASD. (Development Agreement, p. 7.)  The Settlement

Agreement specifically included the Doctors and Woodrum by stating that it applied to

Lakeshore and WASD's "partners, members, managers, [and] representatives."

(Settlement Agreement, ¶ 2.)   Under *Hugel,* these individuals are closely related to the

signatories.  The Settlement Agreement, including the forum selection clause, governs the

Doctors and Woodrum.

To defy the forum selection clause, plaintiffs carry the "heavy" burden of having to show that "the contractual forum will be so gravely difficult and inconvenient that the party challenging the clause will for all practical purposes be deprived his day in court." *AGA Shareholders, LLC,* 467 F.Supp.2d at 843 *quoting Heller Fin., Inc. v. Midwhey Powder Co,* 883 F.2d 1286, 1290-91 (7th Cir. 1989) (internal citations omitted). Indiana state courts are a convenient forum for this suit. All defendants, including Lakeshore and REASC, are located in Indiana. (Houlihan Aff. ¶¶ 4, 6-7; Thompkins Aff. ¶¶ 2, 4.) The ASC and related records are in Indiana. (Houlihan Aff. ¶ 5; Thompkins Aff. ¶ 3.) Woodrum and other WASD personnel traveled to Indiana numerous times to carry out their duties under the Development Agreement. (Houlihan Aff. ¶ 13; Thompkins Aff. ¶ 8.) There is no reason why they cannot do so to prosecute a suit. WASD and Woodrum released all causes of action in this case by entering into the Settlement Agreement. To the extent they challenge the scope of the release, they still agreed to only bring suit in Indiana state courts.

## IV.    CONCLUSION

This Court should dismiss this matter as to the Doctors. The Court lacks jurisdiction over the Doctors and the Northern District Court of Illinois is an improper venue. Illinois has neither general nor specific jurisdiction over the Doctors. None of the Doctors engage in business or provide services in Illinois. The Doctors also have not established minimum contacts with Illinois so as to reasonably expect being haled into court in Illinois. Except for a single lunch meeting held in Chicago at the behest of Woodrum, none of the events constituting plaintiffs' claims happened in Illinois. Out of plaintiffs' eight separate causes of action, only one specifically includes an Illinois event

- and only as to one of the Doctors.  Finally, plaintiffs have waived venue in this Court by agreeing to a mandatory forum selection clause designating Indiana state courts as the proper forum for disputes related to the issues identified in the Complaint.  Plaintiffs should be held to their bargain.

Respectfully submitted,

PLEWS SHADLEY RACHER & BRAUN LLP


/s/John H. Lloyd
Attorneys for Defendants

Stephen A. Studer (Illinois Atty. # 02761947)
John H. Lloyd (Illinois Atty. #06231089)
PLEWS SHADLEY RACHER & BRAUN LLP
53732 Generations Drive
South Bend, Indiana 46635
Tel: (574) 273-1010
E-mail: jlloyd@psrb.com

Jeffrey M. Monberg (Illinois Atty. #6270295)
KRIEG DEVAULT LLP
33 N. LaSalle Street, Suite 2412
Chicago, IL 60615
Tel: (312) 423-9300

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2008, a copy of the foregoing was electronically served upon the following via the CM/ECF system:

Robert H. Lang, Esq.
Karen E. Grossman, Esq.
Holland & Knight LLP
131 S. Dearborn St., 30th Fl.
Chicago, IL 60603

F. Joseph Jaskowiak
HOEPPNER WAGNER & EVANS LLP
1000 East 80th Place – Suite 606S
Merrillville, Indiana 46410

Cintra D. Bentley
SEYFARTH SHAW LLP
131 South Dearborn Street – 2400
Chicago, Illinois 60605


/s/John H. Lloyd

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC, a Nevada limited liability company, and DAVID WOODRUM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.08-C-1721 |
| LAKESHORE SURGICARE, LLC, an Indiana limited liability company; REASC, LLC, an Indiana limited liability company; ANTON THOMPKINS, M.D., BRUCE THOMA, M.D., DAVID MUSGRAVE, M.D., JAMES MALAYTER, M.D., GEORGE ALAVANJA, M.D., MARC BRUELL, M.D., MICHAEL LELAND, M.D., THOMAS KAY, M.D., and PAUL GRUSZKA, M.D. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF TRISH HOULIHAN

Trish Houlihan, being first duly sworn, now says:

1.    I am over the age of eighteen and have personal knowledge of the facts set forth in this Affidavit.

2.    I am the Chief Financial Officer for Lakeshore Bone & Joint Institute, Inc ("LBJI").

3.    During all relevant time periods, Anton Thompkins, M.D. ("Thompkins"), Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay"), and Paul Gruszka, M.D. ("Gruszka") (collectively the "Doctors") were members of LBJI.

EXHIBIT "A"

4.     Per the request of the Doctors, I provided financial and accounting services to Lakeshore Surgicare, LLC ("Lakeshore"), an Indiana limited liability company, from May 2004 to April 2006.  I also provided financial and accounting services for REASC, LLC ("REASC"), an Indiana limited liability company, from January 2005 to April 2006.

5.     Lakeshore was organized in May 2004 to build an ambulatory surgery center in Chesterton, Indiana (the "ASC").  REASC was organized in January 2005 to own the real estate underlying the ASC.

6.     The Doctors were the only members of Lakeshore and REASC from their respective dates of organization until April 2006.

7.     During all relevant times, the Doctors were Indiana citizens who practiced medicine exclusively in Indiana.

8.     None of the Doctors have referral relationships with Illinois entities.

9.     The Doctors do not advertise in Illinois.

10.     The Doctors treated 1,996 patients between 2004 and 2007.  Of this number, less than 2% were Illinois patients.

11.     Lakeshore entered into a Development Agreement with Woodrum Ambulatory Systems Development, LLC ("WASD") on August 6, 2004 (the "Development Agreement").

12.     The Development Agreement was executed by both parties at the Doctors' offices in Indiana.

13.     David Woodrum and other WASD personnel met with the Doctors and representatives of Lakeshore numerous times in Indiana during WASD's commission of its duties under the Development Agreement.

14.    During various times in 2004 and 2005, the Doctors discussed the possibility of WASD joining the membership of Lakeshore, with an offer for WASD to purchase units extended in October 2005. WASD failed to accept this offer by contributing capital. All of these discussions were at Lakeshore board meetings or other meetings in Indiana.

15.    Lakeshore counsel drafted a letter of intent ("LOI") and operating agreement (the Lakeshore OA") for Lakeshore showing 80% ownership by the Doctors and 20% ownership by WASD. These draft versions of the LOI and Lakeshore OA were never completed or executed.

16.    WASD initiated an arbitration proceeding against Lakeshore pursuant to the Development Agreement on March 8, 2007.

17.    This action was resolved by a settlement agreement between Lakeshore and WASD dated October 17, 2007.

Further, Affiant sayeth not.

_____
Trish Houlihan

STATE OF INDIANA        )
                        ) SS:
COUNTY OF PORTER        )

    Subscribed and sworn to before me, a Notary Public, in and for said County and State this 12ᵗ day of June, 2008.

My Commission Expires: 12-18-2014
My County of Residence: Lake

_____
                       Notary Public

**MARY KAPITAN**
**SEAL**
Notary Public, State of Indiana
My Commission Expires Dec. 18, 2014

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC, a Nevada limited liability company, and DAVID WOODRUM, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No.08-C-1721 |
| LAKESHORE SURGICARE, LLC, an Indiana limited liability company; REASC, LLC, an Indiana limited liability company; ANTON THOMPKINS, M.D., BRUCE THOMA, M.D., DAVID MUSGRAVE, M.D., JAMES MALAYTER, M.D., GEORGE ALAVANJA, M.D., MARC BRUELL, M.D., MICHAEL LELAND, M.D., THOMAS KAY, M.D., and PAUL GRUSZKA, M.D. | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF ANTON THOMPKINS, M.D.

Anton Thompkins, M.D., being first duly sworn, now says:

1.      I am over the age of eighteen and have personal knowledge of the facts set forth in this Affidavit.

2.      I was a member of Lakeshore Surgicare, LLC ("Lakeshore"), an Indiana limited liability company, from May 2004 to April 2006. I was also a member of REASC, LLC ("REASC"), an Indiana limited liability company, from January 2005 to April 2006.

3.      Lakeshore was organized in May 2004 to build an ambulatory surgery center in Chesterton, Indiana (the "ASC"). REASC was organized in January 2005 to own the real estate underlying the ASC.

4.      I am an Indiana resident and citizen. I practice medicine exclusively in Indiana. I do not have referral relationships with any Illinois entities.

EXHIBIT "B"

5.      Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay"),  Paul Gruszka, M.D. ("Gruszka") and I (collectively the "Doctors") were the only members of Lakeshore and REASC from the date of organization until April 16, 2006.

6.      David Woodrum ("Woodrum") sent me a proposal/solicitation letter, dated April 2, 2004, offering WASD consultant services for the development of the ASC.  Lakeshore entered into a Development Agreement with Woodrum Ambulatory Systems Development, LLC ("WASD") on August 6, 2004 (the "Development Agreement").

7.      The Development Agreement was executed by both parties at the Doctors' offices in Indiana.

8.      David Woodrum and other WASD representatives met with the Doctors and representatives of Lakeshore numerous times in Indiana during WASD's commission of its duties under the Development Agreement.

9.      During various times in 2004 and 2005, the Doctors discussed the possibility of WASD joining the membership of Lakeshore, with an offer for WASD to purchase units extended in October 2005.  WASD failed to accept this offer by contributing capital.  All of these discussions were at Lakeshore board meetings or other meetings in Indiana.

10.     Lakeshore counsel drafted a letter of intent ("LOI") and operating agreement (the Lakeshore OA") for Lakeshore showing 80% ownership by the Doctors and 20% ownership by WASD. These draft versions of the LOI and Lakeshore OA were never completed or executed.

11.     On December 15, 2005, at a board meeting of Lakeshore in Indiana, the members of Lakeshore voted to pursue Lake-Porter Ambulatory LLC's ("Lake-Porter") proposal to purchase the ASC.

11.    On December 15, 2005, at a board meeting of Lakeshore in Indiana, the members of Lakeshore voted to pursue Lake-Porter Ambulatory LLC's ("Lake-Porter") proposal to purchase the ASC.

12.    In a conversation with me, Woodrum suggested meeting for lunch at Lawry's restaurant in Chicago on December 27, 2007. At this meeting, I informed Woodrum that the members of Lakeshore had voted to sell Lakeshore to Lake-Porter.

13.    WASD initiated an arbitration proceeding against Lakeshore pursuant to the Development Agreement on March 8, 2007.

14.    This action was resolved by a settlement agreement between Lakeshore and WASD dated October 17, 2007.

Further, Affiant sayeth not.

_____
Anton Thompkins, M.D.

STATE OF INDIANA        )
                        ) SS:
COUNTY OF PORTER        )

Subscribed and sworn to before me, a Notary Public, in and for said County and State this 12ᵗʰ day of June, 2008.

My Commission Expires: 12-18-2014
My County of Residence: Lake

_____, Notary Public

MARY KAPITAN
SEAL
Notary Public, State of Indiana
My Commission Expires Dec. 18, 201

# DEVELOPMENT AGREEMENT

This **Development Agreement** (hereinafter the "Agreement") is entered into as of this _16th_ day of _August_, 2004, by and between Lakeshore Surgicare, LLC (referred herein as "Client"), and Woodrum/Ambulatory Systems Development, LLC ("WASD"), with reference to the following facts:

A CLIENT intends to develop, own, and operate an ambulatory surgery center in Chesterton, Indiana, herein collectively referred to as the "Surgery Center" or the "ASC".

B WASD is a health care consulting firm that provides, among other things, development and ongoing management services with respect to ambulatory care projects.

CLIENT desire to engage WASD to provide consulting services with respect to the development activities relating to the Surgery Center and WASD desires to provide such services to CLIENT.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the parties agree as follows:

## ARTICLE I

### ENGAGEMENT OF WASD AS AN INDEPENDENT CONTRACTOR

**1.1 Engagement of WASD and Representation**

CLIENT hereby retains WASD to perform consulting services with respect to development activities relating to the Surgery Center. WASD agrees to provide such consulting services, as defined below. WASD represents and warrants that its officers, managers, directors, and owners are not currently, and have never been, excluded from participation in a federal health care program and that the CLIENT will be notified at any time during the term of this contract.

**1.2 Independent Contractor Relationship**

CLIENT and WASD agree that WASD shall provide services under this Agreement as an independent contractor, and that WASD shall not be deemed to be an employee of CLIENT or of any entity related thereto for all purposes, including payment of Social Security, withholding taxes and all other Federal, State and Local taxes.

## ARTICLE II

### TERM OF AGREEMENT

**2.1 Term**

This Agreement shall be effective (the "Effective Date) as of the date set forth above and shall continue until such time as the Surgery Center receive its Medicare certification (the "Medicare Effective Date") and is fully operational.

**Election to Terminate by Either Party**

Notwithstanding the foregoing, this Agreement

(a) may be terminated by WASD at any time with or without cause  and

EXHIBIT "C"

b) may be terminated by CLIENT at any time with or without cause

Such termination will be effective upon the giving of notice thereof by the party electing to terminate to the other party. Upon any such termination, the value of all work completed by WASD through the date of termination will be paid within thirty (30) days after the effective date of such termination.

ARTICLE III

DEVELOPMENT SERVICES

3.1   WASD Development Services

WASD agrees to perform the following services with respect to the development of the Surgery Center upon approval of CLIENT:

(a)   Relationship to Architect and to Construction Contractor

WASD shall provide the construction management function for the project. WASD shall assist Client in selection of an architect and contractor. WASD shall assist the architect in planning and developing the Surgery Center in conformance with the requirements applicable to surgical clinic licensure, Medicare certification of an ambulatory surgery center, and/or accreditation by the Accreditation Association for Ambulatory Health Care, Inc. ("AAAHC") or equivalent organization. In addition, WASD will provide all reasonably necessary assistance to obtain all necessary permits, licenses, certifications, and approvals for the commencement and completion of construction and for the operation of the Surgery Center. WASD shall assist the architect, as necessary to obtain building and zoning approvals. WASD shall assure that the construction contract will be built according to established specifications and will authorize construction payments for the owner. WASD will serve as the owner's representative for the project. WASD shall not be responsible for the performance of the architect or of the construction contractor, or for any failure of the architect or the construction contractor to comply with the terms of his or its respective contracts.  WASD shall not be responsible for the legal aspects of negotiating the architectural and/or construction contracts, nor shall be responsible for any fees relating to inspections or tests. WASD does not warrant figures in the pre-development feasibility analysis and the bids received from the construction contractor.

(a1   Financial Projections and Budgeting

WASD will prepare pro forma financial projections for the development and initial operating period of the Surgery Center and a development schedule. The pro forma financials will include budgeting for all capital expenditures and cash flow projections through the first five years of the operation of the Surgery Center. All such items will be completed prior to the execution of any construction contracts and will be updated periodically during the development process.

In addition, WASD will prepare a detailed operating budget and cash flow projections for the first year of operations of the Surgery Center. This operating budget and cash flow projections will be delivered to CLIENT at least 90 days prior to the opening of the

2

Surgery Center and will be revised and updated as appropriate

**(b)**   Equipment Planning and Acquisition

WASD shall, in consultation with CLIENT and other representatives of the entity, use its best efforts to assure that medical and non-medical equipment and furnishings acquired on behalf of the entity is within budget. WASD will acquire leasing company bids and/or other financing arrangements for equipment. It is expected that an equipment procurement company will be hired to purchase the medical and non-medical equipment and furnishings for the Surgery Center at a discount from retail rates, handle procurement and purchase orders, and install equipment under WASD's supervision. The equipment procurement company's fee shall be the responsibility of CLIENT and will conform to the budget prepared by WASD.

**(c)**   Assistance in Hiring and Pre-opening Supervision of On-Site Manager

WASD shall assist CLIENT in the screening of candidates for the position of on-site manager for the ASC (the "Manager"). CLIENT and WASD contemplate that the Manager will be employed commencing at least five (5) months prior to the opening of Surgery Center. Pursuant to this Agreement, WASD shall supervise the performance of said Manager for the period prior to the opening of the Surgery Center.

**(d)**   Third Party Payor Relations/Fees

WASD shall develop and set fees with the approval of CLIENT. WASD, working with the Surgery Center staff, shall use all efforts to negotiate third party payor fees and contracts with the third party insurance payers or business and insurance companies in the service area. The board of managers of Client ("Board") will approve all third party contracts that are negotiated.

**(e)**   Development of Operating Systems

WASD shall develop the Surgery Center's credit policies, fee schedules, and initial operating budget. Additionally, WASD shall develop the Surgery Center's accounts receivable, accounts payable, payroll, collections, and general ledger systems. WASD shall train the employees to use the WASD systems.

**(f**   Operating Manuals

WASD shall prepare and provide the ASC with outpatient surgery center operating manuals, protocols, and procedures that comply with applicable Medicare certification requirements, state surgical clinic licensing requirements, and requirements for accreditation by the AAAHC, and shall train the ASC's staff members to use such manuals.

**(g)**   Hiring and Operational Training of Nursing and Management Staff

WASD shall assist the Surgery Center in the hiring of the ASC's personnel and shall train such staff members with respect to the operation of the ASC.

**(h)**   Acquisition of Medical Supplies

WASD shall, in consultation with CLIENT and other representatives

3

of the Surgery Center, plan and acquire on behalf of the Surgery Center medical supplies necessary to open and continually operate the Surgery Center.

### Project Coordination

WASD shall assign a project manager employed by WASD and acceptable to CLIENT to undertake overall coordination of the ASC development project. In addition to frequent telephone contact, such manager shall meet periodically in person with CLIENT and other representatives of CLIENT. It is anticipated that such meetings will take place frequently during the development process, and such meetings will be held as reasonably requested by WASD or by CLIENT. At least one such meeting will occur each month during the development process.

### Negotiation of Ancillary Agreements

WASD shall assist the Surgery Center and the Surgery Center's advisors in negotiating all service agreements required to operate the ASC. WASD shall negotiate and gain approval for the ASC representatives to execute these agreements on behalf of the ASC.

k    ### Licensing and Medicare Certification

WASD shall assist the Surgery Center and the Surgery Center's advisors in obtaining surgical clinic licensure and Medicare certification. WASD shall apply for all permits and licenses on behalf of the ASC. WASD shall attend the on-site survey for licensure and Medicare certification.

**3.2  Restriction of Scope of Development Services**

WASD's obligations under this Agreement do not include any services with respect to applying for or obtaining any certificate of need, or approval pursuant to Section 1122 of the Social Security Act, or any similar approval.

**3.3  WASD Fees for Development Services**

In consideration of WASD's development services pursuant to paragraph 3.1 of this Agreement, CLIENT shall pay WASD a total of $75,000.00 as fees for the Development Services for the Surgery Center which shall be payable as follows: (1) CLIENT shall pay WASD $10,000.00 as of the date of this Agreement;(2) CLIENT shall pay WASD $7,000.00 per month thereafter for a period of eight (8) months; and (3) CLIENT shall pay WASD $9,000 on the day the Medicare certification inspection is completed successfully. If Client decides not to use WASD to perform the construction management function, the total development fee will be reduced to $65,000.00. Payments shall be due the first day of the month following execution of this Agreement. Late payments shall bear interest at a maximum rate of 12 percent per annum.

**3.4  Reimbursement of Out-of-Pocket Development Expenses**

CLIENT will reimburse WASD for all reasonable and actual out-of-pocket expenses or charges, commencing as of the date of this Agreement, incurred by WASD on behalf of the Surgery Center in performing its duties hereunder. WASD shall submit receipts for such payments to CLIENT. CLIENT shall reimburse WASD for such expenses within thirty (30) days following receipt of each expense statement.

## ARTICLE IV

### INDEMNIFICATION

**4.1** <u>Indemnification</u>

WASD shall indemnify and hold CLIENT, its employees and agents, harmless from any and all loss, liability or damage, of any kind whatsoever for which CLIENT shall not be reimbursed by insurance, including but not limited to attorneys' fees and court costs, arising out of or in any manner occasioned by breach by WASD , its agents, employees, servants or subcontractors, of any covenant and/or condition of this Agreement, or by the negligence, improper conduct or intentional acts or omissions of WASD, its agents, employees, servants or subcontractors.

CLIENT shall indemnify and hold WASD, its employees, partners and agents, harmless from any and all loss, liability or damage, of any kind whatsoever for which WASD shall not be reimbursed by insurance, including but not limited to attorneys' fees and court costs, arising out of or in any manner occasioned by breach by CLIENT, its agents, employees, servants or subcontractors, of any covenant and/or condition of this Agreement, or by the negligence, improper conduct or intentional acts or omissions of CLIENT, its agents, employees, servants or subcontractors.

## ARTICLE V

### REASONABLE BEST EFFORTS OF CLIENT

**5.1** <u>Reasonable Best Efforts</u>

CLIENT and all of its directors, officers, employees, and agents, shall use their reasonable best efforts to assist WASD fulfilling its responsibilities under this Agreement. WASD shall use its reasonable best efforts to perform its responsibilities under this Agreement. The parties acknowledge that an outpatient surgery center development project, by is very nature, involves a series of complex, interrelated tasks which frequently involve unforeseeable circumstances and delays beyond the control of surgery center development consultants such as WASD. Notwithstanding anything in this agreement to the contrary, the parties acknowledge that the ability of WASD to carry out its responsibilities hereunder, and WASD's ability to perform such responsibilities in a timely manner, may, in specific instances, depend upon circumstances, or upon the performance of actions by others, or the cooperation or providing information to WASD by others, beyond WASD's control. WASD shall not in any way be deemed to be in default under this Agreement in the event that WASD is unable to perform the development services for which it is responsible under this Agreement within the time frames contemplated herein, to the extent that such inability results from circumstances, or the failure of persons or entities (including but not limited to the CLIENT and/or the parent of CLIENT and all of its directors, officers, employees, or agents), beyond WASD's control.

## ARTICLE VI

### MISCELLANEOUS

**6.1** <u>Arbitration</u>

All claims, controversies, disputes, and disagreements arising out of or relating to this Agreement, including any alleged failure of performance

or any alleged breach of any provision of this Agreement shall be conducted in accordance with, and settled by the Commercial Arbitration Rules of the AAA (American Arbitration Association) and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereover.

### Assignment and Delegation

Neither party shall assign any of their rights and interests, or delegate any of their obligations, under this Agreement to any other person or entity without the express written consent of the other party; provided however, that CLIENT may assign this Agreement to a successor organization within the first three months of this Agreement. No such assignment shall release the assignor from any obligation under this Agreement.

### Agreement Binding on Successors

This agreement shall be binding on the parties' heirs, successors, and assigns.

### 6.4  Merger Clause and Amendment

This Agreement constitutes the entire and whole agreement between the parties hereto relating to the subject matter hereof, and may not be modified or amended except by a written instrument signed by each of the parties.

### 6.5  Waiver

No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or remedy hereunder preclude any further exercise thereof or the exercise of any other right, power or remedy. Each and all of the several rights and remedies of the parties hereto contained in or arising by reason of this Agreement shall be construed as cumulative unless otherwise explicitly provided, and no one of them is exclusive of the other or of any right or priority allowed by law or equity.

### 6.6  Governing Law

This Agreement is entered into in accordance with and shall be governed by the laws of the State of Indiana.

### 6.7  Severability

In the event that any of the provisions or portions of any provision of this Agreement is/are held to be unenforceable or invalid by any court of competent jurisdiction, the remaining portion(s) of any such provision and the remaining provisions shall remain in effect.

### 6.8  Attorney's Fees

In the event of any claim, controversy, dispute, or disagreement arising out of or relating to this Agreement, including any alleged failure of performance or any alleged breach of any provision of this Agreement, the prevailing party shall be entitled to recover from the other party all costs, including actual attorneys' fees incurred in connection therewith, including, but not limited to, actual attorneys' fees incurred in any arbitration, litigation, negotiations, document review, research,

analysis, office conferences, and telephone conferences undertaken by legal counsel in connection with any such claim, controversy, dispute, or disagreement.

**6.9   <u>Notices</u>**

Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given when deposited in the United States mail by certified or registered mail, postage prepaid, return receipt requested, or when hand delivered, and addressed as follows:

> In the case of the CLIENT:
>
> > Lakeshore Surgicare, LLC
> > 601 Gateway Boulevard
> > Chesterton, IN 46304

or to such other person or address as CLIENT may from time to time furnish to WASD in accordance with this Section 6.9.

> In the case of WASD
>
> > Woodrum/Ambulatory Systems Development LLC
> > 175 North Harbor Drive, Suite 2006
> > Chicago, IL 60601-7361
>
> with a copy to
>
> > Woodrum/Ambulatory Systems Development LLC
> > 7326 Wentwood Drive
> > Dallas, Texas 75231

or to such other person or address as WASD shall furnish to CLIENT in accordance with this Section 6.9

IN WITNESS WHEREOF, the parties have executed this Agreement by and through their duly authorized representatives effective as of the date and year first above written.

WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC

By: _____

      David L. Woodrum, Partner          _____

                                                Date

FEIN Number: 75-2669577

LAKESHORE SURGICARE, LLC

By: _____   8/16/04

Print Name: David J. Musgrave MD

Title: Shareholder - Lakeshore Surgicare

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Settlement Agreement") is made on October _____, 2007 by and between Woodrum/Ambulatory Systems Development, LLC ("WASD") on the one hand, and Lakeshore Surgicare, LLC ("Lakeshore"), on the other hand (WASD and Lakeshore will collectively be referred to as the "Parties").

### WITNESSETH

WHEREAS, WASD and Lakeshore entered into an August 16, 2004 Development Agreement ("Development Agreement"); and

WHEREAS, WASD initiated an arbitration claim before the American Arbitration Association against Lakeshore, AAA Case No. 52 193 E 00234 07 arising under the Development Agreement and Lakeshore has submitted a Counterclaim against WASD arising under the Development Agreement in the arbitration (the "Arbitration");

WHEREAS, this Settlement Agreement is made as a compromise between the Parties for the complete and final settlement of their respective claims, differences, and causes of action, without any admission of liability;

NOW THEREFORE, in consideration of the foregoing recitals, which by this reference are incorporated into and made a part of this Settlement Agreement, the mutual promises and covenants set forth below to be kept and performed by the Parties, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Lakeshore shall remit to WASD the lump sum total of Fourteen Thousand Dollars ($14,000.00) ("Payment") immediately upon Lakeshore's receipt of a counterpart of this Settlement Agreement executed by WASD.  The Payment shall be by certified funds and shall be payable to WASD.

QBCHI\128492.00002\544687.1

**EXHIBIT "D"**

2.     WASD and Lakeshore for themselves, their partners, members, managers, representatives, assigns, predecessors, successors, beneficiaries, administrators, alter-egos, affiliates, counsel, lenders, executors, and employees and each of them (the " Releasing Parties"), generally release, covenant not to sue, and forever discharge WASD and Lakeshore and their partners, representatives, assigns, predecessors, successors, beneficiaries, administrators, alter-egos, affiliates, counsel, lenders, executors, and employees and each of them (the  Released Parties") from any and all claims, demands or causes of action related in any way to, or arising out of, the Development Agreement, known or unknown, and any and all other past, present and future.  This release shall not apply to any and all claims that the Parties may have against each other that do not arise under the Development Agreement.

3.     This Settlement Agreement is binding upon, and inures to the benefit of, each Party to this Settlement Agreement, its heirs, executors, administrators, and to the Parties' present and former officers, directors, shareholders, partners, counsel, employees, agents, representatives, assigns, successors, direct and indirect subsidiary corporations and divisions, and anyone claiming any interest through them.

4.     The Parties further warrant and represent that they have read this Settlement Agreement and have been fully informed and have full knowledge of its terms, conditions and effects, and they have, either personally or through their attorneys, fully investigated to their full satisfaction the facts surrounding the various claims, controversies and disputes identified herein and understand and are fully satisfied with the terms and effects of this Settlement Agreement.  The Parties agree that no promise or inducement has been offered or made except as set forth herein, and that this Settlement Agreement is executed as their free act and deed without reliance on any statement or representation except as set forth herein.

5.     Whenever possible, each provision of this Settlement Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of the Settlement Agreement shall be held to be prohibited by, or invalid under, applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Settlement Agreement.

6.     This Settlement Agreement constitutes the entire agreement between the Parties relating to the matters identified herein and may not be modified in any manner, except by an instrument in writing signed by all of the Parties and initialed by all the Parties on all the pages. No oral modifications to this Settlement Agreement shall be permitted.

7.     This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of Indiana. Any and all actions arising from this Settlement Agreement shall be brought in the appropriate Indiana state court and all Parties agree to submit to the jurisdiction of the Indiana courts and waive any and all claims of *forum non conveniens*. The prevailing party shall be entitled to recover from the non-prevailing party its reasonable attorney's fees and costs as to any claims or litigation arising out of this Settlement Agreement.

8.     This Settlement Agreement may be simultaneously executed in two or more counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute a single agreement.

9.     Signatures provided by the Parties hereto via facsimile transmission or via PDF shall be sufficient to bind the Parties to this Settlement Agreement.

10.    The Parties and the signatories hereto hereby represent and warrant to each other that the individual executing the Settlement Agreement for each Party has the full authority to execute this Settlement Agreement on behalf of the signatory's principal.

11.    The Parties shall take all actions necessary to dismiss their respective claims and counterclaims in the Arbitration.

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be executed on the date last set forth below:

_____
Woodrum/Ambulatory Systems Development, LLC

By: _____

Its: _____
        Duly Authorized Representative

Dated: _____


_____
Lakeshore Surgicare, LLC

By: _____ _Tom Galouzis, MD_____

Its: _____ _President_____
        Duly    Authorized    Representative

Dated: _____ _10-9-07_____

10.     The Parties and the signatories hereto hereby represent and warrant to each other that the individual executing the Settlement Agreement for each Party has the full authority to execute this Settlement Agreement on behalf of the signatory's principal.

11.     The Parties shall take all actions necessary to dismiss their respective claims and counterclaims in the Arbitration.

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be executed on the date last set forth below:


Woodrum/Ambulatory Systems Development, LLC

By: _____

Its: _____
     Duly Authorized Representative


Dated: _____


Lakeshore Surgicare, LLC

By: _____

Its: _____
     Duly     Authorized     Representative


Dated: _____