**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC, a Nevada limited liability company, and DAVID WOODRUM, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08-C-1721 |
| LAKESHORE SURGICARE, LLC, an Indiana limited liability company; REASC, LLC, an Indiana limited liability company; ANTON THOMPKINS, M.D., BRUCE THOMA, M.D., DAVID MUSGRAVE, M.D., JAMES MALAYTER, M.D., GEORGE ALAVANJA, M.D., MARC BRUELL, M.D., MICHAEL LELAND, M.D., THOMAS KAY, M.D., and PAUL GRUSZKA, M.D., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF THE
## MOTION TO DISMISS & ALTERNATIVE
## MOTION TO TRANSFER

Defendants, Lakeshore Surgicare, LLC, an Indiana limited liability company, and

REASC, LLC, (hereinafter "REASC") an Indiana limited liability Company, file this

memorandum in support of their Motion to Dismiss and Alternative Motion to Transfer this

cause pursuant to 28 USC §§ 1404, 1406 and FRCP 12(b)(3).  Defendants move the Court for

entry of an order dismissing this cause or alternatively to transfer this litigation to the United

States District Court for the Northern District of Indiana, Hammond Division.  In support of this

Motion and alternative Motion, the Defendants show the court as follows.

## I. STATEMENT OF FACTS

Plaintiffs' Complaint at Law and for an Accounting alleges generally that they were to be made partners or members in a limited liability company, Lakeshore Surgicare, LLC (hereinafter "Lakeshore") company operating an ambulatory surgery center in Northwest Indiana as Lakeshore Surgicare, LLC (hereinafter "Lakeshore"). Plaintiffs generally seek a determination that they were "improperly" "cut" out of the venture and an accounting of the operations of the venture. [Complaint at Law and for an Accounting (hereinafter "Complaint") p. 2. Summary of Action.] Plaintiffs specifically allege that Lakeshore is liable based on these facts on a theory of fraudulent misrepresentation and fraudulent concealment. [Complaint, Count IV and V.] Plaintiffs also allege that Lakeshore and REASC are liable under theories of unjust enrichment and seek an equitable accounting and assert claims for civil conspiracy. [Complaint, Count V, VI and VII.] The alleged misrepresentations were purportedly made at various times, including October, 2005 and the December, 2005 meeting in Illinois. [Complaint , Count IV.] Plaintiffs allege fraudulent concealment arising out of concealing the sale of the venture to a third party, concealing the negotiations and other communications regarding the sale and failing to disclose the sale. [Count V para. 46.] Lakeshore is alleged to have known of and ratified this concealment. [Count V para 47.] Plaintiffs further allege a breach of a purported operating agreement with WASD by 1) failing to distribute the Venture's net cash flow to WASD on an at least quarterly basis; 2) failing to distribute to a pro rata share of the proceeds of the sale and by otherwise failing to comply with the operating agreement. [Complaint, Count I, 23.]

REASC is not alleged to have performed any tortious act or breached any contract and Plaintiffs' theory of recovery against REASC is unclear. [Count VI.] Plaintiffs' argument

appears to be that because the value of an asset previously owned by REASC, the real estate on which the venture is located, has increased as a result of the allegedly tortious acts of Lakeshore and the various individual named doctors, REASC is somehow liable to Plaintiffs on a theory of unjust enrichment. [Count VI, paras. 52-53.] This theory also apparently underlies the claim for an equitable accounting as to REASC. [Count VII.] Plaintiff further alleges civil conspiracy but has not alleged any act by REASC in furtherance of a civil conspiracy. [Count VIII.]

Plaintiff Woodrum/Ambulatory Systems is a Nevada limited liability company whose members are purportedly residents and citizens of Illinois, California and Texas. [Complaint, para. 1.] Plaintiff, David Woodrum, is alleged to be a citizen of Illinois and resident of Chicago, Illinois. [Complaint, para. 2.] Plaintiffs allege that venue is in the Northern District of Illinois, Eastern Division, pursuant to the 28 U.S.C. § 1391(a) based on their allegations that a substantial part of the events or omissions giving rise to their claims occurred in this district and alleging that they have personal jurisdiction over the defendants. [Complaint, para. 7.]

Lakeshore was created for the purpose of building and operating an ambulatory surgery center in Chesterton, Indiana. [Affidavit of Trish Houlihan attached as Exhibit "A" para 5.] REASC was created for the purpose of owning the real estate on which the ambulatory surgery center was constructed. [Affidavit of Trish Houlihan attached as Exhibit "A" para 5.] Neither Lakeshore or REASC own real property in Illinois or do business in Illinois. [Affidavit of Trish Houlihan attached as Exhibit "A" paras 11, 21.] Lakeshore and REASC did not advertise in any manner. [Affidavit of Trish Houlihan attached as Exhibit "A" para 11.] Lakeshore and REASC have not filed suit or otherwise used any Illinois State Court or Federal Court located in Illinois. [Affidavit of Trish Houlihan attached as Exhibit "A" para 13.]

3

Plaintiffs do not allege any substantial activity or meeting which took place in Illinois. Plaintiffs allege, at most, that one letter and two draft documents were prepared either by the Plaintiffs' agent or counsel in Illinois. [Complaint, paras. 8-10.] On or about August 16, 2004, a "Development Agreement" between Lakeshore and WASD was signed in Indiana. [Attached as Exhibit "B"; Affidavit of Anton Thompkins, M.D., "Development Agreement"attached as Exhibit "C" paras 6-7] WASD agreed to perform consulting services respecting development activities relating to the venture. ["Development Agreement" p. 1.] WASD and Lakeshore agreed that Indiana law governed the agreement. ["Development Agreement, p. 6, Article VI, 6.6.]

Plaintiffs make reference to various meetings regarding business negotiations taking place with the defendant Lakeshore and or the individual named co-defendants, but they do not allege that any of these meetings took place in Illinois. [Complaint, para. 11.] All negotiations or discussions related to the possibility of WASD becoming a member of Lakeshore were conducted in Indiana. [Affidavit of Trish Houlihan attached as Exhibit "A" para 17.] Plaintiffs also allege that they performed services related to the venture which included attending meetings on site and providing other services including consulting from WASD's Chicago office. [Complaint para. 12.] One meeting is alleged to have taken place in Illinois; a lunch meeting in Chicago in December, 2005 between the individual named Defendant Thompkins and Woodrum. [Complaint, paras. 13, 15-16.] Two communications were allegedly made; that an offer to purchase Lakeshore's stock had been made by a third party and that Plaintiffs owned 20% of Lakeshore and would be compensated accordingly. [Complaint, para. 13, 25-16.] The meeting at issue took place on December 27, 2005 when Woodrum suggested Thompkins meet with him for

4

lunch. [Affidavit of Anton Thompkins, M.D. para. 12.] Thompkins denies making any statement regarding WASD's purported interest in the venture but did report the offer to purchase. [Affidavit of Anton Thompkins, M.D. para. 12.] A dispute regarding the Development Agreement arose and was submitted to arbitration. [Affidavit of Anton Thompkins, M.D. para. 13-14; "Settlement Agreement" attached as Exhibit "D". ] The parties entered into a Settlement Agreement on October 17, 2007 which was executed in Indiana. [Affidavit of Anton Thompkins, M.D. para. 13-14; "Settlement Agreement" attached as Exhibit "D". ] The Settlement Agreement was governed by Indiana law and the parties agreed that Indiana courts had jurisdiction over all actions arising from the Settlement Agreement. [Settlement Agreement, para. 7.]

## II. ARGUMENT

### A.    Legal Standard

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as other provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part or property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a).

Where venue is laid in the wrong district, the case shall be dismissed or, if in the interests of justice, the litigation shall be transferred to any district or division in which it could have been brought. 28 USC § 1406.

The Supreme Court construed the predecessor statute to § 1391, which also provided for venue where the defendants resided or where the action arose. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 185 (1979). The Supreme Court noted that in the unusual case in which venue did not clearly lie in one district, the Plaintiff might choose between the districts with "approximate equal plausibility - - in terms of the availability of witnesses, the accessibility of other relevant evidence and the convenience of the defendant (but not of the plaintiff)" *Id.*

On a motion to dismiss for improper venue pursuant to FRCP 12(b)(3) Plaintiffs bear the burden of establishing that venue is proper. *Grantham v. Challenge-Cook Bros., Inc.,* 420 F.2d 1182, 1184 (7th Cir. 1969); *Electroplated Metal Solutions, Inc. v. Am. Servs,* 500 F.Supp.2d 974, 976 (N.D. Ill. 2007). The Court should consider the allegations in the Plaintiffs' complaint as true unless contradicted by the Defendant's affidavits. *Nagle v. ADM Investors Servs. Inc.,* 995 F. Supp. 837, 843 (N.D. Ill. 1998)

The individual Defendants are all Indiana citizens and residents of Indiana and the Defendant Corporate entities are all Indiana entities whose members are citizens or residents of Indiana rendering § 1391(a)(3) inapplicable. *Woodward Park Imaging, Inc. v. Iwamoto*, 955 F.Supp. 1006, 1008 (N.D. Ill. 1997). The essential question then is whether the claims asserted by Plaintiffs arose in this judicial district. *Id.*

**B.      Venue is Not Proper in the Northern District of Illinois Because All or Nearly All Substantial Contacts Were in Northwest Indiana.**

The decision of this Court in *Iwamoto* 955 F. Supp. 1006 addressed remarkably similar facts. An Illinois corporation brought an action in the Northern District of Illinois against Matthew Iwamoto, a citizen of California. An Illinois citizen and resident (Broderick) had

contacted the California defendant with a proposal to purchase three radiology centers operating as a joint venture in California. Broderick and his employees traveled to California several times to discuss the proposed sale. A corporate entity was created by Broderick to purchase the radiology centers.

Negotiations over the sale took place in California. The parties negotiated for the purchase of the radiology centers and part of the proposed deal would have Iwamoto providing radiology services and billing customers in his name. The Illinois corporate entity purchased the three radiology centers. The parties exchanged proposals regarding Iwamoto's providing radiology services. Broderick allegedly agreed to a counter proposal submitted by Iwamoto but died before signing the agreement.

After Broderick's death, the parties were unable to formalize an agreement for Iwamoto to provide services. The Illinois plaintiff filed suit against Iwamoto in state court for an accounting, conversion, misappropriation of funds, and breach of fiduciary duty. The defendant removed the matter to federal court on diversity jurisdiction and then moved the court to transfer the matter to a federal court in California pursuant to § 1404(a).

The district court first noted that the only defendant resided in eastern California and that venue was proper in California. This left only the issue of whether the claim arose in substantial part in the Northern District of Illinois. *Iwamoto*, 955 F. Supp. at 1008. The corporate entity which was the subject of the litigation was located in California, the defendant lived and worked in California, the bulk of the negotiations were conducted in California and this is where the alleged wrongful conduct took place. The complaint itself was devoid of any allegation that supported a finding that the claims arose in substantial part in Illinois. Based on these facts, the

district court concluded that venue in the Northern District of Illinois was improper pursuant to §

1406 requiring dismissal or, if in the interests of justice, transfer. *Id.* Under Illinois' most

significant relationship test for determining the choice of law, California law would apply. *Id.*

Transfer to the Northern District of California was appropriate because that Court would be more

familiar with California law.

The corporate defendants, Lakeshore and REASC, are entitled to dismissal because venue

is improper pursuant to § 1406. Plaintiffs identify one contact between them and one of the

individual named defendants allegedly acting as Lakeshore's agent or which was affirmed or

endorsed by Lakeshore which took place in Illinois. However, that contact does not even include

business negotiations. The only statements identified in Plaintiffs' complaint are that Thompkins

confirmed an earlier representation regarding WASD's purported twenty percent interest in the

ASC venture and advised Woodrum that the venture was to be sold.

Plaintiffs, somewhat remarkably, allege that they were advised that they were either in a

partnership or were members of an LLC. However, in either instance, the partnership or LLC is

an Indiana entity operating and/or owning property exclusively in Indiana. All but, at most, one

of the contacts occurred in Indiana. The contact that occurred in Chicago did not involve

substantive negotiations.

The Chicago meeting and the statements purportedly made during the meeting do not

reflect any business dealings or negotiations between Lakeshore and Defendants. The statement

that Plaintiffs owned an interest in the venture is not alleged to be the result of negotiations or

dealings and only confirms an earlier statement made in negotiations. These negotiations and

dealings all occurred in Indiana. The mere fact that one meeting between a person allegedly

8

acting as Lakeshore's agent and Woodrum occurred in Illinois does not show that substantial parts of the business dealings or alleged tortious conduct at issue took place in Illinois. For this reason, venue in Illinois is improper. The cause should be dismissed for want of venue or, in the alternative, be transferred to the Northern District of Indiana, Hammond Division.

**C.    Venue is Not Proper in the Northern District of Illinois Because Illinois Courts Lack General or Specific Jurisdiction Over Lakeshore and REASC.**

The matter should also be dismissed because the Corporate Defendants are not subject to specific or general jurisdiction in Illinois. Plaintiffs have the burden of establishing that Illinois courts would have specific and/or general jurisdiction over both Lakeshore and REASC to establish that jurisdiction exists in this Court. *Illinois Commerce Comm'n v. Entergy Koch Trading, LP* 841 N.E.2d 27 (Ill. Ct. App. 2005); *RAR, Inc. v. Turner Diesel, Ltd.*, 197 F.3d 1272, 1275 (7th Cir. 2003).

For specific jurisdiction to exist "the action must directly arise out of the contacts between the defendant and the forum." *Ill. Commerce Comm'n*, 841 N.E.2d at 796. This requires a showing of sufficient minimum contacts with the forum that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Id quoting International Shoe v. Washington*, 326 U.S. 310 (1945). General jurisdiction exists when a defendant has carried on business activities within the forum state with a fair measure of permanence and continuity even if the cause of action does not arise directly out of these contacts.  *Ill. Commerce Comm'n*, 841 N.E.2d at 796.

Illinois due process limits jurisdiction to circumstances in which it is "fair, just, and reasonable to require a non-resident defendant to defend an action in Illinois, considering the

quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Sabados v. Planned Parenthood of Greater Indiana*, 882 N.E.2d 121, 135 (Ill. Ct. App. 2007)

REASC is an Indiana limited liability Company which owned the real property in Indiana on which the venture is located. Plaintiffs have not made any allegation that REASC had a business or other relationship with them or that REASC participated in, authorized or affirmed any representation or misrepresentation in Illinois, Indiana or anywhere. Plaintiffs do not allege that they were promised or owned any interest in REASC. In fact, Plaintiffs' Complaint fails to state a claim against REASC and its allegations against REASC are frivolous. For these reasons, Illinois Courts have no specific jurisdiction over REASC.

There is no allegation or evidence that REASC ever undertook or performed any business or other activity in Illinois. There is no evidence, or even an allegation, that REASC participated in any of the conduct which is alleged as the basis for the claims against Lakeshore or the individual named co-defendants. For these reasons, Illinois Courts lack general jurisdiction over REASC.

Plaintiffs allege that the defendant partners have seen Illinois patients. However, Lakeshore was to be an ambulatory surgical center and so would not see patients. [Affidavit of Trish Houlihan attached as Exhibit "A" para 12.] As the Court noted in *Sabados*, the fact that a patient may travel from Illinois to a clinic in Indiana to secure treatment at that clinic, was insufficient to create general jurisdiction. *Sabados*, 882 N.E.2d at 127. This is consistent with a long line of cases recognizing that medical care provided to an Illinois citizen in another state does not create jurisdiction in the patient's home state over the healthcare provider. *Ballard v.*

*Rawlins*, 428 N.E.2d 532 (Ill. Ct. App. 1981) (claims by patient that nonresident doctor solicited

her as a patient and called prescription into an Illinois pharmacy did not establish personal

jurisdiction over the doctor in Illinois); *Rogers v. Furlow*, 699 F. Supp. 672, 676-77 (N.D. Ill.

1988) (health care providers "treat people, not states, and therefore they are not invoking the

protection of the laws of Illinois by treating residents of Illinois exclusively" in another state).

     As noted in co-defendant's Motion and supporting memorandum, the doctors in this

matter see, at most, a handful of Illinois citizens as patients. Assuming, for the sake of argument,

that some Illinois citizens travel to Indiana for medical services, "they should expect to travel

back to [Indiana] in order to lodge any related complaint." *Sabados*, 882 N.E.2d at 127.

Lakeshore did not advertise at all. It has not availed itself of Illinois Courts or of federal Courts

in Illinois. As such there is no general jurisdiction in Illinois as to Lakeshore.

     The single documented instance of any contact with Illinois regarding Plaintiffs' claims

as to any Defendant is Thompkins' lunch with Woodrum. The allegation of fraud in that

conversation is, at least in part, insufficient to even support a cause of action for fraud or other

misrepresentation. Under Indiana law, which governs in this case, actual or constructive fraud

can only be based on a statement of present or existing fact. Darst v. Illinois Farmers Ins. Co.,

716 N.E.2d 579, 581 (Ind. Ct. App. 1999). The alleged misrepresentation, that Plaintiffs owned

twenty percent of the venture, was not alleged to be the result of business negotiations but is

merely a reaffirmation of an earlier statement which would have to have been made in Indiana,

where all prior negotiations were carried out. The second statement that Plaintiffs would be

compensated according to this purported ownership interest is a statement of future intent and

can not be the basis of a claim for fraud. However, as noted more fully above, even treating

these allegations as true, which they are not, for purposes of this motion only, they do not

establish sufficient direct contact between the facts alleged to support jurisdiction in Illinois or

venue as to Lakeshore or REASC.

**D.    The Litigation Should be Transferred Pursuant to 28 USC §1404.**

    **1.    Legal Standard.**

Pursuant to 28 USC §1404, transfer to a more convenient forum is left to the sound

discretion of the district court. *Riviera Trading Corp. v. Oakley, Inc.*, 944 F.Supp. 1150, 1158

(S.D. NY 1996)  While a plaintiff's choice of forum is a factor for consideration this choice may

be overborne where the balance of factors favors transfer. *Figgle International Corp. v.

Destileria Serralles, Inc.*, 925 F.Supp. 411 (D. SC 1996)

Litigation may be transferred to another district court for the convenience of the parties

and in the interests of justice.  28 USC 1404.  The private interest factors which the Court should

consider in evaluating a forum non-conveniens motion include the 1) convenience of the parties,

2) the convenience of the witnesses and 3) the interests of justice. *Coffey v. Van Dorn Iron

Works,* 796 F.2d 217, 220 (7th Cir. 1986)  Convenience of non-party witnesses is an important

factor which is accorded great weight in the forum non-conveniens analysis. *Aquatic Amusement

Associates, Ltd. v. Walt Disney World Co.,* 734 F. Supp. 54 (1990).  The court should give some

weight to the Plaintiff's choice of forum. *Volkswagen Aktiengesellschaft v. Dee Engineering,

Inc.*, 2003 U.S. Dist. LEXIS 3550 *7 (SD Ind. 2003)

    **2.    Argument.**

All of the individual defendants are citizens and residents of Indiana.  They are also

practicing doctors.  Both the doctors and their patients benefit from transfer to Indiana where the

doctors live and practice and which would reduce the impact of trial on their practices and personal life. Plaintiffs seek an accounting from the LLCs and seek access to virtually every financial record of REASC and Lakeshore:

> Requiring the Defendants to provide a detailed equitable accounting for both the Sale and the Venture, including but not limited to, the listing of every receipt and every disbursement for both the Sale and the Venture and providing proper back-up documentation for such receipts and disbursements.

[Complaint Count VII.]

These records are maintained in Indiana. The witnesses, including accountants and staff with knowledge of these records, are located in Indiana. Access to evidence and witnesses and the attendant convenience to the witnesses is enhanced by trying this matter in the Northern District of Indiana.

As this Court may properly note, the Northern District of Illinois has a high case load. The Court's 2007 information release, attached as Exhibit "E", notes 7,606 new civil case filings and 933 felony charges in 2007. There is no reason to burden the citizens of Illinois with jury service in this matter.

Plaintiffs' allegations largely flow from their contention that they are or should be members or partners in an Indiana LLC or partnership and seeks an accounting from an Indiana LLC. This supports the second basis for transfer under the interest of justice test, the familiarity of the court with applicable law. *Coffey*, 796 F.2d at 221. Illinois choice of law doctrine provides that the law of the state with the most significant relationship to tort litigation applies. *Iwamoto*, 955 F.Supp. at 1008; *Miller v. Long Airdox Co.,* 914 F.2d 976, 978 (7th Cir. 1990) As a general matter, the law of the state which is the site of conduct which is alleged to be the cause of

an injury will apply. *Id* 978-79 (where injury occurred in Indiana, Indiana's law would apply absent exceptional circumstances such as Indiana law providing that injury occurring in mine in Indiana would be controlled by state where the mouth of the mine is located)  The most significant relationship test applied by Illinois as to the choice of law in a tort claim requires consideration of the place where the injury occurred and the place where the conduct causing the injury occurred. *Id at 987*.  The law of the place where the injury occurred will apply absent another state with a more significant relationship to the occurrence or to the parties. *Id* at 978.

As set out above, the conduct which supports Plaintiffs' claims occurred in Indiana. Lakeshore is alleged to have failed to perform an act, paying amounts owed to the Plaintiffs as partners or members of Indiana entities operating in Indiana.  This act, or more precisely omission, occurred in Indiana where Lakeshore was to operate.  The Northern District of Indiana will be more familiar with applicable Indiana law.   The only plaintiff who is identified as a citizen of Illinois is Woodrum.  However, the Complaint reveals no specific injury or damage to Woodrum except in his capacity as a member of WASD.  WASD is a Nevada LLC.  Its members are from various states.  In contrast, all of the Defendants including the LLC's are  citizens of Indiana.  No unusual circumstance or significant relationship to Illinois favors the application of Illinois substantive law to a dispute over who is, or is not, a partner or member of an Indiana partnership or LLC.  This factor strongly supports transfer.

**E.     The Plaintiffs Have Waived Venue Through a Forum Selection Clause.**

Defendants, REASC and Lakeshore herein incorporate by reference the argument and authority and evidence of the Co-Defendants set out in section B(3) of their Memorandum in Support of Certain Defendants' Motions to Dismiss.

### III. CONCLUSION

WHEREFORE, Defendants, Lakeshore Surgicare, LLC and REASC, LLC respectfully move the Court to DISMISS the above captioned matter due to the absence of venue and, alternatively, to transfer the case to the Northern District of Indiana, Hammond Division in the interests of justice and pursuant to 28 USC 1404.

Respectfully submitted,

HOEPPNER WAGNER & EVANS LLP
Attorneys for Defendants, Lakeshore
Surgicare, LLC and REASC, LLC

SEYFARTH SHAW LLP

By: s/ F. Joseph Jaskowiak
      F. Joseph Jaskowiak

By: s/ Cintra D. Bentley
      Cintra D. Bentley

HOEPPNER WAGNER & EVANS LLP
Twin Towers South
1000 East 80th Place, 6th Floor
P.O. Box 10627
Merrillville, IN   46411-0627
Telephone: (219) 769-6552

SEYFARTH SHAW LLP
131 South Dearborn Street - Suite 2400
Chicago, IL   60605
Telephone: (312) 460-5000

## CERTIFICATE OF SERVICE

    Cintra D. Bentley, an attorney, certifies that she caused a true and correct copy of the foregoing "Memorandum in Support of the Motion to Dismiss & Alternative Motion to Transfer" to be served upon the following, via ECF notification on this 16th day of June, 2008:

Stephen A. Studer
John H. Lloyd
PLEWS SHADLEY RACHER & BRAUN LLP
53732 Generations Drive
South Bend, Indiana 46635
(574) 273-1010
E-mail: jlloyd@psrb.com

Karen E. Grossman
Robert H. Lang
Holland & Knight LLC
131 South Dearborn Street
30th Floor
Chicago, IL   60603
(312) 263-3600
karen.gossman@hklaw.com
rhlang@hklaw.com

Jeffrey Mark Monberg
Galvin, Galvin & Leeney
5231 Hohman Avenue
7th Floor, Calumet Building
Hammond, IN   46320
(219) 933-0380
jmonberg@kdlegal.com

s/Cintra D. Bentley

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

WOODRUM/AMBULATORY SYSTEMS )
DEVELOPMENT, LLC, a Nevada )
limited liability company, and DAVID )
WOODRUM, )
                         )
            Plaintiffs, )
                         )
     v. )    Case No. 08-C-1721
                         )
LAKESHORE SURGICARE, LLC, an Indiana )
limited liability company; REASC, LLC, an )
Indiana limited liability company; ANTON )
THOMPKINS, M.D., BRUCE THOMA, M.D., )
DAVID MUSGRAVE, M.D., JAMES )
MALAYTER, M.D., GEORGE ALAVANJA, )
M.D., MARC BRUELL, M.D., MICHAEL )
LELAND, M.D., THOMAS KAY, M.D., and )
PAUL GRUSZKA, M.D., )
                         )
           Defendants. )

## AFFIDAVIT OF TRISH HOULIHAN

Trish Houlihan, being first duly sworn, now says:

1.      I am over the age of eighteen and have personal knowledge of the facts set forth in this Affidavit.

2.      I am the Chief Financial Officer of Lakeshore Bone & Joint Institute, Inc. ("LBJI").

3.      During all relevant time periods, Anton Thompkins, M.D. ("Thompkins"), Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay"), and Paul Gruszka, M.D. ("Gruszka") (collectively the "Doctors") were members of LBJI.



EXHIBIT

"A"

4.     Per the request of the Doctors, I provided financial and accounting services to Lakeshore Surgicare, LLC ("Lakeshore"), an Indiana limited liability company, from May 2004 to April 2006.  I also provided financial and accounting services for REASC, LLC ("REASC"), an Indiana limited liability company, from January 2005 to April 2006.

5.     Lakeshore was organized in May 2004 to build an ambulatory surgery center in Chesterton, Indiana (the "ASC").  REASC was organized in January 2005 to own the real estate underlying the ASC.

6.     The Doctors were the only members of Lakeshore and REASC from their respective dates of organization until April 2006.

7.     During all relevant times, the Doctors were Indiana citizens who practiced medicine exclusively in Indiana.

8.     None of the Doctors have referral relationships with Illinois entities.

9.     The Doctors do not advertise in Illinois.

10.     At all times relevant to Plaintiffs' Complaint from May 2004 through April 2006, I regularly attended any meetings of Lakeshore or REASC and was familiar with the activities of these entities.

11.     Neither Lakeshore nor REASC did any business in the State of Illinois.  Neither Lakeshore nor REASC advertised, in any fashion, let alone within the State of Illinois.

12.     Neither Lakeshore nor REASC saw any patients.

13.     Neither Lakeshore nor REASC ever used federal or state courts located in the State of Illinois.

2

14.    Lakeshore entered into a Development Agreement with Woodrum Ambulatory Systems Development LLC ("WASD") on August 6, 2004 (the "Development Agreement").

15.    The Development Agreement was executed by both parties at the Doctors' offices in Indiana.

16.    David Woodrum and other WASD personnel met with the Doctors and representatives of Lakeshore numerous times in Indiana during WASD's commission of its duties under the Development Agreement.

17.    During various times in 2004 and 2005, the Doctors discussed the possibility of WASD joining the membership of Lakeshore, with an offer for WASD to purchase units extended in October 2005.  WASD failed to accept this offer by contributing capital.  All of these discussions were at Lakeshore board meetings or other meetings in Indiana.

18.    Lakeshore counsel drafted a letter of intent ("LOI") and Operating Agreement ("Lakeshore OA") for Lakeshore showing 80% ownership by the Doctors and 20% ownership by WASD.  These draft versions of the LOI and Lakeshore OA were never completed or executed.

19.    WASD initiated an arbitration proceeding against Lakeshore pursuant to the Development Agreement on March 8, 2007.

20.    The proper locale for this arbitration proceeding was determined to be Indiana, over WASD's objection.

21.    This action was resolved by a settlement agreement between Lakeshore and WASD dated October 17, 2007.

22.    Neither Lakeshore nor REASC owned any real estate or other property within the State of Illinois.

FURTHER, Affiant sayeth not.

Trish Houlihan

STATE OF INDIANA )
                 )  SS:
COUNTY OF PORTER )

Subscribed and sworn to before me, a Notary Public, in and for said County and State this 16th day of June, 2008.

My Commission Expires:
My County of Residence:

JUDY C. DAVIS
Notary Public, State of Indiana
Porter County
My Commission Expires
December 19, 2009

_____, Notary Public

4

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

WOODRUM/AMBULATORY SYSTEMS )
DEVELOPMENT, LLC, a Nevada )
limited liability company, and DAVID )
WOODRUM, )
)
Plaintiffs, )
)
v. )          Case No.08-C-1721
)
LAKESHORE SURGICARE, LLC, an Indiana )
limited liability company; REASC, LLC, an )
Indiana limited liability company; ANTON )
THOMPKINS, M.D., BRUCE THOMA, M.D., )
DAVID MUSGRAVE, M.D., JAMES )
MALAYTER, M.D., GEORGE ALAVANJA, )
M.D., MARC BRUELL, M.D., MICHAEL )
LELAND, M.D., THOMAS KAY, M.D., and )
PAUL GRUSZKA, M.D. )
)
Defendants. )

## AFFIDAVIT OF ANTON THOMPKINS, M.D.

Anton Thompkins, M.D., being first duly sworn, now says:

1.      I am over the age of eighteen and have personal knowledge of the facts set forth in this

Affidavit.

2.      I was a member of Lakeshore Surgicare, LLC ("Lakeshore"), an Indiana limited liability

company, from May 2004 to April 2006.  I was also a member of REASC, LLC ("REASC"), an Indiana

limited liability company, from January 2005 to April 2006.

3.      Lakeshore was organized in May 2004 to build an ambulatory surgery center in

Chesterton, Indiana (the "ASC").  REASC was organized in January 2005 to own the real estate

underlying the ASC.

4.      I am an Indiana resident and citizen.  I practice medicine exclusively in Indiana.  I do not

have referral relationships with any Illinois entities.



EXHIBIT

"B"

5.      Bruce Thoma, M.D. ("Thoma"), David Musgrave, M.D. ("Musgrave"), James Malayter, M.D. ("Malayter"), George Alavanja, M.D. ("Alavanja"), Marc Bruell, M.D. ("Bruell"), Michael Leland, M.D. ("Leland"), Thomas Kay, M.D. ("Kay"),  Paul Gruszka, M.D. ("Gruszka") and I (collectively the "Doctors") were the only members of Lakeshore and REASC from the date of organization until April 16, 2006.

6.      David Woodrum ("Woodrum") sent me a proposal/solicitation letter, dated April 2, 2004, offering WASD consultant services for the development of the ASC.  Lakeshore entered into a Development Agreement with Woodrum Ambulatory Systems Development, LLC ("WASD") on August 6, 2004 (the "Development Agreement").

7.      The Development Agreement was executed by both parties at the Doctors' offices in Indiana.

8.      David Woodrum and other WASD representatives met with the Doctors and representatives of Lakeshore numerous times in Indiana during WASD's commission of its duties under the Development Agreement.

9.      During various times in 2004 and 2005, the Doctors discussed the possibility of WASD joining the membership of Lakeshore, with an offer for WASD to purchase units extended in October 2005.  WASD failed to accept this offer by contributing capital.  All of these discussions were at Lakeshore board meetings or other meetings in Indiana.

10.     Lakeshore counsel drafted a letter of intent ("LOI") and operating agreement (the Lakeshore OA") for Lakeshore showing 80% ownership by the Doctors and 20% ownership by WASD. These draft versions of the LOI and Lakeshore OA were never completed or executed.

11.    On December 15, 2005, at a board meeting of Lakeshore in Indiana, the members of Lakeshore voted to pursue Lake-Porter Ambulatory LLC's ("Lake-Porter") proposal to purchase the ASC.

12.    In a conversation with me, Woodrum suggested meeting for lunch at Lawry's restaurant in Chicago on December 27, 2007.  At this meeting, I informed Woodrum that the members of Lakeshore had voted to sell Lakeshore to Lake-Porter.

13.    WASD initiated an arbitration proceeding against Lakeshore pursuant to the Development Agreement on March 8, 2007.

14.    This action was resolved by a settlement agreement between Lakeshore and WASD dated October 17, 2007.

Further, Affiant sayeth not.

_Anton Thompkins, M.D._

Anton Thompkins, M.D.


STATE OF INDIANA          )
                          ) SS:
COUNTY OF PORTER          )


Subscribed and sworn to before me, a Notary Public, in and for said County and State this 12th day of June, 2008.

My Commission Expires: 12-18-2014
My County of Residence: Lake

_Mary Kapitan_, Notary Public

MARY KAPITAN
SEAL
Notary Public, State of Indiana
My Commission Expires Dec. 18, 201-

EXHIBIT C



American Arbitration Association
*Dispute Resolution Services Worldwide*

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. There is no additional administrative fee for this service.* ☐

| Name of Respondent<br>Lake Shore Surgicare LLC | | | Name of Representative (if known)<br>Stephen Studer, Esq. | | |
|---|---|---|---|---|---|
| Address<br>601 Gateway Blvd. | | | Name of Firm (if applicable)<br>Plews Shadley Racher and Brown | | |
| | | | Representative's Address<br>53732 Generations Drive | | |
| City<br>Chesterton | State<br>IN | Zip Code<br>46304 | City<br>South Bend | State<br>IN | Zip Code<br>46635 |
| Phone No.<br>219-921-1444 | Fax No.<br>219-921-0533 | | Phone No.<br>574-273-1010 | | Fax No.<br>574-271-2050 |
| Email Address:<br>info@lbji.com | | | Email Address:<br>sastuder@psrb.com | | |

The named claimant, a party to an arbitration agreement dated August 16, 2004 which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

**THE NATURE OF THE DISPUTE** Breach of contract and other claims by Claimant against Respondent for breach of Development Agreement regarding the development of an ambulatory surgery center

| **Dollar Amount of Claim** at least $20,123.30 | Other Relief Sought: ☑ Attorneys Fees  ☑ Interest<br>☑ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other |
|---|---|

**AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND** (please refer to the fee schedule in the rules for the appropriate fee) $950.00

**PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:** Familiar with basic breach of contract claims.

| Hearing locale:  Chicago | (check one) ☑ Requested by Claimant ☐ Locale provision included in the contract |
|---|---|

| Estimated time needed for hearings overall:<br><br>___4___  hours or _____ days | Type of Business:    Claimant:  Developer<br><br>Respondent:  Medical Services Provider |
|---|---|

Is this a dispute between a business and a consumer? ☐Yes ☑ No  Does this dispute arise out of an employment relationship? ☐ Yes ☑ No
If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one) ☐ Atlanta, GA  ☑ Dallas, TX  ☐ East Providence, RI ☐ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.    Under the rules, may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative)    Date:<br><br>*[signature]*  3/8/07 | Name of Representative<br>Robert H. Lang, Esq. | | |
|---|---|---|---|
| Name of Claimant<br>Woodrum/Ambulatory Systems Development, LLC | Name of Firm (if applicable)<br>Quarles & Brady, LLP | | |
| Address (to be used in connection with this case)<br>175 N. Harbor Drive, #2206 | Representative's Address<br>500 W. Madison, #3700 | | |
| City<br>Chicago | State<br>IL | Zip Code<br>60601 | City<br>Chicago | State<br>IL | Zip Code<br>60661 |
| Phone No. | Fax No. | | Phone No.<br>312-715-5151 | | Fax No.<br>312-632-1751 |
| Email Address: | | | Email Address:<br>rlang@quarles.com | | |

Please visit our website at www.adr.org if you would like to file this case online.    AAA Customer Service can be reached at 800-778-7879

**EXHIBIT**
"C"

## DEVELOPMENT AGREEMENT

This **Development Agreement** (hereinafter the "Agreement") is entered into as of this _16th_ day of _August_, 2004, by and between Lakeshore Surgicare, LLC (referred herein as "Client"), and Woodrum/Ambulatory Systems Development, LLC ("WASD"), with reference to the following facts:

A.   CLIENT intends to develop, own, and operate an ambulatory surgery center in Chesterton, Indiana, herein collectively referred to as the "Surgery Center" or the "ASC".

B.   WASD is a health care consulting firm that provides, among other things, development and ongoing management services with respect to ambulatory care projects.

C.   CLIENT desire to engage WASD to provide consulting services with respect to the development activities relating to the Surgery Center and WASD desires to provide such services to CLIENT.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the parties agree as follows:

### ARTICLE I

### ENGAGEMENT OF WASD AS AN INDEPENDENT CONTRACTOR

1.1   Engagement of WASD and Representation

CLIENT hereby retains WASD to perform consulting services with respect to development activities relating to the Surgery Center. WASD agrees to provide such consulting services, as defined below. WASD represents and warrants that its officers, managers, directors, and owners are not currently, and have never been, excluded from participation in a federal health care program and that the CLIENT will be notified at any time during the term of this contract.

1.2   Independent Contractor Relationship

CLIENT and WASD agree that WASD shall provide services under this Agreement as an independent contractor, and that WASD shall not be deemed to be an employee of CLIENT or of any entity related thereto for all purposes, including payment of Social Security, withholding taxes and all other Federal, State and Local taxes.

### ARTICLE II

### TERM OF AGREEMENT

2.1   Term

This Agreement shall be effective (the "Effective Date) as of the date set forth above and shall continue until such time as the Surgery Center receive its Medicare certification (the "Medicare Effective Date") and is fully operational.

2.2   Election to Terminate by Either Party

Notwithstanding the foregoing, this Agreement:

(a) may be terminated by WASD at any time with or without cause, and

1

(b) may be terminated by CLIENT at any time with or without cause.

Such termination will be effective upon the giving of notice thereof by the party electing to terminate to the other party. Upon any such termination, the value of all work completed by WASD through the date of termination will be paid within thirty (30) days after the effective date of such termination.

### ARTICLE III

### DEVELOPMENT SERVICES

3.1   <u>WASD Development Services</u>

WASD agrees to perform the following services with respect to the development of the Surgery Center upon approval of CLIENT:

(a)    <u>Relationship to Architect and to Construction Contractor</u>

WASD shall provide the construction management function for the project. WASD shall assist Client in selection of an architect and contractor. WASD shall assist the architect in planning and developing the Surgery Center in conformance with the requirements applicable to surgical clinic licensure, Medicare certification of an ambulatory surgery center, and/or accreditation by the Accreditation Association for Ambulatory Health Care, Inc. ("AAAHC") or equivalent organization. In addition, WASD will provide all reasonably necessary assistance to obtain all necessary permits, licenses, certifications, and approvals for the commencement and completion of construction and for the operation of the Surgery Center. WASD shall assist the architect, as necessary to obtain building and zoning approvals. WASD shall assure that the construction contract will be built according to established specifications and will authorize construction payments for the owner. WASD will serve as the owner's representative for the project. WASD shall not be responsible for the performance of the architect or of the construction contractor, or for any failure of the architect or the construction contractor to comply with the terms of his or its respective contracts. WASD shall not be responsible for the legal aspects of negotiating the architectural and/or construction contracts, nor shall be responsible for any fees relating to inspections or tests. WASD does not warrant figures in the pre-development feasibility analysis and the bids received from the construction contractor.

(a1)   <u>Financial Projections and Budgeting</u>

WASD will prepare *pro forma* financial projections for the development and initial operating period of the Surgery Center and a development schedule. The *pro forma* financials will include budgeting for all capital expenditures and cash flow projections through the first five years of the operation of the Surgery Center. All such items will be completed prior to the execution of any construction contracts and will be updated periodically during the development process.

In addition, WASD will prepare a detailed operating budget and cash flow projections for the first year of operations of the Surgery Center. This operating budget and cash flow projections will be delivered to CLIENT at least 90 days prior to the opening of the

2

Surgery Center and will be revised and updated as appropriate.

(b)  **Equipment Planning and Acquisition**

WASD shall, in consultation with CLIENT and other representatives of the entity, use its best efforts to assure that medical and non-medical equipment and furnishings acquired on behalf of the entity is within budget.  WASD will acquire leasing company bids and/or other financing arrangements for equipment. It is expected that an equipment procurement company will be hired to purchase the medical and non-medical equipment and furnishings for the Surgery Center at a discount from retail rates, handle procurement and purchase orders, and install equipment under WASD's supervision. The equipment procurement company's fee shall be the responsibility of CLIENT and will conform to the budget prepared by WASD.

(c)  **Assistance in Hiring and Pre-opening Supervision of On-Site Manager**

WASD shall assist CLIENT in the screening of candidates for the position of on-site manager for the ASC (the "Manager"). CLIENT and WASD contemplate that the Manager will be employed commencing at least five (5) months prior to the opening of Surgery Center. Pursuant to this Agreement, WASD shall supervise the performance of said Manager for the period prior to the opening of the Surgery Center.

(d)  **Third Party Payor Relations/Fees**

WASD shall develop and set fees with the approval of CLIENT. WASD, working with the Surgery Center staff, shall use all efforts to negotiate third party payor fees and contracts with the third party insurance payers or business and insurance companies in the service area. The board of managers of Client ("Board") will approve all third party contracts that are negotiated.

(e)  **Development of Operating Systems**

WASD shall develop the Surgery Center's credit policies, fee schedules, and initial operating budget. Additionally, WASD shall develop the Surgery Center's accounts receivable, accounts payable, payroll, collections, and general ledger systems. WASD shall train the employees to use the WASD systems.

(f)  **Operating Manuals**

WASD shall prepare and provide the ASC with outpatient surgery center operating manuals, protocols, and procedures that comply with applicable Medicare certification requirements, state surgical clinic licensing requirements, and requirements for accreditation by the AAAHC, and shall train the ASC's staff members to use such manuals.

(g)  **Hiring and Operational Training of Nursing and Management Staff**

WASD shall assist the Surgery Center in the hiring of the ASC's personnel and shall train such staff members with respect to the operation of the ASC.

(h)  **Acquisition of Medical Supplies**

WASD shall, in consultation with CLIENT and other representatives

3

of the Surgery Center, plan and acquire on behalf of the Surgery Center medical supplies necessary to open and continually operate the Surgery Center.

(i)   Project Coordination

WASD shall assign a project manager employed by WASD and acceptable to CLIENT to undertake overall coordination of the ASC development project. In addition to frequent telephone contact, such manager shall meet periodically in person with CLIENT and other representatives of CLIENT. It is anticipated that such meetings will take place frequently during the development process, and such meetings will be held as reasonably requested by WASD or by CLIENT. At least one such meeting will occur each month during the development process.

(j)   Negotiation of Ancillary Agreements

WASD shall assist the Surgery Center and the Surgery Center's advisors in negotiating all service agreements required to operate the ASC. WASD shall negotiate and gain approval for the ASC representatives to execute these agreements on behalf of the ASC.

(k)   Licensing and Medicare Certification

WASD shall assist the Surgery Center and the Surgery Center's advisors in obtaining surgical clinic licensure and Medicare certification. WASD shall apply for all permits and licenses on behalf of the ASC. WASD shall attend the on-site survey for licensure and Medicare certification.

3.2   Restriction of Scope of Development Services

WASD's obligations under this Agreement do not include any services with respect to applying for or obtaining any certificate of need, or approval pursuant to Section 1122 of the Social Security Act, or any similar approval.

3.3   WASD Fees for Development Services

In consideration of WASD's development services pursuant to paragraph 3.1 of this Agreement, CLIENT shall pay WASD a total of $75,000.00 as fees for the Development Services for the Surgery Center which shall be payable as follows: (1) CLIENT shall pay WASD $10,000.00 as of the date of this Agreement;(2) CLIENT shall pay WASD $7,000.00 per month thereafter for a period of eight (8) months; and (3) CLIENT shall pay WASD $9,000 on the day the Medicare certification inspection is completed successfully. If Client decides not to use WASD to perform the construction management function, the total development fee will be reduced to $65,000.00. Payments shall be due the first day of the month following execution of this Agreement. Late payments shall bear interest at a maximum rate of 12 percent per annum.

3.4   Reimbursement of Out-of-Pocket Development Expenses

CLIENT will reimburse WASD for all reasonable and actual out-of-pocket expenses or charges, commencing as of the date of this Agreement, incurred by WASD on behalf of the Surgery Center in performing its duties hereunder. WASD shall submit receipts for such payments to CLIENT. CLIENT shall reimburse WASD for such expenses within thirty (30) days following receipt of each expense statement.

4

08/16/2004  10:25      219___0533                    LBJI                              PAGE  07/09

ARTICLE IV

INDEMNIFICATION

4.1    Indemnification

WASD shall indemnify and hold CLIENT, its employees and agents, harmless from any and all loss, liability or damage, of any kind whatsoever for which CLIENT shall not be reimbursed by insurance, including but not limited to attorneys' fees and court costs, arising out of or in any manner occasioned by breach by WASD , its agents, employees, servants or subcontractors, of any covenant and/or condition of this Agreement, or by the negligence, improper conduct or intentional acts or omissions of WASD, its agents, employees, servants or subcontractors.

CLIENT shall indemnify and hold WASD, its employees, partners and agents, harmless from any and all loss, liability or damage, of any kind whatsoever for which WASD shall not be reimbursed by insurance, including but not limited to attorneys' fees and court costs, arising out of or in any manner occasioned by breach by CLIENT, its agents, employees, servants or subcontractors, of any covenant and/or condition of this Agreement, or by the negligence, improper conduct or intentional acts or omissions of CLIENT, its agents, employees, servants or subcontractors.

ARTICLE V

REASONABLE BEST EFFORTS OF CLIENT

5.1    Reasonable Best Efforts

CLIENT and all of its directors, officers, employees, and agents, shall use their reasonable best efforts to assist WASD fulfilling its responsibilities under this Agreement.  WASD shall use its reasonable best efforts to perform its responsibilities under this Agreement.  The parties acknowledge that an outpatient surgery center development project, by is very nature, involves a series of complex, interrelated tasks which frequently involve unforeseeable circumstances and delays beyond the control of surgery center development consultants such as WASD.  Notwithstanding anything in this agreement to the contrary, the parties acknowledge that the ability of WASD to carry out its responsibilities hereunder, and WASD's ability to perform such responsibilities in a timely manner, may, in specific instances, depend upon circumstances, or upon the performance of actions by others, or the cooperation or providing information to WASD by others, beyond WASD's control.  WASD shall not in any way be deemed to be in default under this Agreement in the event that WASD is unable to perform the development services for which it is responsible under this Agreement within the time frames contemplated herein, to the extent that such inability results from circumstances, or the failure of persons or entities (including but not limited to the CLIENT and/or the parent of CLIENT and all of its directors, officers, employees, or agents), beyond WASD's control.

ARTICLE VI

MISCELLANEOUS

6.1    Arbitration

All claims, controversies, disputes, and disagreements arising out of or relating to this Agreement, including any alleged failure of performance

5

or any alleged breach of any provision of this Agreement shall be conducted in accordance with, and settled by the Commercial Arbitration Rules of the AAA (American Arbitration Association) and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereover.

## 6.2   Assignment and Delegation

Neither party shall assign any of their rights and interests, or delegate any of their obligations, under this Agreement to any other person or entity without the express written consent of the other party; provided however, that CLIENT may assign this Agreement to a successor organization within the first three months of this Agreement. No such assignment shall release the assignor from any obligation under this Agreement.

## 6.3   Agreement Binding on Successors

This agreement shall be binding on the parties' heirs, successors, and assigns.

## 6.4   Merger Clause and Amendment

This Agreement constitutes the entire and whole agreement between the parties hereto relating to the subject matter hereof, and may not be modified or amended except by a written instrument signed by each of the parties.

## 6.5   Waiver

No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or remedy hereunder preclude any further exercise thereof or the exercise of any other right, power or remedy. Each and all of the several rights and remedies of the parties hereto contained in or arising by reason of this Agreement shall be construed as cumulative unless otherwise explicitly provided, and no one of them is exclusive of the other or of any right or priority allowed by law or equity.

## 6.6   Governing Law

This Agreement is entered into in accordance with and shall be governed by the laws of the State of Indiana.

## 6.7   Severability

In the event that any of the provisions or portions of any provision of this Agreement is/are held to be unenforceable or invalid by any court of competent jurisdiction, the remaining portion(s) of any such provision and the remaining provisions shall remain in effect.

## 6.8   Attorney's Fees

In the event of any claim, controversy, dispute, or disagreement arising out of or relating to this Agreement, including any alleged failure of performance or any alleged breach of any provision of this Agreement, the prevailing party shall be entitled to recover from the other party all costs, including actual attorneys' fees incurred in connection therewith, including, but not limited to, actual attorneys' fees incurred in any arbitration, litigation, negotiations, document review, research,

6

analysis, office conferences, and telephone conferences undertaken by legal counsel in connection with any such claim, controversy, dispute, or disagreement.

6.9    Notices

Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given when deposited in the United States mail by certified or registered mail, postage prepaid, return receipt requested, or when hand delivered, and addressed as follows:

In the case of the CLIENT:

Lakeshore Surgicare, LLC
601 Gateway Boulevard
Chesterton, IN 46304

or to such other person or address as CLIENT may from time to time furnish to WASD in accordance with this Section 6.9.

In the case of WASD:

Woodrum/Ambulatory Systems Development LLC
175 North Harbor Drive, Suite 2006
Chicago, IL 60601-7361

with a copy to:

Woodrum/Ambulatory Systems Development LLC
7326 Wentwood Drive
Dallas, Texas 75231

or to such other person or address as WASD shall furnish to CLIENT in accordance with this Section 6.9.

IN WITNESS WHEREOF, the parties have executed this Agreement by and through their duly authorized representatives effective as of the date and year first above written.

WOODRUM/AMBULATORY SYSTEMS DEVELOPMENT, LLC

By: _____          8-13-04
        David L. Woodrum, Partner                    Date

FEIN Number: 75-2669577

LAKESHORE SURGICARE, LLC
By: _____          8/16/04
Print Name: David J. Musgrave MD
Title: Shareholder - Lakeshore Surgicare -

7

# EXHIBIT D

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Settlement Agreement") is made on October _____, 2007 by and between Woodrum/Ambulatory Systems Development, LLC ("WASD") on the one hand, and Lakeshore Surgicare, LLC ("Lakeshore"), on the other hand (WASD and Lakeshore will collectively be referred to as the "Parties").

## WITNESSETH

WHEREAS, WASD and Lakeshore entered into an August 16, 2004 Development Agreement ("Development Agreement"); and

WHEREAS, WASD initiated an arbitration claim before the American Arbitration Association against Lakeshore, AAA Case No. 52 193 E 00234 07 arising under the Development Agreement and Lakeshore has submitted a Counterclaim against WASD arising under the Development Agreement in the arbitration (the "Arbitration");

WHEREAS, this Settlement Agreement is made as a compromise between the Parties for the complete and final settlement of their respective claims, differences, and causes of action, without any admission of liability;

NOW THEREFORE, in consideration of the foregoing recitals, which by this reference are incorporated into and made a part of this Settlement Agreement, the mutual promises and covenants set forth below to be kept and performed by the Parties, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Lakeshore shall remit to WASD the lump sum total of Fourteen Thousand Dollars ($14,000.00) ("Payment") immediately upon Lakeshore's receipt of a counterpart of this Settlement Agreement executed by WASD. The Payment shall be by certified funds and shall be payable to WASD.

QBCHI\128492.00002\544687.1

**EXHIBIT**
"D"

2.      WASD and Lakeshore for themselves, their partners, members, managers, representatives, assigns, predecessors, successors, beneficiaries, administrators, alter-egos, affiliates, counsel, lenders, executors, and employees and each of them (the " Releasing Parties"), generally release, covenant not to sue, and forever discharge WASD and Lakeshore and their partners, representatives, assigns, predecessors, successors, beneficiaries, administrators, alter-egos, affiliates, counsel, lenders, executors, and employees and each of them (the  Released Parties") from any and all claims, demands or causes of action related in any way to, or arising out of, the Development Agreement, known or unknown, and any and all other past, present and future.  This release shall not apply to any and all claims that the Parties may have against each other that do not arise under the Development Agreement.

3.      This Settlement Agreement is binding upon, and inures to the benefit of, each Party to this Settlement Agreement, its heirs, executors, administrators, and to the Parties' present and former officers, directors, shareholders, partners, counsel, employees, agents, representatives, assigns, successors, direct and indirect subsidiary corporations and divisions, and anyone claiming any interest through them.

4.      The Parties further warrant and represent that they have read this Settlement Agreement and have been fully informed and have full knowledge of its terms, conditions and effects, and they have, either personally or through their attorneys, fully investigated to their full satisfaction the facts surrounding the various claims, controversies and disputes identified herein and understand and are fully satisfied with the terms and effects of this Settlement Agreement.  The Parties agree that no promise or inducement has been offered or made except as set forth herein, and that this Settlement Agreement is executed as their free act and deed without reliance on any statement or representation except as set forth herein.



5.    Whenever possible, each provision of this Settlement Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of the Settlement Agreement shall be held to be prohibited by, or invalid under, applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Settlement Agreement.

6.    This Settlement Agreement constitutes the entire agreement between the Parties relating to the matters identified herein and may not be modified in any manner, except by an instrument in writing signed by all of the Parties and initialed by all the Parties on all the pages.  No oral modifications to this Settlement Agreement shall be permitted.

7.    This Settlement Agreement shall be governed by, and construed in accordance with, the laws of the State of Indiana.  Any and all actions arising from this Settlement Agreement shall be brought in the appropriate Indiana state court and all Parties agree to submit to the jurisdiction of the Indiana courts and waive any and all claims of *forum non conveniens*.  The prevailing party shall be entitled to recover from the non-prevailing party its reasonable attorney's fees and costs as to any claims or litigation arising out of this Settlement Agreement.

8.    This Settlement Agreement may be simultaneously executed in two or more counterparts, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute a single agreement.

9.    Signatures provided by the Parties hereto via facsimile transmission or via PDF shall be sufficient to bind the Parties to this Settlement Agreement.



10.    The Parties and the signatories hereto hereby represent and warrant to each other that the individual executing the Settlement Agreement for each Party has the full authority to execute this Settlement Agreement on behalf of the signatory's principal.

11.    The Parties shall take all actions necessary to dismiss their respective claims and counterclaims in the Arbitration.

IN WITNESS WHEREOF, the Parties have caused this Settlement Agreement to be executed on the date last set forth below:

_____        _____
Woodrum/Ambulatory Systems Development,     Lakeshore Surgicare, LLC
LLC

By: _____        By: _____

Its: _____       Its: _____
    Duly Authorized Representative              Duly    Authorized    Representative

Dated: _____        Dated: _____

# EXHIBIT E



# Court Information Release

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION
### 219 SOUTH DEARBORN STREET
### CHICAGO, IL 60604

**Release Date:**
May 9, 2008

**Contact:**    Joel Daly
(312) 435-5693 (phone)
(312) 554-8239 (fax)
joel_daly@ilnd.uscourts.gov

## CHIEF JUDGE HOLDERMAN DELIVERS
## ANNUAL STATE OF THE COURT ADDRESS

CHICAGO – The state of the court is "Good" according to Chief Judge James F. Holderman in his annual "State of the Court Address," which he delivered on May 9, 2008 – the 160th anniversary of legislation establishing Chicago as an authorized site for a United States District Court in the State of Illinois.

Holderman said there was a brief period this past year that the district court was at full strength: after newly-appointed District Judge Robert Dow joined the court and before former District Judge Mark Filip resigned to take the number two post in the United States Department of Justice.

On the magistrate judge bench, Magistrate Judge Susan Cox joined the court in late August 2007. Magistrate Judge Morton Denlow completed his term as the presiding magistrate judge in January 2008, and Magistrate Judge Sidney Schenkier took over that post. The 8-year terms of Magistrate Judge Geraldine Soat Brown in Chicago and Magistrate Judge P. Michael Mahoney in Rockford were renewed in April 2008.

On the bankruptcy court, Chief Judge Carol Doyle assumed the role of chief judge on July 1, 2007, when former Chief Judge Eugene Wedoff completed his term.

The court's civil case load remained fairly steady in 2007 at 7,606 new civil case filings, 99.5% of the civil filings in 2006. The court remained in the top ten districts across the country in median time from filing to disposition of civil cases, at 6.2 months. On the criminal side, 933 defendants were charged with felonies in the district during 2007, down 15% from the 1,106 felony defendants charged in 2006.

Electronic filing continues to run smoothly. The court now has over 17,800 registered e-filers, 20% more than at the end of 2006. E-filings of initial complaints commenced November 1, 2007 as did electronic filing fee payments through the pay.gov system. The court receives over 660 e-filings each business day and about 25 new civil complaints are e-filed each day.

**EXHIBIT**

"E"

In response to a survey of approximately 5,000 lawyers and the docketing departments of 80 law firms in the Northern District of Illinois, the court redesigned its website to make the information most readily desired more readily accessible. The new website design was launched on March 1, 2008. At that time, the court also introduced a mobile version of its website, the first United States District Court in the country to do so.

Judicial security has been beefed-up at judges' homes due to legislation sponsored by Senator Dick Durbin. Also thanks to Senator Dick Durbin, long awaited construction of the new United States Courthouse in Rockford will get underway later this month.

The court continues to provide judges with criminal background checks of jurors upon the presiding judge's request and continues to provide employment protection for jurors when needed. The court this past year also continued a number of programs to enhance access to justice for those who could otherwise not afford it by encouraging *pro bono* representation by lawyers, providing a *Pro Se* Help Desk, which advises *pro se* litigants on court procedures, and continuing the Settlement Assistance Program for *pro se* litigants. The court also has continued to work cooperatively with the media in its coverage of cases and events at the Dirksen U.S. Courthouse.

Several judges of the court participated in a variety of continuing legal education and other education programs in 2007. Some judges also served by designation on other federal courts, both trial and appellate, outside the Northern District of Illinois to assist those courts with their workloads.

In 2007, the court hosted numerous programs for visiting schoolchildren from the Chicago area, as well as for foreign judges and dignitaries from ten foreign countries. Administrative law judges from eleven different governmental agencies held proceedings at the courthouse during 2007. And the court hosted five different congressional hearings for U.S. Senators and Representatives at the Dirksen U.S. Courthouse.

Chief Judge Holderman said, "the judges of the court will steadfastly continue their mission to administer justice by upholding the Constitution and the Rule of Law for all people." He thanked those in attendance for their assistance in that endeavor during the past year and stated he looked forward to the challenges of the year to come.